# EXHIBIT B
# COMPLAINT AND EXHIBITS

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 25CV_____-310

25CV008835-310

LEE CONSTRUCTION COMPANY OF THE
CAROLINAS, INC.,

                    Plaintiff,

v.

FLATIRON DRAGADOS USA, INC. formerly
known as DRAGADOS USA, INC.; LIBERTY
MUTUAL INSURANCE COMPANY;
FIDELITY DEPOSIT COMPANY OF
MARYLAND; ZURICH AMERICAN
INSURANCE COMPANY; THE
CONTINENTAL INSURANCE COMPANY;
and XL SPECIALTY INSURANCE
COMPANY,

                    Defendants

**COMPLAINT**

NOW COMES Plaintiff Lee Construction Company of the Carolinas, Inc., complaining of

Defendants Flatiron Dragados USA, Inc., formerly known as Dragados USA, Inc.; Liberty Mutual

Insurance Company; Fidelity Deposit Company of Maryland; Zurich American Insurance

Company; The Continental Insurance Company; and XL Specialty Insurance Company, alleges

and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Lee Construction Company of the Carolinas, Inc. ("Lee"), is a corporation

organized and existing under the laws of the State of North Carolina, with its principal place of

business in Mecklenburg County, North Carolina.  Lee is a licensed general contractor in the State

of North Carolina.



2. Defendant Flatiron Dragados USA, Inc. is a corporation organized under the laws of a foreign jurisdiction and is authorized to conduct business in North Carolina. Flatiron Dragados USA, Inc. was formerly known as Dragados USA, Inc. ("DUSA"). DUSA acted as the general contractor on a highway project awarded by the North Carolina Department of Transportation ("NCDOT"), as described more fully below. DUSA engaged in acts in the State of North Carolina and in Durham County making it subject to the jurisdiction of this Court.

3. Defendants Liberty Mutual Insurance Company, Fidelity Deposit Company of Maryland, Zurich American Insurance Company, The Continental Insurance Company, and XL Specialty Insurance Company are insurance companies authorized to conduct business in the State of North Carolina and as such are authorized to issue surety bonds in the State of North Carolina. These defendants performed acts in the State of North Carolina by issuing a surety bond as more specifically described below, thereby making them subject to the jurisdiction of this Court under North Carolina General Statutes Chapter 44A, Article 3.

4. Venue is proper in Durham County pursuant to N.C. Gen. Stat. § 1-82 because the events giving rise to this Complaint occurred in this State and County, and also is proper in Durham County pursuant to N.C. Gen. Stat. § 44A-28(a) as the lawsuit relates to a surety bond issued for work on a state project to be performed in Durham County.

5. Jurisdiction is proper in the Superior Court Division pursuant to N.C. Gen. Stat. § 7A-243 because the amount in controversy exceeds $25,000.

## FACTUAL ALLEGATIONS

6. Lee incorporates paragraphs 1 through 5 as if fully restated herein.

7. DUSA served as the prime contractor on the NCDOT project known as the "East End Connector." The project extended from north of North Carolina Highway 98 to North

2

Carolina Highway 147 (also known as the Buck Dean Freeway) in Durham, North Carolina (the "Project").

8.      Defendants Liberty Mutual Insurance Company, Fidelity Deposit Company of Maryland, Zurich American Insurance Company, The Continental Insurance Company, and XL Specialty Insurance Company issued a Contract Payment Bond dated December 15, 2014, obligating themselves to pay any unsatisfied obligations of DUSA on the Project.  The Contract Payment Bond is attached as Exhibit 1.

9.      DUSA retained Extreme Concrete Cutting of Gaffney, LLC ("Extreme") to perform rehabilitation and repair work on Bridge 188 (Durham Freeway eastbound known as Bridge 15), Bridge 189 (Durham Freeway westbound known as Bridge 14), Bridge 191 (Durham Freeway eastbound known as Bridge 13), and Bridge 192 (Durham Freeway westbound known as Bridge 12) at the Project pursuant to a Subcontract dated November 16, 2016. The Subcontract is attached as Exhibit 2 (the "Extreme Subcontract").  United States Fire Insurance Company ("U.S. Fire") issued a Performance Bond and a Payment Bond, each numbered 602-107065-9, on behalf of Extreme in relation to the Extreme Subcontract. The Bonds issued by U.S. Fire are attached as Exhibit 3 (the "Extreme Bonds").

10.     DUSA terminated Extreme from the Project and the Extreme Subcontract by letter dated June 20, 2019, and made a demand on U.S. Fire under the Extreme Bonds.

11.     U.S. Fire and DUSA entered into a Completion Agreement, dated February 11, 2020, pursuant to which U.S. Fire arranged for completion of the Extreme Subcontract pursuant to and subject to the Extreme Bonds and the Extreme Subcontract.  The Completion Agreement between U.S. Fire and DUSA is attached as Exhibit 4 (the "U.S. Fire Completion Agreement").

3

12.     After entering into the U.S. Fire Completion Agreement with DUSA, U.S. Fire invited several contractors, including Lee, to offer a bid proposal for the work originally contracted to Extreme.  The bid request of U.S. Fire was based upon the subcontract between Extreme and DUSA.  Based upon the bids received, U.S. Fire retained Lee as the replacement contractor to complete the Extreme Subcontract.  The completion agreement between U.S. Fire and Lee dated January 31, 2020, is attached as Exhibit 5 (the "Lee Completion Agreement").

13.     Additionally, Lee entered into a separate direct subcontract with DUSA to perform bearing and anchor bolt replacement work on the Project (the "Lee Direct Subcontract").

14.     The work on the bridges at the Project under the Lee Completion Agreement included, among other items, concrete and steel repairs, epoxy injection, shotcrete, protective coating, girder jacking, and bearing replacement.

15.     For certain bridges under the Lee Completion Agreement, the scope of work included Item 691 – Structural Steel for Girder Repair – with a bid quantity of 42,000 pounds of steel to be cut out and replaced per plans prepared by Simpson Engineers & Associates ("SEA"), a firm engaged by NCDOT.

16.     SEA provided a sequence of work that included shifting the traffic pattern to remove any live load from the area under repair.  As such, the contract included repairs based on SEA's submissions with no load or traffic above areas undergoing active repairs.

17.     Furthermore, Extreme, as the previous subcontractor, provided DUSA, and subsequently Lee, with submittals that were previously approved by NCDOT and included the means and methods prescribed by SEA, including methods for eliminating any live load or traffic while repairs were undertaken.

4

18.     DUSA failed to perform earlier project work in accordance with SEA's sequence of construction and scope, rendering the originally designed steel repair method unachievable. As a result, the repairs were unable to be completed with the absence of a live load or traffic above, rendering Lee's bid to U.S. Fire for the Lee Completion Agreement obsolete and inexecutable. A revised scope of work under the Lee Completion Agreement therefore was necessary, but neither DUSA nor NCDOT ever prepared a revised scope of work that was incorporated into the Lee Completion Agreement but rather gave directives to Lee to perform work in specific manners as described below.

19.     DUSA's failure to follow SEA's sequence further rendered SEA's girder repair means and methods obsolete. Lee was advised that NCDOT was considering alternative methods. Consequently, Lee was directed by DUSA and NCDOT to begin other work on the Project while the steel repair scope remained unresolved.

20.     In July 2020, NCDOT's Materials and Test Unit ("M&T") issued revised Beam Plating Repair Details, drastically altering the work by requiring replacing cut-outs with small steel patch plates and reducing the scope of steel to be used from 42,000 pounds to an estimated 2,500 pounds per bridge.

21.     This change in the amount of steel to be used constituted a material change to the scope, means, and method of the work to be performed by Lee. The revised scope increased labor and installation costs despite the reduced steel quantity.

22.     In April 2021, M&T issued further inspection reports, none of which clarified or confirmed a definitive scope of steel repairs.

23.     DUSA instructed Lee to proceed with the steel repairs even though the scope of repairs was still unclear, forcing Lee to begin work on-site.

5

24.     Lee subcontracted the welding to Surelift, Inc., which in turn hired a disadvantaged business enterprise, Tidewater Blue Arc, LLC ("Tidewater"), a firm with NCDOT-certified welders.

25.     In accordance with the due diligence required of a subcontractor, both Lee and Tidewater inspected previously approved repairs to better understand the specific expectations and requirements of NCDOT and its representatives.

26.     Work commenced and progressed under the inspection and oversight of the NCDOT.  However, in August 2021, M&T halted the work of Lee and Tidewater, claiming it was noncompliant despite having previously overseen and approved such work.

27.     Contrary to industry standard, M&T then required Lee to hire a third-party certified welding inspector.  Lee retained S&ME, a well-regarded materials testing and engineering firm. as the welding inspector, which issued a 357-page report noting minor deficiencies typical in field welding.  M&T further limited Tidewater's scope of work by refusing to allow any Tidewater welders to work on any new sections of the Project until all minor corrective work was completed.

28.     M&T subsequently revoked Tidewater's welder certifications and prevented Tidewater employees from returning to Project - or any other NCDOT project - even after Tidewater complied with additional testing for reinstatement of its welder certifications.  This action went beyond the requirements under NCDOT's field welder certification program and the American Welding Society's certified welder requirements.

29.     M&T's, and therefore NCDOT's, revocation, of Tidewater's certification forced Lee to hire more costly substitute welders in order to mitigate delays and disruptions.

30.     Lee intended to allow Tidewater to remedy all items noted by S&ME based upon the promises made by M&T to reverse the revocation of the welding certifications and to reinstate

the certifications of the Tidewater welders. However, M&T did not follow through with its promise to reinstate the certifications, and Tidewater was arbitrarily removed from the Project, prohibiting it from correcting and completing its scope of work. This wrongful act forced Lee to hire two additional, and more expensive, welding firms at the direction of M&T.

31. Lee hired Metalcraft Specialties and Barnes Welding to complete the welding work at the Project, but both companies needed additional time to become familiar with the work, exacerbating delays and costs. Additionally, both companies experienced unusually rigorous inspection requirements that far exceeded normal NCDOT standards.

32. M&T instructed Barnes to remove and replace most of Tidewater's work, further escalating costs and delays.

33. The revised scope of work reduced the originally bid quantities of 42,000 pounds to 4,940.60 pounds of steel. NCDOT paid the lesser amount, and the reduced quantity paid by NCDOT was far short of the original 42,000 pounds bid by Lee.

34. The final work performed bore little resemblance to the original SEA plans. The plating added limited structural value compared to the originally designed means and methods.

35. Due to compliance with all NCDOT directives, Lee incurred significant additional costs and delays.

36. Lee and/or its subcontractors achieved substantial completion of the Direct Subcontract and the Lee Completion Agreement no later than September 2023, yet DUSA has failed and refused to pay sums due to U.S. Fire under the U.S. Fire Completion Agreement (which in turn encompassed the work performed by Lee under the Lee Completion Agreement) since January 2022. U.S. Fire is currently due no less than $441,944.56, plus interest, fees, and costs from DUSA under the U.S. Fire Completion Agreement.

4907-7809-3654, v. 1

37.     Under the terms of an agreement dated March 23, 2025, U.S. Fire assigned all of its rights under the U.S. Fire Completion Agreement to Lee, and Lee therefore is the owner of and has the legal right to pursue all claims of U.S. Fire, including but not limited to claims of U.S. Fire against DUSA and the Surety.

38.     U.S Fire has made demand upon DUSA and the Surety for payment of monies due under the U.S. Fire Completion Agreement.  DUSA has refused to pay to U.S. Fire monies due and owing under the U.S. Fire Completion Agreement despite these repeated demands.

39.     After the demand was made by U.S. Fire, on August 26, 2024, U.S. Fire, DUSA, Lee, and the Surety entered into a Tolling Agreement that tolled any applicable statutes of limitation from the date of that agreement until it was terminated.  Pursuant to the terms of the Tolling Agreement (as extended and amended on February 25, 2025), the Tolling Agreement is set to expire on August 30, 2025.

40.     The U.S. Fire Completion Agreement incorporates the Extreme Subcontract, and Article 27 of the Extreme Subcontract provides that claims, disputes, or other matters in controversy between DUSA and Extreme under or relating to the Extreme Subcontract shall be subject to non-binding mediation, administered by the American Arbitration Association ("AAA"), as a condition precedent to dispute resolution.  U.S. Fire, DUSA, and Lee participated in a mediation, administered through the American Arbitration Association, on November 25, 2024. No resolution of the disputes was reached by the mediation.

41.     U.S. Fire has satisfied all conditions necessary to file suit and is entitled payment from DUSA in the amount of $441,944.56, plus interest, fees, and costs.

8

42.     Since the Project was completed, Lee has diligently submitted its cost documentation to DUSA, expecting its request for equitable adjustment would be included in a pass-through request for equitable adjustment to NCDOT.

43.     Discussions occurred between Lee and DUSA about the request for equitable adjustment of Lee, and DUSA confirmed it was reviewing the information and suggested that it would submit the request for equitable adjustment of Lee.

44.     Based upon comments from DUSA, on March 18, 2024, Lee provided updated information and a revised request to DUSA.  Lee and DUSA continued to discuss the request over the ensuing months of 2024, including submitting a further revised request on November 25, 2024.

45.     DUSA had never submitted a request for equitable adjustment to NCDOT that included the request of Lee, despite repeated requests by Lee that it do so.

46.     Lee had been informed by employees of NCDOT that the Department would consider the request for equitable adjustment of Lee once it was submitted by DUSA.

47.     On December 16, 2024, without prior notice to Lee, and despite knowledge of Lee's long-standing request to submit the claim for equitable adjustment to NCDOT, DUSA entered into an agreement with NCDOT to close out the Project and waived all remaining claims on the Project, including subcontractor pass-through claims such as the claim of Lee as described above.

48.     DUSA did not notify Lee of the agreement it reached with NCDOT and either (a) wrongfully retained monies received from NCDOT intended to address the work performed by Lee, or (b) failed to preserve or protect Lee's interests by closing out the Project without submitting the request for equitable adjustment of Lee.  Lee has been damaged by the actions of DUSA under either scenario.

9

49. By entering into the agreement with NCDOT to close out the Project and to waive all claims arising out of the Project, DUSA precluded Lee from seeking equitable adjustment or reimbursement for its costs directly or indirectly from NCDOT. The request of Lee for additional compensation and for equitable adjustment or cost reimbursement would have been in excess of $1,605,027.88. Due to the wrongful and intentional actions of DUSA in settling its claims with NCDOT and waiving all claims on the Project without protecting and preserving the rights of its subcontractor or in wrongfully withholding monies received from NCDOT that were intended to address the request of Lee of equitable adjustment and/or the additional work performed by Lee as described above, Lee has been damaged in an amount in excess of $25,000.00, with specific damages to be proven at trial.

## FIRST CAUSE OF ACTION
### Breach of Contract (DUSA)

50. Lee incorporates paragraphs 1 through 49 above as if fully restated herein.

51. DUSA and U.S. Fire entered into a binding subcontract, and U.S. Fire and Lee in turn entered into a binding subcontract.

52. As the prime contractor with NCDOT, DUSA had a legal obligation to present any claims of lower tier subcontractors such as Lee to NCDOT. As Lee did not have a contract with NCDOT, the only legally viably method of presenting such claims would be through DUSA as the general contractor with NCDOT.

53. Lee met its obligations under the Lee Completion Agreement and the U.S. Fire Completion Agreement and performed work at the Project for which Lee was not compensated.

54. Lee relied upon DUSA to fulfill its duties under the Lee Completion Agreement and the U.S. Fire Completion Agreement.

10

55.     DUSA breached its obligations to Lee by failing to preserve Lee's right to equitable adjustment or cost reimbursement and refusing to pay for changed work directed by the NCOT.

56.     DUSA further breached its obligations to U.S. Fire under the U.S. Fire Completion Agreement by wrongfully withholding monies rightfully owed under the U.S. Fire Completion Agreement, which in turn includes any claims of Lee under the Lee Completion Agreement. Lee has been assigned all claims of U.S. Fire under the U.S. Fire Completion Agreement and has the right to assert all claims of U.S. Fire under that Agreement.

57.     As a result of the breach of contract by DUSA, Lee suffered damages an amount in excess of $25,000.00, with specific damages to be proven at trial.

## SECOND CAUSE OF ACTION
### Breach of Contract Payment Bond (Surety)

58.     Lee incorporates the allegations of Paragraphs 1 through 57 above as if fully restated herein.

59.     Defendants Liberty Mutual Insurance Company, Fidelity Deposit Company of Maryland, Zurich American Insurance Company, The Continental Insurance Company, and XL Specialty Insurance Company (collectively the "Surety") issued a Contract Payment Bond dated December 15, 2014, obligating themselves to pay any unsatisfied obligations of DUSA on the Project.

60.     As described above, U.S. Fire furnished labor and materials for the Project under the Completion Agreement in accordance with the terms and conditions of the contract. U.S. Fire has assigned all claims for this work to Lee.

61.     U.S. Fire has fulfilled all its obligations under the Completion Agreement.

62.     Despite Plaintiff's performance, DUSA has failed to pay U.S. Fire the sum of $441,944.56 for the labor and material provided, despite demands for payment.

4907-7809-3654, v. 1

63.     On or about March 9, 2023, September 21, 2023, and November 16, 2023, U.S. Fire provided notice to both DUSA and Surety of DUSA's non-payment and demanded payment from Surety under the terms of the Contract Payment Bond.

64.     The Contract Payment Bond constitutes a valid and enforceable contract between the DUSA, the Surety, and those who furnished labor and materials to the Project, including U.S. Fire and Lee.

65.     Lee, directly and as assignee of U.S. Fire, is a party for whose benefit the Contract Payment Bond was issued.

66.     Lee, directly and as assignee of U.S. Fire, performed its obligations under the U.S. Fire Completion Agreement with DUSA.

67.     DUSA breached its payment obligations to U.S. Fire under the U.S. Fire Completion Agreement. Lee has been assigned all claims arising from this breach by DUSA.

68.     Surety, through the Contract Payment Bond, guaranteed DUSA's payment obligations to those who furnished labor and materials to the Project.

69.     Surety breached its obligations under the Contract Payment Bond by failing to pay Plaintiff the outstanding amount after DUSA's default.

70.     As a direct and proximate result of Surety's breach of its obligations under the Contract Payment Bond, Plaintiff has suffered damages in the amount of $441,944.56.

71.     As a result of Defendants' breaches, Plaintiff has incurred damages, including but not limited to the unpaid amount owed of $441,944.56 for labor and materials furnished, plus interest, costs, and attorney fees as allowed by law.

4907-7809-3654, v. 1

## THIRD CAUSE OF ACTION
### Breach of Duty of Good Faith and Fair Dealing (DUSA)

72.     Lee incorporates the allegations of Paragraphs 1 through 71 above as if fully set forth herein.

73.     DUSA had a duty to act fairly and in good faith in the administration of its subcontract with Lee and its completion agreement with U.S. Fire.

74.     As Lee did not have a contract with NCDOT, the only legally viably method of presenting such claims would be through DUSA as the general contractor with NCDOT.  DUSA had a duty of good faith and fair dealing with its subcontractors, including lower tier subcontracts such as Lee, to ensure that claims for equitable adjustment or cost reimbursement are submitted to NCDOT and that the rights of its subcontractors are preserved and protected.

75.     DUSA breached that duty by failing to pursue Lee's claim for equitable adjustment or cost reimbursement and waiving such without notice or opportunity to pursue those claims by Lee.

76.     As a result of the wrongful acts by DUSA, Lee suffered damages an amount in excess of $25,000.00, with specific damages to be proven at trial.

## FOURTH CAUSE OF ACTION
### Promissory Estoppel (DUSA)

77.     Lee incorporates the allegations of Paragraphs 1 through 76 above as if fully set forth herein.

78.     DUSA made representations to Lee that Lee's claim for equitable adjustment or cost reimbursement would be submitted to NCDOT.

79.     Lee reasonably relied on those promises and incurred significant costs in preparing documentation and continuing work.

13

80. Justice requires enforcement of that promise or reimbursement for reliance damages.

81. As a result of the wrongful acts by DUSA, Lee suffered damages in an amount in excess of $25,000.00, with specific damages to be proven at trial.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty (DUSA)

82. Lee incorporates the allegations of Paragraphs 1 through 81 above as if fully set forth herein.

83. Lee had no privity with NCDOT and relied on DUSA to assert its claim for equitable adjustment.

84. DUSA had a fiduciary duty to Lee that it would seek payment on Lee's behalf of NCDOT.

85. DUSA breached its duty to Lee by settling with NCDOT and waiving Lee's claim without authority or compensation.

86. Lee was damaged as a direct result of this breach. As a result of the breach of contract by DUSA, Lee suffered damages in an amount in excess of $25,000.00, with specific damages to be proven at trial.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation (DUSA)

87. Lee incorporates the allegations of Paragraphs 1 through 86 above as if fully set forth herein.

88. DUSA represented to Lee that Lee's claim would be evaluated and submitted to NCDOT.

89.     Lee reasonably relied upon DUSA's representations that it would present and submit Lee's claim to NCDOT.

90.     DUSA's representation that it would evaluate and submit Lee's claim to NCDOT was false and/or was made without reasonable care and without intentions of presenting Lee's claim to NCDOT.

91.     DUSA knew or should have known it was in settlement negotiations with NCDOT over the Project that would waive all claims of Lee and knew or should have known that it was proceeding in settlement negotiations with NCDOT without submission of Lee's claims despite DUSA's representations to Lee to the contrary.

92.     DUSA failed to exercise reasonable care in communicating the true status of the claim with NCDOT to Lee, and Lee relied upon these negligent misrepresentations to its detriment.

93.     As a result of these misrepresentations, Lee suffered damages in an amount in excess of $25,000.00, with specific damages to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Lee Construction Company of the Carolinas, Inc, respectfully requests the following prayer for relief:

1.     That Lee, as assignee of U.S. Fire, have and recover from Dragados USA, Inc., the outstanding amount owed for labor and materials in the sum of at least $441,944.56 or in such other amounts as may be proven at trial;

2.     That Lee, as assignee of U.S. Fire, have and recover from the Surety the sum of $441,944.56 owed by DUSA for labor and materials performed on the Project or in such other amounts as may be proven at trial;

15

4907-7809-3654, v. 1

3.      That Lee recover damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) from Dragados USA for breach of its obligations to Lee as set forth in the Complaint, in such amounts as may be proven at trial;

4.      For interest as allowed by law and/or the Contract Payment Bond terms;

5.      That it recover attorneys' fees and costs as allowed by law or contract, including but not limited to attorneys' fees as allowed under North Carolina General Statues § 44A-35;

6.      FOR A TRIAL BY JURY ON ALL ISSUES OF FACT SO TRIABLE; and

7.      For such other and further relief as the Court deems just and proper.

This 21st day of August, 2025.

**RAGSDALE LIGGETT PLLC**

BY:     */s/ William W. Pollock*
        William W. Pollock
        N.C. Bar No.: 19381
        Amie C. Sivon
        N.C. Bar No.: 34206
        2840 Plaza Place, Suite 400
        Raleigh, NC  27612
        Telephone: (919) 787-5200
        Facsimile: (919) 783-8991
        Email: bpollock@rl-law.com
               asivon@rl-law.com
        *Attorneys for Plaintiff*

4907-7809-3654, v. 1

Rev 5-17-11

Bond No.
015046470 (Liberty)
PRF09172566 (F&D/Zurich)
929591500 (CIC)
US00068253SU14A (XL)

# CONTRACT PAYMENT BOND

| | |
|---|---|
| Date of Payment Bond Execution | December 15, 2014 |
| Name of Principal Contractor | Dragados USA, Inc. |
| Name of Surety: | Liberty Mutual Insurance Company, Fidelity and Deposit Company of Maryland, Zurich American Insurance Company, The Continental Insurance Company, XL Specialty Insurance Company |
| Name of Contracting Body: | **North Carolina Department of Transportation** **Raleigh, North Carolina** |
| Amount of Bond: | One Hundred Forty-One Million Nine Hundred Forty-Nine Thousand Five Hundred and 00/100 ($141,949,500.00) Dollars |
| Contract ID No.: | C203394 |
| County Name: | Durham |

KNOW ALL MEN BY THESE PRESENTS, That we, the PRINCIPAL CONTRACTOR (hereafter, PRINCIPAL) and SURETY above named, are held and firmly bound unto the above named Contracting Body, hereinafter called the Contracting Body, in the penal sum of the amount stated above for the payment of which sum well and truly to be made, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the principal entered into a certain contract with the Contracting Body, numbered as shown above and hereto attached:

NOW THEREFORE, if the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, then this obligation to be void; otherwise to remain in full force and virtue.

IN WITNESS WHEREOF, the above-bound parties have executed this instrument under their several seals on the date indicated above, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

**Exhibit**

**1**

# CONTRACT PAYMENT BOND

*Affix Seal of Surety Company*

Liberty Mutual Insurance Company, Fidelity and Deposit Company of Maryland, Zurich American Insurance Company, The Continental Insurance Company, XL Specialty Insurance Company

Print or type Surety Company Name

By    Andrea E. Gorbert

Print, stamp or type name of Attorney-in-Fact

Signature of Attorney-in-Fact

Signature of Witness

Anne Potter

Print or type Signer's name

390 N. Broadway, Jericho, NY 11753

Address of Attorney-in-Fact

# CONTRACT PAYMENT BOND

## CORPORATION

### SIGNATURE OF CONTRACTOR (Principal)

Dragados USA, Inc.
_____
Full name of Corporation

810 Seventh Avenue, 9th Floor, New York, NY 10019
_____
Address as prequalified

By _____
Signature of President, Vice President, Assistant Vice President
_Select appropriate title_ **CFO**

Fernando Gonzalez Alcaniz
_____
Print or type Signer's name

_Affix Corporate Seal_

Attest _____
Signature of Secretary, Assistant Secretary
_Select appropriate title_

Joseph G. Portela
_____
Print or type Signer's name

## DRAGADOS USA, INC.

**Subcontract 037a- Structure Rehabilitation**

| Date | |
|---|---|
| | November 17, 2016 |

| | | |
|---|---|---|
| CONTRACTOR:<br>Dragados USA, Inc.<br>4600 Marriott Drive, Suite 140<br>Raleigh, NC 27612 | Attention:<br><br>Jose Ignacio Martin Alos | ("Contractor") |
| SUBCONTRACTOR:<br>Extreme Concrete Cutting of Gaffney, LLC<br>115 Madison Ave.<br>Gaffney SC 29340 | Attention:<br><br>Christopher H. Myles | ("Subcontractor") |
| WORK: | Rehabilitation and Repair – Bridges 12, 13, 14, and 15 | |
| PROJECT: | East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway)<br>Durham, NC | ("Project") |
| OWNER: | North Carolina Department of Transportation<br>1550 Mail Service Center<br>Raleigh, NC 27699-1550 | ("Owner") |
| ARCHITECT-ENGINEER: | NCDOT<br>MA Engineering Consultants, Inc. | ("Architect") |
| PRIME CONTRACT: | C203394     Dated:     Nov. 12, 2014<br>WBS 34745.3.S2 | ("Contract") |
| SUBCONTRACT PRICE: | Two Million, One Hundred Thirty Thousand, Six Hundred Seventy Five Dollars and Ninety Six Cents.<br>    ($     2,130,675.96     ) | ("Price") |
| MONTHLY BILLING DATE: | 25th Callender Day of each month | ("Monthly Billing Date") |
| RETAINED PERCENTAGE: | 0   % | ("Retained Percentage") |
| CHANGE ORDER OVERHEAD AND PROFIT: | % | ("Profit Percentage") |

*CHM*
*See Exhibit D (MO) 1/12/17*

PAYMENT AND PERFORMANCE BONDS:     100%          Required ☒ Not Required ☐

(The above terms are incorporated by reference and are more fully explained below.)

Contractor, and Subcontractor, with offices at the addresses shown above, agree for themselves, their successors and assigns as follows:

**Exhibit**

**2**

Initialed _____ DUSA / _____ Subc.

# CONTENTS

PAGE

ARTICLE 1, WORK .............................................................................................. 3
ARTICLE 2, PRICE ............................................................................................. 3
ARTICLE 3, PROGRESS PAYMENTS ............................................................... 3
ARTICLE 4, FINAL PAYMENT ........................................................................... 4
ARTICLE 5, PAYMENT CONDITIONS ................................................................ 4
ARTICLE 6, TIME ............................................................................................... 5
ARTICLE 7, EXTENSIONS OF TIME ................................................................. 6
ARTICLE 8, CHANGE ORDERS ........................................................................ 6
ARTICLE 9, NOTICES ....................................................................................... 7
ARTICLE 10, BONDS ......................................................................................... 7
ARTICLE 11, INSURANCE ................................................................................. 7
ARTICLE 12, INDEMNITY .................................................................................. 7
ARTICLE 13, ASSIGNMENT .............................................................................. 8
ARTICLE 14, COMPLIANCE .............................................................................. 8
ARTICLE 15, SAFETY ....................................................................................... 9
ARTICLE 16, CLEAN UP .................................................................................. 10
ARTICLE 17, TEMPORARY FACILITIES .......................................................... 10
ARTICLE 18, QUALITY ..................................................................................... 10
ARTICLE 19, GUARANTEES AND WARRANTIES ........................................... 10
ARTICLE 20, SUBMITTALS .............................................................................. 10
ARTICLE 21, PERFORMANCE ......................................................................... 11
ARTICLE 22, LIENS .......................................................................................... 11
ARTICLE 23, PATENTS .................................................................................... 11
ARTICLE 24, LABOR ........................................................................................ 12
ARTICLE 25, DAMAGE ..................................................................................... 12
ARTICLE 26, DEFAULT .................................................................................... 12
ARTICLE 27, DISPUTES ................................................................................... 13
ARTICLE 28, EARLY TERMINATION ................................................................ 14
ARTICLE 29, SETOFF ...................................................................................... 14
ARTICLE 30, MISCELLANEOUS ...................................................................... 14
SCHEDULE 1 — CONTRACT DOCUMENTS .................................................. 16
SCHEDULE 2 — PERFORMANCE SCHEDULE .............................................. 17
SCHEDULE 3 — TEMPORARY FACILITIES ................................................... 17
SCHEDULE 4 – EMPLOYMENT ELIGIBILITY VERIFICATION ........................ 18

Initialed _____ DUSA / _____ Subc.

Case 1:25-cv-00870-JLD   Document 1-2   Filed 09/09/25   Page 22 of 98

## ARTICLE 1, Work

The term "Work" means: (i) the furnishing and performance of all labor and materials by Subcontractor, at or for the benefit of the Project which is within the general scope of this Subcontract (as set forth in Exhibit B) and the Contract Documents (as that term is defined in Schedule 1), or which can be reasonably inferred from the general scope of this Subcontract or the Contract Documents; (ii) unless specifically expressly excepted, the furnishing by Subcontractor of all labor, material, equipment, supplies, plant, tools, scaffolding, hoisting, temporary facilities, transportation, superintendence, inspections and temporary construction of every nature; (iii) that which is to be produced and supplied pursuant to this Subcontract; and (iv) the obligation of Subcontractor to visit the Project site, and to fully acquaint and familiarize itself with the site, surrounding and subsurface conditions and the character of the operations to be carried on at the site, and make such investigations as Subcontractor may deem fit or as may be prudent for Subcontractor to fully understand the facilities, physical conditions and restrictions attending the Work. All Work shall be completed strictly in accordance with the requirements of this Subcontract and the Contract Documents.

The Contract Documents are available for examination by Subcontractor at all reasonable times at the office of Contractor. Subcontractor represents and agrees that it has carefully examined and understands the Contract Documents relevant to the Work; has adequately investigated the nature and conditions of the Project site and locality; has familiarized itself with conditions affecting the difficulty of the Work; and has entered into this Subcontract based on its own examination, investigation and evaluation and not in reliance upon any opinions or representations of Contractor.

The Contract Documents are to be treated by Subcontractor as "scope" documents which indicate the general scope of the Work in terms of the architectural design concept, the overall dimensions, the type of structural, mechanical, electrical, utility, and other systems, and an outline of major architectural elements. As "scope" documents, the Contract Documents do not necessarily indicate or describe all items required for the full performance and proper completion of the Work. It is the intent of this Subcontract that Subcontractor is to furnish for the Price all items required for proper completion of the Work. Subsequently issued documents may more completely detail certain requirements of the Work, at the option of the Architect, for the purpose of further defining the Work, but there is no obligation to issue such additional documents.

As a part of its obligation to provide and perform the Work, Subcontractor recognizes its responsibility to furnish a competent and adequate staff and use its best skill and attention for the proper administration, coordination, supervision and superintendence of the Work; (i) organize the procurement of all materials and equipment so that they will be available at the time they are needed for the Work; (ii) keep an adequate force of skilled workers on the job to complete the Work in strict accordance with all requirements of the Contract Documents; (iii) maintain throughout the duration of the Work a competent, full time, on-site superintendent (who is able to read, write and speak English in order to communicate with Contractor's personnel and the supervisory personnel of other trades) and any necessary assistants, all of whom shall be acceptable to Contractor and shall not be changed without the consent of Contractor; (iv) enforce disci-

pline and order among Subcontractor's employees and not to employ at the Project any unfit person or anyone not skilled in the task assigned; (v) provide supervision by experts in all aspects of the application of the materials, equipment or system being fabricated and installed; and (vi) submit to Contractor the names, responsibilities and titles of the principal members of Subcontractor's staff.

Subcontractor shall be bound to Contractor by the terms and conditions of the Contract Documents, as the same shall be applicable to the Work and this Subcontract, and hereby assumes toward Contractor all of the duties, obligations and responsibilities that Contractor has by the Contract Documents assumed toward the Owner.

Subcontractor hereby irrevocably grants Contractor a license to use all shop drawings, designs, and deliverables provided by Subcontractor on the Project for Contractor's purposes on the Project. Such license extends, without limitation to all shop drawings, CAD drawings, submittals to governmental or quasi-governmental authorities, product approvals, fabrication processes and the like, which are in any way necessary or desirable for the performance of the Work ("Granted Licenses"). This Subcontract shall constitute conclusive evidence of the granting to Contractor of the Granted Licenses by Subcontractor.

## ARTICLE 2, Price

Contractor shall pay to Subcontractor for the satisfactory performance and completion of the Work and performance of all the duties, obligations and responsibilities of Subcontractor under this Subcontract, the sum set forth above as the Price, subject only to additions and deductions as expressly provided in this Subcontract. To the extent that the Work is to be performed on a unit price basis, the Price shall be computed in accordance with the unit prices set forth in Exhibit D, based on actual quantities determined in accordance with the Contract Documents and this Subcontract. The Price and all unit prices shown in Exhibit D shall be deemed to include all costs of Subcontractor's performance of the Work as set forth in the Contract Documents, including, but not limited to, the costs of labor, supervision, services, materials, equipment, tools, scaffolds, hoisting, transportation, storage, insurance, permits, fees, inspection costs, taxes (including, but not limited to, sales taxes, use taxes and personal property taxes levied or assessed against Contractor or Subcontractor arising out of either the acquisition by Contractor for the furnishing or installing by Subcontractor or by any of its sub-subcontractors of any tier of materials, equipment or any other kind of personal property, or the furnishing of labor and/or services in connection with the Work; where the law requires any such tax to be stated and charged separately, the total of all items included within the Work and the added tax shall not exceed the Price), and all overhead and profit.

## ARTICLE 3, Progress Payments

Within ten (10) days after the date of transmission of this Subcontract to Subcontractor, Subcontractor shall submit to Contractor for Owner's and Contractor's approval a detailed schedule showing a proper cost breakdown (with a proper share of associated overhead and profit) of the Price according to the various line items, or parts, of the Work, for use only as a basis for verifying Subcontractor's applications for payment or supporting Contractor's applications for payments under the Contract Documents.

Initialed _____ DUSA / _____ Subc.

Case 1:21-cv-00008-JLT Document 1 Filed 09/24/25 Page 23 of 98

On or before each Monthly Billing Date, Sub-contractor shall submit to Contractor, in such form and supported by such data (including bills of sale and applicable insurance) as Contractor may require, a progress payment application showing the value of the Work installed ("Completed Work"), plus the value of the material and equipment for incorporation in the Work suitably stored and insured (to the satisfaction of Contractor and Architect) at the Project site or other approved location ("Stored Work"), as of such date if, and only if, the Contract Documents provide for payments to Contractor on that basis. Subcontractor shall also furnish to Contractor, with Subcontractor's first Application For Payment, a list of all companies, entities, and individuals supplying labor or materials for the performance of the Work ("Furnisher Information Schedule"). Such Furnisher Information Schedule shall be updated with every Application For Payment. Within seven (7) days after receiving a progress payment from Owner under the Contract Documents, Contractor shall make a progress payment to Subcontractor equal to the value of the Completed Work and Stored Work as of the corresponding Monthly Billing Date, to the extent approved by Contractor and allowed and paid by Owner on account of the Work, and so long as all other conditions of payment are met under Article 5, below, and after deducting (a) all previous payments, (b) current re-tainage (meaning a reserve equal to the Retained Percentage times the allowed value of Completed Work and Stored Work, plus any additional reserve provided for herein) and (c) all charg-es or backcharges for services, materials, equipment, or other items furnished or otherwise chargeable to Subcontractor. To the fullest extent permitted by law, Contractor and/or Contractor's surety or sureties shall have no liability or responsibility for any amounts due or claimed to be due Subcontractor for any reason whatsoever except to the extent that Contractor has actually received funds from Owner specifically designated for disburse-ment to Subcontractor. Receipt of these funds by Contractor shall be an absolute condition precedent to Subcontractor's right to receive payment under the Contract Documents or any pay-ment bond. In the event of any conflict between the Contract Documents, any payment bond and this provision, this provision shall govern. With regard to the foregoing, Subcontractor: (i) agrees that the Price shall be a non-recourse obligation; and (ii) waives Subcontractor's right to assert any claim, demand, right, or cause of action against Contractor and/or Contractor's surety or sureties for any portion of the Price (unless and to the extent that Contractor actually receives funds from the Owner attributa-ble to the Work). Notwithstanding the inclusion of the Contract in the Contract Documents, no provision of the Contract Documents shall be interpreted so as to create a conflict, inconsistency or ambiguity in the contingent payment provisions of this Subcon-tract and, in the event there is any such conflict, inconsistency or ambiguity, the contingent payment provisions of this Subcontract shall take precedence and control.

Contractor shall review each Application for Payment together with such supporting documents as required under Article 5 of this Subcontract and as otherwise requested by Owner or Contractor. Contractor shall then approve, modify or reject, in whole or in part, such Application for Payment. Con-tractor reserves the right to advance the date of any payment (including final payment) due or to become due under this Sub-contract if, in its sole judgment, it becomes desirable to do so.

Subcontractor shall not be entitled to any payment until this Subcontract has been properly executed and

all documents and information to be furnished by Subcontractor have been supplied to Contractor.

ARTICLE 4, FINAL PAYMENT

A final payment, consisting of the unpaid balance of the Price, shall be made within thirty (30) days after the last of the following to occur: (a) satisfactory completion of the Work by Subcontractor, (b) unqualified acceptance thereof by the Architect and Owner, (c) full final payment by Owner to Con-tractor under the Contract Documents on account of the Work, (d) furnishing of evidence satisfactory to Contractor that there are no claims, obligations, or liens outstanding or unsatisfied for la-bor, services, materials, equipment, taxes, or other items per-formed, furnished or incurred in connection with the Work, (e) delivery of all guaranties, warranties, bonds, instruction manuals, performance charts, diagrams, as-built drawings and similar items required of Subcontractor or its suppliers or subcontractors and (f) delivery of a general release, in a form satisfactory to Contractor, executed by Subcontractor running to and in favor of Contractor and Owner, and such other parties as Contractor may require. To the fullest extent permitted by law, Contractor and/or Contractor's surety or sureties shall have no liability or responsi-bility for any amounts due or claimed to be due Subcontractor for any reason whatsoever except to the extent that Contractor has actually received funds from Owner specifically designated for disbursement to Subcontractor. Receipt of these funds by Con-tractor shall be an absolute condition precedent to Subcontrac-tor's right to receive payment under the Contract Documents or any payment bond. In the event of any conflict between the Con-tract Documents, any payment bond and this provision, this pro-vision shall govern. With regard to the foregoing, Subcontractor: (i) agrees that the Price shall be a non-recourse obligation; and (ii) waives Subcontractor's right to assert any claim, demand, right, or cause of action against Contractor and/or Contractor's surety or sureties for any portion of the Price (unless and to the extent that Contractor actually receives funds from the Owner attributable to the Work).

Acceptance by Subcontractor of Final Pay-ment shall constitute a release of Owner and Contractor of and from all liability for all things done or not done or furnished or not furnished in connection with the Work, and for every act, omis-sion, or neglect, if any, relating to or arising out of the Project. As a condition of final payment, Subcontractor shall also execute and deliver a general release to Contractor naming Owner and Contractor as releasees, said general release to be in such form as Contractor may provide.

ARTICLE 5, PAYMENT CONDITIONS

Subcontractor will receive the payments made by Contractor and Subcontractor will hold such payments as a trust fund to be applied first to the payment of laborers, sup-pliers, subcontractors and others responsible for the Work for which such payments are made, including sufficient funds so that all taxes and insurance applicable thereto are also paid. Subcon-tractor shall first apply all progress payments as trustee to satisfy all obligations Subcontractor has incurred due to the Work.

Subcontractor shall, as often as requested by Contractor, furnish such information, evidence and substantiation as Contractor may require with respect to the extent and value of current progress and the nature and extent of all obligations in-curred by Subcontractor in connection with the Work and all payments made by Subcontractor on account thereof. Subcon-tractor shall also furnish, as required by Contractor in its sole

Initialed ____ DUSA / ____ Subc.

discretion, such partial or final lien waivers or releases as Contractor deems necessary to ensure that Subcontractor has paid all persons furnishing any labor, material, or services in furtherance of any Work furnished hereunder. If required by Contractor, the furnishing of such lien waivers and releases shall be a condition precedent to any payment hereunder. Moreover, no prior failure of Contractor to require such releases and waivers shall limit Contractor's right to require them subsequently.

Contractor reserves the right to withhold, as an additional reserve and without limiting its other rights and remedies, an amount sufficient: (a) to defend, satisfy and discharge any asserted claim that Subcontractor (or anyone providing any of the Work hereunder) has failed to make payment for labor, services, materials, equipment, taxes, or other items or obligations furnished or incurred in connection with the Work or has caused damage to the Work or to any other work on the Project; (b) to complete the Work if it appears that funds remaining in the Subcontract, including retainage and exclusive of backcharges, are insufficient to complete the Work; (c) to reimburse Contractor for any backcharges incurred as a result of any act or omission by Subcontractor hereunder; (d) to protect Contractor from the possible consequences of any other breach or default by Subcontractor hereunder; or (e) to secure Contractor with respect to any breach or default by Subcontractor or its affiliates, parent company and subsidaries under any other agreement.

Payment hereunder shall not be evidence of the proper performance or progress of the Work and no payment shall be construed to be acceptance of defective, faulty or improper work or materials. To the extent that payment is requested for any Work which requires the preparation of construction documents which are maintained on electronic media, no payment shall be due until delivery of the data for such construction documents in a format which is acceptable to Contractor.

Subcontractor shall at all times cooperate, in the course of its performance of the Work and of the Contract Documents, with any lending entity or entities providing financing for the Project and shall agree in writing to all changes and modifications to the Contract Documents which are requested by such entity or entities that do not impose any substantial additional burdens on Subcontractor or materially reduce or limit Subcontractor's rights. Subcontractor shall supply such information and certifications as reasonably may be required from time to time by the aforesaid lending entity or entities in order that Owner can satisfy conditions to lender's obligations to make advances upon Owner's construction loan.

As an additional condition precedent to any payment (including, but not limited to, final payment) under this Subcontract, Subcontractor shall provide to Contractor on electronic media copies of all drawings, shop drawings, CAD documentation and discs, and other documents prepared by Subcontractor, or prepared at Subcontractor's direction, in connection with the performance of the Work, whether or not submitted to Contractor or Owner in connection with the Work.

### ARTICLE 6, TIME

Time is of the essence in the Subcontractor's commencement, prosecution and construction of the Work. Therefore, Subcontractor shall be liable for all damages arising out of Subcontractor's breach of this Subcontract. Subcontractor shall: (a) submit to Contractor within ten (10) days of the date of transmission of this Subcontract to Subcontractor a detailed, proposed schedule of the Work for Contractor's use in preparing

an overall progress schedule for the entire Work and its several parts under the Contract Documents; (b) begin the Work promptly upon Contractor's order to do so; (c) coordinate and perform the Work, and its several parts, diligently and promptly and in such order and sequence as Contractor may from time to time direct and as will assure its efficient and timely prosecution and will not delay completion of the entire Work and its several parts under the Contract Documents; and (d) furnish at all times sufficient, qualified and competent forces and supervision, and adequate, conforming and usable materials, equipment, plants, tools and other necessary things, to achieve progress according to Contractor's current progress schedule, including any specific schedule for Subcontractor's Work attached hereto as Schedule 2, and any revisions thereof by Contractor

Without limiting the generality of the foregoing and in recognition of the completion dates contained herein and in the Contract Documents, Subcontractor shall: (a) submit, with its proposed schedule, information showing the time required to prepare and approve shop drawings, to fabricate and deliver materials and equipment, and to install the Work, (b) order (for manufacture or purchase and delivery) all materials required for performance of the Work as soon as possible in order to avoid delays caused by strikes, transportation or unavailability; (c) furnish Contractor within thirty (30) days a list of major materials and equipment required for the Work, showing the name(s), address(es) and telephone number(s) of the supplier(s) and the date(s) on which such material and equipment is expected to be delivered to the Project site; (d) furnish Contractor, upon issuance, a copy of each major purchase order and subcontract (with price information deleted); (e) cause a qualified home office supervisory representative (while Subcontractor has forces at the Project site and for two weeks prior thereto) to attend weekly progress meetings; and (f) notify Contractor immediately by telephone and confirm in writing within seventy-two (72) hours, if Subcontractor finds that any item cannot be delivered as required to maintain Contractor's progress schedule. Subcontractor also agrees to be bound by such modifications to the Project schedule as are discussed at the weekly job progress meetings and are contained in the minutes of those meetings unless written objection is delivered in writing by Subcontractor within forty-eight (48) hours of the occurrence of such meeting.

The Work shall be performed during regular working hours except that, in the event of emergency or when necessary to perform the Work in accordance with the requirements of Article 6 of this Subcontract, Work shall be performed at Subcontractor's cost and expense (including Contractor's standby and other general conditions costs) on night shifts, overtime, Saturdays, Sundays, holidays and at other times, if permission to do so has been obtained in writing from Contractor. Without limiting the requirements of the preceding sentence, if the progress of the Work or of the Project has been delayed by any fault, neglect, act, or failure to act of Subcontractor or any of its subcontractors or suppliers, Subcontractor shall work such overtime, at Subcontractor's cost and expense as aforesaid, as Contractor shall deem necessary or desirable to make up for all time lost and to avoid delay in the completion of the Work or the Project. The failure by Contractor to direct Subcontractor to engage in such overtime work shall not relieve Subcontractor of the consequences of its delay. Subcontractor will be required to make up work days lost due to rain on weekends on a for day basis and at no additional charge to Contractor.

Initialed _____ DUSA / _____ Subc.

Case 1:21-cv-00087-JLW Document 1 Filed 09/24/25 Page 25 of 98

Contractor may direct acceleration of the Work in order that it may be performed in advance of the schedules, time requirements and Project requirements described in Article 6 hereof. If so directed, Subcontractor shall increase its staff or work overtime, or both. Subcontractor will not be entitled to additional compensation for work performed outside of regular working hours, except as authorized and accepted in writing by Contractor. Provided that Subcontractor is not in default under the Subcontract, and Contractor has issued the aforesaid authorization, there shall be added to the Price an actual out-of-pocket amount equal to : (i) additional wages actually paid, at rates which have been approved in advance in writing by Contractor; (ii) taxes imposed by law on such additional wages; and (iii) premiums for worker's compensation and liability insurance if required to be paid on such additional wages.

Written authorization for overtime which exceeds $500.00 in any one week shall be invalid unless confirmed in advance in writing by Contractor's Project Manager, it being understood that Contractor's Superintendent shall not have authority to authorize such overtime which exceeds $500.00 in any one week.

### ARTICLE 7, EXTENSIONS OF TIME

If Subcontractor claims an extension in the completion time requirements by reason of a change in the Work, Subcontractor shall give Contractor written notice thereof within seventy-two (72) hours after the occurrence of the conditions giving rise to such event. This written notice shall be given by Subcontractor before proceeding with the Work. No such request for an extension of time shall be valid unless written notice is given as required above. After delivering written notice of a perceived cause of delay, Subcontractor shall proceed to execute the Work, even though the time extension has not been agreed upon.

Should Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the Work without fault on its part, and by reason of causes which would entitle the Contractor to an extension of time under the Contract, then Subcontractor shall be entitled to an extension of time only to perform the Work which shall be equal to the extension of time to which the Contractor is entitled and granted by the Owner but no claim for extension of time on account of delay shall be allowed unless a claim in writing therefor is presented to Contractor with reasonable diligence but in any event not later than seventy-two (72) hours after the commencement of such claimed delay. The entitlement to an extension is absolutely conditioned upon Subcontractor's timely submission of the aforesaid written notice. Subcontractor expressly agrees not to make, and hereby waives, any claim for damages, including those resulting from increased labor or material costs, on account of any delay, obstruction or hindrance for any cause whatsoever, whether or not foreseeable and whether or not anticipated including, but not limited to, causes that would entitle the Contractor to an extension of time under the Contract, and agrees that the sole right and remedy therefore shall be an extension of time in accordance with the foregoing paragraph. Without limiting any of the foregoing, should Subcontractor ever be entitled to any damages for delay hereunder or under any other provisions of this Subcontract or by operation of law, then any recovery from Contractor shall be limited to a proportionate share of Contractor's recovery, if any, from the Owner and Subcontractor must bear its share of any costs and fees incurred in making the recovery. In the event

Page 6

Contractor has provided a payment bond, all terms of this paragraph shall apply to claims made against the bond and or Contractor's surety or sureties.

Moreover, Subcontractor shall not be allowed an extension of time unless Subcontractor has established to Contractor's satisfaction that the delay claimed by Subcontractor is to a portion of the Work on the critical path of the Work schedule and that Subcontractor could not have reasonably anticipated the delay.

### ARTICLE 8, CHANGE ORDERS

Owner has reserved the right under the Contract Documents to require Contractor to make changes in the Work, including additions thereto and deletions therefrom. Additionally, Contractor reserves the right under this paragraph to require Subcontractor to make changes in the Work, including additions thereto and deletions therefrom. Without notice to any surety and without invalidating this Subcontract, Contractor may from time to time, by written order ("Change Order") to Subcontractor, make changes in the Work to the same extent and in the same manner as may be required of Contractor by Owner under the Contract Documents. Subcontractor shall thereupon perform the changed Work in accordance with the terms of this Subcontract and the Change Order. In the event that Subcontractor is obligated hereunder to provide a payment or a performance bond, or both, under this Subcontract, the penal sum of such bonds shall automatically be deemed to be increased by any increase in the Subcontract Price.

Upon request of Contractor, and in time and manner sufficient to permit Contractor to comply with its obligations under the Contract Documents, Subcontractor shall submit a written proposal for any applicable Price and time adjustment attributable to the changed Work, detailed as Contractor or Owner may require, supported by and conforming to the requirements of the Contract Documents.

Where a Change Order is issued pursuant to a change required by the Owner, the Price shall be adjusted by the net amount of any direct savings and direct cost plus Profit Percentage attributable to the Change Order, and the time for performance of the Work may be adjusted according to the Contract Documents, subject, however, in each case to the following limitations: (a) the Price and time adjustments hereunder shall be limited to the amount and extent of adjustments actually allowed Contractor under the Contract Documents (less, in the case of Price, any overhead, profit or similar markup allowed by Owner for Contractor's account); (b) where the Work affected by Change Order is the subject of unit prices under Exhibit D, the Price adjustment shall be limited to the amounts obtained by applying such unit prices to the actual increase or decrease in the quantity of units due to the change; and (c) the amount allowable for all overhead and profit shall be limited to the product obtained by multiplying the Profit Percentage by the net amount of Subcontractor's direct savings and direct cost.

As used in this Subcontract, Subcontractor's direct savings and direct cost shall mean and be limited to the actual amount of the following: cost of materials, including sales tax and cost of delivery; cost of labor, including social security, old age and unemployment insurance, and fringe benefits required by agreement or custom; worker's compensation insurance; bond premiums if and to the extent actually increased; and actual rent not greater than the rent charged in the locale or rea-

Initialed ___ DUSA / ___ Subc.

sonable value of Subcontractor-owned equipment and machinery.

If the parties are able to agree upon the amount of the Price adjustment and the extent of any time adjustment, such adjustments shall be set forth in the Change Order, which shall be accepted by Subcontractor. If the parties are unable to agree upon such adjustments, Contractor may elect to issue the Change Order to Subcontractor directing such work to be performed by Subcontractor and any adjustments to Price or time shall be subject to ultimate determination in accordance with this Subcontract; and Subcontractor shall, nonetheless, proceed immediately with the changed Work. Subcontractor shall keep a detailed account of the direct savings and direct cost due to the changed Work separately from its other accounting records and shall make such records available to the Contractor at Contractor's request. Failure to keep adequate and separate cost records of the changed Work, and to furnish same to Contractor upon its request, shall constitute an acceptance on Subcontractor's part of the Contractor's determination of the direct savings and direct cost of such changed Work. In no event shall Subcontractor proceed with changed Work without a Change Order issued pursuant to this Article 8 and Contractor shall not be liable for any additional costs incurred or delays encountered in the performance of such changed Work without such a written Change Order.

### ARTICLE 9, NOTICES

All written notices provided for in this Subcontract or in the Contract Documents shall be deemed given if delivered personally to the party, sent by facsimile (with proof of transmission, or by regular mail to the party at its address and to the attention of the representative specified herein. Either party may from time to time, by notice to the other as herein provided, designate a different address and/or representative to which notices to it should be sent.

### ARTICLE 10, BONDS

If so indicated on page 1 hereof, Subcontractor, within ten (10) days of date of transmission of this Subcontract to Subcontractor, shall furnish performance, and labor and material payment bonds each for one hundred percent (100%) of the Price, said bonds to be on Contractor's standard bond forms (attached hereto as Exhibit F) and with sureties satisfactory to Contractor. The premiums on such bonds shall be paid by Subcontractor, or paid directly by Contractor to Subcontractor's surety and deducted from amounts due or to become due to Subcontractor, and are included in the Price. Subcontractor agrees to notify its surety or sureties of increases in the Price and to take such action as is required to have the penal amount of the bonds furnished pursuant to this paragraph increased correspondingly. Irrespective of whether Subcontractor is required to provide performance, and labor and material surety bonds under the terms of the Subcontract, Contractor shall have the right from time to time during the course of the Work to require Subcontractor to furnish bonds for one hundred percent (100%) of the Price (with sureties and in form attached hereto as Exhibit F and amount acceptable to Contractor) covering the faithful performance of the Subcontract and the payment of all obligations arising thereunder. Such bonds shall be furnished within ten (10) days after Subcontractor has been given written notice of such requirement by Contractor.

### ARTICLE 11, INSURANCE

Before commencing the Work and until completion and final acceptance thereof by Owner, Subcontractor shall obtain and maintain, at its expense, at least the insurance coverage specified in Exhibit C attached hereto, all from companies and in form and substance acceptable to Contractor.

As a condition to any payment for the Work, Subcontractor shall furnish a certificate, satisfactory to Contractor, from each insurance company showing the required insurance to be in force and stating that the insurance will not be canceled or changed except upon at least thirty (30) days' written notice thereof to Contractor or as otherwise required by the Contract Documents. The certificate shall name Contractor, Owner and any other parties required by the Contract Documents as additional insureds under the policies required in Exhibit C. The terms and conditions of insurance to be provided by Subcontractor are described in Exhibit C. Neither Owner nor Contractor nor any other additional insureds, nor their agents, employees or assigns, shall be liable to Subcontractor or its agents, employees or assigns for any loss or damage covered by the insurance policies described in Exhibit C. The failure of Subcontractor to obtain the insurance required therein prior to the commencement of the Work shall not be deemed a waiver of such requirements or of any rights or remedies that Owner or Contractor may have.

Subcontractor hereby acknowledges its obligation for any loss to its Work, including stored materials, paid for or not.

Subcontractor waives all rights against the Owner, Contractor, Architect and any separate contractors for damages caused by fire or other perils to the extent covered by property insurance applicable to the Work or Subcontractor's equipment, except such rights as Subcontractor may have to the proceeds of such insurance. Subcontractor shall require similar waivers from its subcontractors, suppliers, sub-subcontractors, agents and employees of any of them, by appropriate agreements, each in favor of the other parties enumerated herein.

### ARTICLE 12, INDEMNITY

To the full extent permitted by law, Subcontractor agrees to defend, indemnify and hold harmless Contractor and Owner, as well as any other parties which Contractor is required under the Contract Documents to defend, indemnify and hold harmless, and their agents, servants and employees, from and against any claim, cost, expense, or liability (including attorneys' fees, and including costs and attorneys' fees incurred in enforcing this indemnity), attributable to bodily injury, sickness, disease, or death, or to damage to or destruction of property (including loss of use thereof), caused by, arising out of, resulting from, or occurring in connection with the performance of the Work by Subcontractor, its subcontractors and suppliers of any tier, or their respective agents, servants, or employees, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such injury, sickness, disease, death, damage, or destruction is caused by the sole negligence of a party indemnified hereunder. Subcontractor's obligation hereunder shall not be limited by the provisions of any worker's compensation or similar act.

Should Owner or any other person or entity assert a claim or institute a suit, action, or proceeding against Contractor involving the manner or sufficiency of the performance of the Work (including attorneys' fees), Subcontractor shall upon

Initialed _____ DUSA / _____ Subc.

Case 1:21-cv-00008-JLW Document 3 Filed 09/29/25 Page 27 of 98

request of Contractor promptly assume the defense of such claim, suit, action or proceeding, at Subcontractor's expense. To the fullest extent permitted by law, Subcontractor shall indemnify and save harmless Contractor as well as anyone to be defended, indemnified and held harmless by Contractor and its or their agents, servants and employees, from and against any liability, loss, damage, or expense (including attorneys' fees, and including costs and attorneys' fees incurred in enforcing this indemnity) arising out of or related to such claim, suit, action or proceeding. Nothing in Article 12 shall be construed to require any indemnification which would make Article 12 void or unenforceable or to eliminate or reduce any indemnification or rights which the Contractor or any other party indemnified hereunder have by law.

### ARTICLE 13, ASSIGNMENT

Subcontractor shall not assign this Subcontract, or any monies due or to become due hereunder, or subcontract any substantial part of the Work, without the prior written consent of Contractor. For purposes of this provision, a change of control of Subcontractor shall constitute a prohibited assignment. "Change of control" of Subcontractor is defined as: (i) a merger or consolidation of Subcontractor in which the stockholders of Subcontractor immediately prior to such transaction would own, in the aggregate, less than fifty percent (50%) of the total combined voting power of all classes of capital stock of the surviving entity normally entitled to vote for the election of directors of the surviving entity or (ii) the sale by Subcontractor of all or substantially all Subcontractor's assets in one transaction or in a series of related transactions. In the event of such assignment or change of control by Subcontractor without the prior written consent of Contractor, then Subcontractor shall be deemed to be in default under this Subcontract and Contractor may proceed in accordance with Article 26 as well as any other rights under this Subcontract. No assignment by Subcontractor of any right hereunder shall be effective and any such attempt shall be null and void. No third party shall have any right to enforce any right of Subcontractor under this Subcontract. If Contractor gives written consent to an assignment of this Subcontract, in whole or in part, Subcontractor shall not be relieved of its duties and obligations hereunder and shall be and remain fully responsible and liable for the acts and omissions of its assignees. Nothing herein shall prevent Subcontractor from engaging subcontractors to perform a portion of the Work hereunder. However, Subcontractor shall be and remain as fully responsible for all persons directly or indirectly employed by such subcontractors as Subcontractor is for its own acts and omissions and those of its agents, servants and employees. Additionally, nothing herein shall prevent any guarantor or surety of Subcontractor from enforcing any right hereunder after acknowledgment of its obligation as guarantor or surety. Any attempted enforcement of such rights in the absence of an express acknowledgment shall constitute an admission by any guarantor or surety of its obligations under its agreement of guarantee or suretyship.

Before any subcontractor or supplier is employed by Subcontractor, the name of such subcontractor or supplier shall be submitted in writing to Contractor, and no subcontractor or supplier shall be employed unless acceptable to Contractor. Each subcontractor and supplier shall be bound by all Contract Documents to the same extent and with the same effect as if the subcontractor or supplier were the Subcontractor. Subcontractor shall cause its subcontractors and suppliers to comply with the Contract Documents. Subcontractor shall be

responsible for all of the acts, work, material and equipment of its subcontractors and suppliers and all persons either directly or indirectly employed by any of them.

Subcontractor (and its successors and assigns) hereby assigns to Contractor all its interest in any subcontracts and purchase orders now existing or hereinafter entered into by Subcontractor for performance of any part of the Work which assignment will be effective upon acceptance by Contractor in writing and only as to those subcontracts and purchase orders which Contractor designates in writing. It is agreed and understood that Contractor may accept said assignment at any time during the course of construction prior to final completion. It is further agreed that all subcontracts and purchase orders shall provide that they are freely assignable by Subcontractor to Contractor and Contractor's assigns. Contractor may assign this Subcontract at any time without the consent of Subcontractor, or Subcontractor's payment and performance sureties or guarantors, if any. Any assignment by Contractor of his interest hereunder shall automatically transfer Contractor's interest in Subcontractor's performance and payment bonds without requirement of separate assignment and any rights enforceable hereunder by Owner and/or Contractor shall give them rights under said bonds whether or not both of them are named as obliges. The term "Owner" includes Owner's lender(s). In case of any inconsistency between the terms of this Subcontract and any payment of performance bonds furnished by Subcontractor, the terms of this Subcontract shall prevail.

### ARTICLE 14, COMPLIANCE

Subcontractor shall, at its own expense, obtain all necessary licenses and permits pertaining to the Work and comply with all statutes, ordinances, rules, regulations and orders of any governmental or quasi-governmental authority having jurisdiction over the Work or the performance thereof, including, but not limited to, those relating to safety, wages, discrimination and equal employment opportunity and pay any fines or penalties imposed for any violations thereof ("Legal Requirements"). Subcontractor shall promptly correct any violations of such statutes, ordinances, rules, regulations and orders committed by Subcontractor, its agents, servants and employees. Subcontractor shall receive and respond to, and shall defend, indemnify and save harmless Contractor and Owner, as well as anyone to whom Contractor is obligated, and their agents, servants and employees from and against any loss, liability, or expense arising from any such violations and any citations, assessments, fines, or penalties resulting therefrom. Without limiting the foregoing, Subcontractor will appear at hearings, proceedings and/or in court and consent to its substitution as a party defendant in respect of all summonses and claimed violations arising out of or relating to the Work.

By executing this Subcontract, Subcontractor represents and warrants to Contractor that the Work, when completed, will comply fully with all applicable building and safety codes, regulations and construction requirements imposed or enforced by any governmental agencies and in existence on the date of execution of this Subcontract, without regard to any errors, omissions or deficiencies in the drawings and specifications; and Subcontractor shall furnish samples of all materials and component parts to be used as test specimens. Subcontractor shall furnish labor and facilities at the Project site as necessary in connection with testing and inspection services.

Page 8

Initialed ___ DUSA / ___ Subc.

Except as otherwise expressly specified in the Contract Documents or elsewhere in this Subcontract, Subcontractor shall pay for all laboratory services, tests, testing laboratories, agencies, professional engineers, engineering inspections and reports required by the Contract Documents, the Architect, or Contractor. Testing laboratories and professional engineers shall be subject to Contractor's prior written approval. Without limiting the provisions herein, the cost of testing laboratories, agencies, and/or engineers for the convenience of Subcontractor in its scheduling and performance of the Work, or related to remedial operations or possible deficiencies, shall be borne by Subcontractor.

The observations of or participation by Owner, Architect, or Contractor in inspections or tests by persons other than Subcontractor shall not relieve Subcontractor from its obligations to perform the Work in accordance with the Contract Documents. Owner, Architect and Contractor, upon request, promptly shall have access to the Work, whether at the Project, in storage or in manufacture or preparation. Subcontractor shall provide proper and safe facilities for such access and for inspection at the Project site, at the place of storage or elsewhere. Subcontractor has given a license to exercise self-help by Contractor, Owner and/or Engineer for such access. If the specifications or any legal requirements require any portion of the Work to be tested or reviewed, Subcontractor shall give Contractor timely written notice of such test or review.

Subcontractor shall comply with and cooperate with other subcontractors, Contractor, Architect, and Owner in complying with legal requirements, including but not limited to OSHA requirements. Among other things, Subcontractor shall be responsible for performing corrective work within abatement periods, appealing from decisions or orders, requesting extensions on abatement periods, and furnishing such information or evidentiary material as may be necessary or as may be requested by Contractor to fully protect the rights and interests of Owner, Architect, and Contractor with respect to possible, threatened or pending proceedings or orders.

Subcontractor shall comply, and shall cause each of its lower-tier subcontracts to comply, with the requirements of Schedule 4 attached hereto to the fullest extent required by applicable law. Subcontractor shall further maintain all records appropriate to document such compliance.

ARTICLE 15, SAFETY

Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the Work is its responsibility, even if Contractor establishes a safety program for the entire Project. Subcontractor shall establish and implement safety measures, policies and standards conforming to those required or recommended by governmental or quasi-governmental authorities having jurisdiction and by Contractor and Owner, including, but not limited to, any requirements imposed by the Contract Documents. Subcontractor shall comply with the reasonable recommendations of insurance companies having an interest in the Project and shall stop any part of the Work that Contractor deems unsafe until corrective measures satisfactory to Contractor have been taken. Contractor's failure to stop Subcontractor's unsafe practices shall not relieve Subcontractor of its responsibility therefor.

Subcontractor shall continuously protect the Work, other work, and the property of Contractor, Owner and others from damage, injury or loss arising in connection with the Subcontractor's performance of the Work. Neither Owner nor Contractor shall be responsible for any loss or damage to the Work or the property of Subcontractor, however caused, until after final acceptance thereof by Owner and final payment therefor. Likewise, neither Owner nor Contractor shall be responsible for loss of or damage (however caused) to materials, tools, equipment, appliances and other personal property of Subcontractor used in the performance of the Work. Subcontractor shall provide and maintain adequate protection against weather so as to protect the Work from injury or damage.

Subcontractor shall enforce Contractor's instructions regarding signs, advertisements, fires, smoking, alcoholic beverages, and the possession of firearms by any person at the Project site. Subcontractor, as necessary for the Work, shall provide flagmen, erect proper barricades and other safeguards, and post danger signs and other warnings as warranted by hazardous and existing conditions.

Subcontractor shall promptly report in writing to Contractor and Subcontractor's insurance carriers all accidents arising out of, or in connection with, the performance of the Work, whether on or off the Project site, which caused death, bodily injury or property damage, giving full details and statements of witnesses. In addition, if death or serious injuries or serious damages occur, the incident shall be reported to Contractor immediately by telephone or in person.

Subcontractor shall provide to Contractor a written site specific Safety and Health Program prior to the commencement of any Work on the Project. The Safety and Health Program shall address tasks to be performed on the Project with attendant risk analysis and have appropriate controls and safeguards to prevent injury and illness. Contractor will review the Safety and Health Program prior to the start of the work. Any questions, comments or inquiries by Contractor as to the adequacy of this program must be completely addressed by Subcontractor before Work is started.

Subcontractor must have a Safety Orientation Program for all of its new Project workers. Documentation of this orientation is required for the Project. Weekly safety meeting with the workers of Subcontractor and its subcontractors of any tier are also required with evidence of the meeting results being supplied to Contractor. If Subcontractor does not have a company Safety Policy or if Subcontractor does have a Safety Policy and it is in any way less stringent than the Safety Policy of the Contractor, Subcontractor will be required to sign Contractor's Safety Policy form stating that Subcontractor will adopt and implement the Contractor's Safety Policy.

ANSI compliant hard hats, eye protection and high visibility vests are required on the Project. Subcontractor must have a Safety Disciplinary Program and Contractor will use a safety disciplinary system with the Subcontractor.

Guardrails are to be provided by Subcontractor at all working places and other locations where persons or materials could fall more than six (6) feet. Where this cannot be physically achieved, suitable and sufficient fall protection devices that do not rely on individuals must be provided and used by Subcontractor to establish a safe place of work. Harnesses and personal fall arrest systems must be used by Subcontractor as a last resort. The decisions made and options implemented must be clearly detailed by Subcontractor in its written site specific Safety and Health Program.

Page 9

Initialed _____ DUSA / _____ Subc.

Powered cranes, hoists, aerial platforms and scissor lifts provided by Subcontractor must have a competent driver that is certified by a qualified third party. Additionally, the *above items must be certified by a qualified third party as safe to use.*

Subcontractor must comply in full with all applicable environment, health and safety ("EH&S") local and national legislation, including all OSHA regulations. In circumstances where there is a conflict between local or national legislation and this Article 15, the higher (more protective) requirement shall prevail.

All persons working for or under Subcontractor on suspended scaffolds/cradles/gondolas must wear and use appropriate fall prevention equipment so as to protect them effectively, at all times when they are at risk from any failure of any part of the scaffold/cradle/gondola, including its suspension system.

Holes, shafts and edges from or through which persons could fall a distance of more than 6 feet must be clearly marked by Subcontractor with signage or other means and must be adequately protected by covers or barriers provided by Subcontractor so as to prevent falls of persons and materials.

All temporary electrical circuits provided and used by Subcontractor must include a Residual Current Device, Earth Leakage Circuit Breaker or Ground Fault Circuit Interrupter at source.

Adequate lighting must be provided by Subcontractor to enable safe access to and egress from every place on a site where persons are liable to work. This is in addition to task lighting.

### ARTICLE 16, CLEAN UP

Subcontractor shall, at its own expense: (a) keep the premises at all times free from waste materials, packaging and other debris accumulated in connection with the Work by collecting and removing such debris from the job site on a daily or other basis requested by Contractor; (b) at the completion of the Work in each area, clear the Project site (including the right-of-way, borrow pits, and all ground Subcontractor occupies in connection with the work) of all rubbish, equipment, excess materials and temporary structures; (c) remove all of its tools, equipment, scaffolds, temporary structures and surplus materials as directed by Contractor at the completion of the Work; and (d) at final inspection clean and prepare the Work for acceptance by Owner. Subcontractor agrees to provide all cleaning and cleanup required under the Contract Documents pertaining to the Work to the extent such requirements are in excess of those contained in this paragraph.

### ARTICLE 17, TEMPORARY FACILITIES

Temporary facilities and services shall be provided in accordance with Schedule 3 attached hereto.

### ARTICLE 18, QUALITY

Subcontractor shall at all times provide first-quality, new materials (unless otherwise specified in the Contract Documents) and workmanship conforming to the Contract Documents requirements and be in accordance with the best standards of the construction industry where the Project is located. Subcontractor shall at all times provide proper facilities and an opportunity for the inspection of the Work by Contractor, Architect and Owner and their representatives. *Subcontractor shall, within*

twenty-four (24) hours after receiving written notice from Contractor or Architect, proceed to take down and remove all portions of the Work which Contractor or Architect shall have condemned as *unsound, improper, or in any way failing to conform to the* Contract Documents or this Subcontract and shall replace the same with proper and satisfactory Work and make good all work damaged or destroyed thereby. Contractor's failure to discover or notify Subcontractor of defective or nonconforming Work at the time the Work, or any portion thereof, is performed or completed shall not relieve Subcontractor of full responsibility for replacement of the defective or nonconforming Work and all damages resulting therefrom. If the Owner elects to accept defective or nonconforming Work, Contractor may require an appropriate adjustment in the Price to the extent required of Contractor.

Subcontractor shall use all necessary means to discover and to notify Contractor in writing of any defect, including substrate and contiguous work, in any part of the Project upon which the satisfactory performance of the Work may depend, and to allow a reasonable amount of time for remedying such defects. If Subcontractor should proceed with the Work, Subcontractor shall be considered to have accepted and be responsible for such condition unless Subcontractor shall have been directed by Contractor to proceed over Subcontractor's written objection to Contractor.

Subcontractor's Work hereunder shall include all cutting and patching of substrate or contiguous work necessary for the proper performance of Subcontractor's Work

### ARTICLE 19, GUARANTEES AND WARRANTIES

Subcontractor warrants and guarantees the Work to the full extent provided for in and required by the Contract Documents. Without limiting the foregoing or any other liability or obligation with respect to the Work, Subcontractor shall, at its expense, make good any faulty, defective, or improper parts of the Work discovered within one (1) year from the date of acceptance of the Project by Architect and Owner or within such longer period as may be provided in the Contract Documents or Legal Requirements. Subcontractor warrants that all materials furnished hereunder meet the requirements of the Contract Documents and warrants that they are both merchantable and fit for the purposes for which they are to be used under the Contract Documents. No Guarantee Period shall be construed to limit any warranty given by Subcontractor hereunder.

Performance of the aforementioned guarantee obligations shall be deemed to be a material component of Subcontractor's contractual obligation to perform the Work. This Subcontract shall not be considered completely performed until all guarantee obligations hereunder are fully satisfied. Performance bonds required of Subcontractor shall include the performance of guarantee obligations and warranty obligations and shall not contain clauses limiting the time to sue upon said bonds for breach of the guarantee or warranty.

### ARTICLE 20, SUBMITTALS

Subcontractor shall immediately prepare or obtain and promptly submit to Contractor shop and erection drawings, samples, product data, catalogue cuts, laboratory and inspection reports and engineering calculations, all as may be required by the Contract Documents or as may be necessary or appropriate to describe the details of the Work. Approval of drawings or other submittals by Contractor or Architect shall not relieve Subcontractor of its obligation to perform the Work in strict

Initialed _____ DUSA / _____ Subc.

Case 1:25-cr-00080-JLK Document 1 Filed 09/29/25 Page 30 of 98

accordance with the Contract Documents or of its responsibility for the proper matching of the Work to contiguous work.

Subcontractor shall promptly submit all shop drawings and samples as to cause no delay in the Work or the progress of the Project. Subcontractor shall submit all shop drawings and samples through the Contractor to the Owner for the Architect's review. By submitting shop drawings and samples, Subcontractor represents and warrants that it has determined and verified all materials, field measurements, and field construction criteria pertaining thereto, has checked and coordinated this information with the Work and the Contract Documents, and that the Subcontractor shall fully guarantee and warrant the Work in accordance with this Subcontract and the Contract Documents. Any submission that, in Contractor's opinion, is incomplete, contains errors or has not been fully and properly checked, may be returned unreviewed by Contractor for revision and resubmission.

In reviewing shop drawings, Architect/Engineer need not verify dimensions and field conditions. Architect/Engineer will review shop drawings and samples only for conformance with the design concept of the Work and for general detailing. Architect and Contractor's review shall not be construed as a complete check nor shall it relieve Subcontractor from its responsibility for any deficiency that may exist or from any departures or deviations from the requirements of the Contract Documents. Architect's or Contractor's review shall not relieve Subcontractor from responsibility for errors in shop drawings; responsibility for proper fitting of the Work; the necessity of furnishing any Work required by the Contract Documents which may not be indicated on shop drawings when reviewed; or the necessity of providing sufficient quantities of items.

ARTICLE 21, PERFORMANCE

The Work shall be performed and furnished under the direction and to the satisfaction of Architect and Contractor, but Subcontractor shall not thereby be relieved of its obligation to supervise the Work, using its best skill and attention, or its obligation to perform the Work as provided for herein. Subcontractor shall be bound by the interpretations and decisions of Architect and Owner to the same extent as Contractor may be bound thereby under the Contract Documents. No certificate issued or payment made to Subcontractor nor any partial or entire use or occupancy of the Project site shall be an acceptance of any Work not in accordance with this Subcontract or the Contract Documents or be deemed evidence of proper performance of the Work, either in whole or in part, or be construed as an acceptance of defective workmanship or improper materials.

Subcontractor shall notify and obtain the approval of Contractor before the arrival of forces or delivery of materials and equipment to the Project site, before any substantial change in its forces, and before leaving the Project site for any reason.

Subcontractor shall promptly and carefully check all Contract Documents and notify Contractor of any discrepancies or conflicts before performing any Work, and Subcontractor shall be responsible for any extra costs resulting from its failure to do so. Subcontractor shall cooperate with Contractor and other subcontractors in the preparation of coordination drawings where required by Contractor. Subcontractor shall take field measurements and verify field conditions and compare such field measurements and field conditions with the Contract Documents before activities are commenced. Errors, inconsistencies or

omissions discovered are to be reported to Contractor at once. Any work done by Subcontractor with respect to any portion of the Work affected by such error, discrepancy, conflict, misunderstanding, or variance before reporting the same in writing to Contractor and before resolution of such discovered issues will be at Subcontractor's own risk and Subcontractor shall bear all costs and loss arising therefrom.

Neither Architect nor Contractor nor Owner shall be responsible for: construction means, methods, techniques, sequences or procedures of Subcontractor; safety precautions and programs of Subcontractor; the acts or omissions of Subcontractor; or the failure of Subcontractor to carry out the work in accordance with the Contract Documents.

The Subcontractor shall confine operations at the Project site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the Project site with materials and equipment. Subcontractor shall not perform any portion of the Work outside the areas of the Project site owned or controlled by Owner or designated as part of the Project site in the Contract Documents unless Subcontractor gives thirty (30) days advance written notice to Contractor, and Owner is able to obtain permission from the appropriate parties to proceed with the Work or to permit access pursuant to Owner's agreements with the owners and/or tenants of said areas. Any work permitted outside of the Project site owned by Owner shall be scheduled in a manner as to cause or occasion a minimum of inconvenience or disturbance to or interference with the normal operations of the Owner, abutters and the public. Subcontractor shall prosecute such operations expeditiously and restore the affected area and other areas needed for access to their original conditions immediately upon completion of such operations unless otherwise specified.

ARTICLE 22, LIENS

To the extent not expressly prohibited by law, Subcontractor shall not suffer or permit any lien or other encumbrance to be filed or to remain of record as a claim against the building or the Project site or against any monies due or to become due for any Work performed or materials furnished by, to or on behalf of Subcontractor, or any of its subcontractors or suppliers; nor shall Subcontractor suffer or permit any such lien or encumbrance to be so filed because of any claim or demand against, or any action or non-action of, Subcontractor or any of its subcontractors or suppliers. Subcontractor shall defend, indemnify and save harmless Contractor, Contractor's sureties and Owner from any lien or claim of lien filed or maintained by any laborer, materialman, subcontractor, or other person or entity directly or indirectly acting for, through, or under Subcontractor, against the Project or any part thereof or any interest therein or against any monies due or to become due from Owner to Contractor or from Contractor to Subcontractor. Without limiting the foregoing, Subcontractor shall cause any such lien or claim of lien to be satisfied, removed, or discharged by bond, payment, or otherwise within such time as provided under the Contract Documents or ten (10) days from the date of receipt by Subcontractor of written notice from Contractor or Owner to remove the lien, whichever period is shorter.

ARTICLE 23, PATENTS

Subcontractor shall pay all royalties and license fees applicable to the Work. Subcontractor shall defend, indemnify and hold Owner, Architect and Contractor harmless of, from and against any and all suits, demands and claims for in-

Initialed _____/_____DUSA / _____/_____ Subc.

Case 1:25-cv-00800-JLU Document 1 Filed 02/09/25 Page 31 of 98

fringement of any patent rights except to the extent that Owner may have assumed responsibility therefor under the Contract Documents by specifying and requiring the use of a design, process or product that is subject to patent rights. The foregoing exception shall be inapplicable if Subcontractor had or should have had reason to believe the design, process, or product infringed upon a patent and failed to give written notification to Contractor of same.

### ARTICLE 24, LABOR

Subcontractor shall employ labor that is compatible with the labor of other subcontractors; shall take all steps necessary to avoid labor disputes; and shall be responsible for any delays and damages to Owner caused by such disputes. Subcontractor agrees that where the Work is stopped, delayed, or interfered with by strikes, slow-downs, or similar interruptions or disturbances, Contractor shall have the rights and remedies provided for in Article 26. Subcontractor shall maintain and exercise control over all employees engaged in the performance of the Work, and Subcontractor shall, to the extent permitted by law, remove or cause to be removed from the Project any employee whose presence is detrimental to the orderly prosecution of the Work. Subcontractor shall not permit anyone under the age of 18 to perform the Work or to have access to the Project site. Subcontractor shall comply with all instructions by Contractor relating to the ingress and egress of its employees, materialmen and suppliers to the Project and shall take all necessary steps to restrain and enjoin any illegal picketing, demonstrating, violence, or similar activity against Subcontractor at the Project. Subcontractor agrees that if any provision of the Contract Documents conflicts with any agreement among members of a trade association, or with a union or labor council which regulates the work to be performed by a particular trade, Subcontractor shall reconcile such conflict without delay or damage to Owner or Contractor. Nothing herein shall be deemed to limit Contractor's rights under Article 26 hereof.

### ARTICLE 25, DAMAGE

Contractor shall not be liable or responsible for loss or damage to the equipment, tools, facilities, or other personal property owned, rented, or used by Subcontractor, or anyone employed by or through Subcontractor, in the performance of the Work; and Subcontractor shall maintain such insurance and take such protective action as Subcontractor deems desirable with respect to such property. Contractor shall not be liable or responsible for any loss or damage to the Work, and Subcontractor shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of Contractor or any other subcontractor, resulting from the operations of Subcontractor, or its subcontractors, agents, servants, or employees hereunder. Subcontractor shall take all reasonable precautions to protect the Work from loss or damage prior to acceptance by Owner.

### ARTICLE 26, DEFAULT

Should Subcontractor at any time:
(a) fail to supply the labor, materials, equipment, supervision and other things required of it in sufficient quantities and of required quality to perform the Work with the skill, conformity, promptness and diligence required hereunder;
(b) cause interference, stoppage, or delay to the Project or any activity necessary to complete the Project;
(c) become insolvent;

(d) fails to properly and promptly make payment for all materials, equipment, labor and services provided in the performance of the Work; or

(e) fail in the Contractor's opinion in the performance or observance of any of the covenants, conditions, or other terms of this Subcontract (including, but not limited to, those contained in Article 15 [Safety] hereof), then in any such event, each of which shall constitute a default hereunder by Subcontractor, Contractor shall, after giving Subcontractor written notice of default and two (2) business days within which to cure said default, have the right to exercise any one or more of the following remedies:

(i) require that Subcontractor utilize, at its own expense, overtime labor (including Saturday and Sunday Work) and additional shifts as necessary to overcome the consequences of any delay attributable to Subcontractor's default;

(ii) attempt to remedy the default by whatever means Contractor may deem necessary or appropriate, including, but not limited to, correcting, furnishing, performing, or otherwise completing the Work, or any part thereof, by itself or through others (utilizing where appropriate any materials and equipment previously purchased for that purpose by Subcontractor) and deducting the cost thereof (plus an allowance for administrative burden equal to fifteen percent (15%) of such costs) from any monies due or to become due to Subcontractor hereunder;

(iii) after giving Subcontractor an additional two (2) business days written notice (at any time following the expiration of the initial two (2) business days notice and curative period), terminate this Subcontract, without thereby waiving or releasing any rights or remedies against Subcontractor or its sureties, and by itself or through others take possession of the Work, and all materials, equipment, facilities, plants, tools, scaffolds and appliances of Subcontractor relating to the Work, for the purposes of completing the Work and securing to Contractor the payment of its costs (plus an allowance for administrative burden equal to fifteen percent (15%) of such costs) and other damages under the Subcontract and for the breach thereof, it being intended that Contractor shall, for the stated purposes, be the assignee of and have a security interest in the property described above to the extent located on the Project site (and Contractor may at any time file this Subcontract as a financing statement under applicable law); or

(iv) recover from Subcontractor all losses, damages, penalties and fines (including without limitation actual and/or liquidated damages and any increase in Contractor's cost of insurance resulting from Subcontractor's failure to maintain insurance coverages required hereunder), and all reasonable attorneys' fees suffered or incurred by Contractor by reason of or as a result of Subcontractor's default.

Subcontractor shall not be entitled to receive any further payment until the Work shall be wholly completed to the satisfaction of Contractor and shall have been accepted by Contractor, Architect and Owner. After completion of the Work by the exercise of any one or more of the above remedies and said acceptance of the Work and full payment therefore by Owner, Contractor shall promptly pay Subcontractor the undisbursed balance of the Price, if any. If the cost of completion of the Work, plus the allowance for administrative burden, together with any other damages or losses sustained or incurred by Contractor, shall exceed the undisbursed balance of the Price, Subcontractor and its guarantors, surety or sureties shall pay the difference.

Initialed _____ DUSA / _____ Subc.

Case 1:21-cv-00087-JLDocumentenl 3 Filed 09/24/24 Page 32 of 98

within fifteen (15) days of written demand from Contractor. Such cost of completion shall include not only the cost of completing the Work to the satisfaction of Contractor and Owner and of performing and furnishing all labor, services, materials, equipment and other items required therefore, but also all losses, damages, costs and expenses, including, without limitation, attorney's and legal fees and disbursements, sustained, incurred or suffered or to be sustained, incurred or suffered by Owner or Contractor by reason of or resulting from any default of Subcontractor.

The foregoing remedies shall be considered separate and cumulative and shall be in addition to every other remedy given hereunder or under the Contract Documents, or now or hereafter existing at law or in equity. Subcontractor's guarantors, surety or sureties agree to be bound to Contractor with respect to such remedies notwithstanding any provision of the bonds provided pursuant to Article 10 hereof.

Except as limited by this Subcontract, Subcontractor shall have the rights and remedies available at law or in equity for a breach of this Subcontract by Contractor. Any default by Contractor shall be deemed waived unless Subcontractor shall have given Contractor written notice thereof within five (5) days after the occurrence of such default. Subcontractor shall be entitled to stop the Work or terminate this Subcontract only (a) on account of Contractor's failure to pay an amount to Subcontractor which is paid by Owner to Contractor under Subcontractor's Application for Payment that is approved in accordance with the Contract Documents and (b) where a good faith reason does not exist as to the withholding of such payments claimed by Subcontractor ("Contractor's Default"). Subcontractor shall not be entitled to stop the Work on account of a Contractor's Default unless such Contractor's Default shall have continued for more than ten (10) days after Contractor's receipt of written notice of such Contractor's Default from Subcontractor, specifying in detail the nature of the default and the steps necessary to cure the claimed default.

Subcontractor shall not be entitled to terminate this Subcontract except for a Contractor's Default which shall have continued for at least an additional thirty (30) days after (a) Subcontractor shall have stopped Work in accordance with this paragraph and (b) Contractor shall have received thirty (30) days written notice of Subcontractor's intention to terminate this Subcontract. Article 26 represents the Subcontractor's sole right to stop the Work or terminate this Subcontract.

Should any termination for default under Article 26 (iii) be determined to be invalid, improper or wrongful, such termination shall be deemed to have been a termination for convenience as provided in Article 28 below.

## ARTICLE 27, DISPUTES

In the event of any dispute between Subcontractor and Contractor arising out of or relating to this Subcontract, or the breach thereof, which involves the correlative rights and duties of Owner, the dispute shall be decided in accordance with the Contract Documents, and Subcontractor, its suppliers, subcontractors and its guarantors, surety, or sureties, shall be bound to Contractor to the same extent that Contractor is bound to Owner by the terms of the Contract Documents and by any decisions or determination made under the Contract Documents by an authorized person, board, court, arbitration, or other tribunal. Subcontractor shall be afforded a reasonable opportunity to present information and testimony involving its rights. Subcon-

tractor shall be solely responsible for the preparation of any information or testimony hereunder unless Contractor notifies Subcontractor in writing of its intention to provide attorneys and provide for the presentation of any case governed by this paragraph, in which case Subcontractor shall have the duty to cooperate with Contractor. Contractor shall have the right to join Subcontractor as a party in any dispute resolution procedure (including, without limitation, binding arbitration) between the Owner and Contractor, and/or between Contractor and any other Subcontractor(s), together with such other subcontractors or parties as may be appropriate, where in the sole judgment of Contractor the issues in dispute are related to the Work or performance of Subcontractor.

If a claim, dispute or other matter in controversy should arise between Contractor and Subcontractor under or relating to the Subcontract, or the breach thereof, which does not involve the correlative rights and duties of Owner and is not, therefore, controlled by the foregoing provision (the "Claim"), then the Claim shall be subject to non-binding mediation as a condition precedent to binding dispute resolution. Said mediation shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures then in effect. A request for mediation shall be made in writing to the other party to the Subcontract and filed with the person or entity administering the mediation. The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon in writing. Agreements reached in mediation shall be enforceable as settlement agreements in a court of competent jurisdiction located in the State in which the Project is located. Any Claim subject to, but not resolved by, mediation, shall be resolved in the same manner and under the same procedure as provided in the Contract Documents with respect to disputes between the Owner and Contractor. Alternatively, and at the sole discretion of Contractor, such Claims shall be resolved by binding arbitration in accordance with the Construction Industry Rules of the American Arbitration Association then in effect at a hearing locale in the place where the Project is located. A demand for arbitration shall be made in writing to the other party to the Subcontract and filed with the person or entity administering the mediation. The demand must assert all Claims known to the party filing the same on which arbitration is permitted to be demanded. A demand for arbitration shall not be made after the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable statute of limitations. The award rendered by the arbitrator(s) in any such arbitration shall be final, and judgment may be entered upon it in accordance with applicable law in any court of competent jurisdiction located in the State in which the Project is located. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to the Subcontract shall be specifically enforceable under applicable law in a court of competent jurisdiction located in the State in which the Project is located

In the event of any dispute as to whether any item or portion of the Project Work is within the scope of the Work to be performed by Subcontractor or any dispute as to whether Subcontractor is entitled to an extra payment, Subcontractor shall continue to proceed diligently with the performance of the Work, this Subcontract, and any disputed Work, pending any resolution. The existence of a dispute shall not be grounds

Page 13

Initialed ___ DUSA / ___ Subc.

Case 1:25-cv-00870-JLW Document 1 Filed 09/29/25 Page 33 of 98

for any failure to perform by Subcontractor nor limit the right of Contractor to proceed to remedy any default by Subcontractor.

## ARTICLE 28, EARLY TERMINATION

If Owner terminates the Contract or stops the Work for a reason other than the sole default of Contractor, Contractor may terminate this Subcontract or stop the Work for the same reason, and Subcontractor's rights and remedies, including the basis for payment of any unpaid portion of the Price, shall be limited to the corresponding rights and remedies available to Contractor under the Contract Documents, and controlled by Article 26 above. Should this Subcontract be terminated for default, Subcontractor shall assign all purchase orders and subcontracts to Contractor if Contractor, in its sole and absolute discretion, requests such assignments. Subcontractor agrees to incorporate such provisions in its agreements with suppliers and subcontractors to effectuate this Article 28. Nothing herein shall create any duty on the part of Contractor to accept the assignment of any purchase order or subcontract hereunder.

Further, in its sole discretion and without notice to any guarantors, surety, or sureties, Contractor may, at any time prior to final payment, terminate this Subcontract for its convenience upon the giving of written notice to Subcontractor. In no event shall Subcontractor be entitled to consequential damages or loss of profits on portions of the Work not yet performed. If terminated for convenience, Subcontractor shall be entitled to be paid all costs of all Work provided hereunder including reasonable and necessary costs of termination, as determined in accordance with the method set forth in Article 8 above, together with the Profit Percentage attributable to the costs so determined. Payment shall be made in accordance with and subject to the requirements of Article 4.

Without limitation, the following obligations, among others, of Subcontractor shall survive the termination of the Subcontract whether pursuant to this Subcontract: warranties and guarantees of Work performed; indemnity; payment of taxes, damages, losses and expenses; certifications; delivery of manuals, data on electronic media and as-built drawings; correction of Work performed; removal of liens; and cooperation with the construction lender.

## ARTICLE 29, SETOFF

If Subcontractor is, or hereafter begins, performing any work for Contractor other than the Work under the Subcontract and the unpaid balance of the Price becomes insufficient to complete such Work or compensate Contractor for any damages or deficiencies by the Subcontractor in the performance of the other work, Subcontractor hereby consents and agrees to allow Contractor, in its sole discretion and judgment, to setoff any of Contractor's claims against any funds due, or which may become due, Subcontractor under any other agreement with Contractor, or any subcontract on any other project. No refusal or failure of Contractor to exercise its rights hereunder shall constitute the basis of any right or claim against Contractor.

## ARTICLE 30, MISCELLANEOUS

(a) All matters relating to the validity, performance or interpretation of this Subcontract shall be governed by the law of the State in which the Project is located, applicable to the validity, performance or interpretation, as the case may be, of the Contract Documents. Any permitted action arising out of or pertaining to the Subcontract shall be commenced in a court of competent jurisdiction located in the State in which the Project is

located. In the event that any term, provision, or part of the Subcontract is held to be illegal, invalid or unenforceable, such term, provision, or part shall be deemed severed from the Subcontract and the remaining terms, provisions and parts shall remain unaffected thereby. Where the context requires, neuter terms used herein shall include the masculine and feminine, and singular terms shall include the plural, and vice versa.

(b) This Subcontract, including the documents incorporated herein by reference, embodies the entire agreement of the parties and supersedes all prior negotiations, agreements and understandings relating to the subject matter hereof. Subcontractor agrees that any claims against Contractor, irrespective of an alleged breach by Contractor of the Contract Documents, shall be based, nonetheless, upon this Subcontract and the Price, and shall in no event be based upon an asserted fair and reasonable value of the Work performed.

(c) This Subcontract may not be changed in any way except as herein provided or by a writing signed by a duly authorized officer or agent of each party. No requirement of this Subcontract may be waived except in writing signed by a duly authorized officer of the waiving party. This provision may not be waived orally by Contractor.

(d) The provisions of this Subcontract and the Contract Documents are intended to supplement and complement each other. If, however, any provision of this Subcontract irreconcilably conflicts with a provision of the Contract Documents, the provision imposing the greater duty on the Subcontractor shall govern.

(e) As to any claim which arises out of Subcontractor's performance which is also caused by the acts or omissions of any third party, Subcontractor's liability hereunder shall be joint and several.

(f) The failure of Owner or Contractor to insist upon performance or strict performance of any of the terms, covenants or conditions of this Subcontract or the Contract Documents shall not be deemed a waiver of any rights or remedies that Owner or Contractor may have; shall not be deemed to constitute an amendment of this Subcontract; and shall not be deemed a waiver of any subsequent breach or default by Contractor of any of the terms, covenants, or conditions of this Subcontract.

(g) This Subcontract also constitutes a Security Agreement and Financing Statement. The collateral hereunder shall include all materials, products and equipment in Subcontractor's possession or control for which payment has been made by Contractor, wherever such materials, products and equipment are located and including such materials, products and equipment stored off the site of the Project. Subcontractor agrees to execute such financing statements and to take whatever other actions are requested by Contractor to further grant, to perfect and to continue Contractor's security interest in the collateral. The Subcontractor does hereby convey, transfer, assign, set over and grant unto Contractor, as security for the performance of its obligations under this Subcontract, a continuing security interest in all of Subcontractor's right, title and interests whether now owned or hereafter acquired or arising in and to all materials, products and equipment in Subcontractor's possession or control for which payment has been by Contractor, whether such materials, products and equipment are located and including such materials, products and equipment stored off site of the Project. The Subcontractor covenants and agrees to execute and

Initialed _____ DUSA / _____ Subc.

Case 1:25-cv-00870-JLR Document 1 Filed 02/24/25 Page 34 of 98

deliver to Contractor such agreements, instruments and documentation as Contractor may request from time to time to effectuate the conveyance, transfer, assignment and grant to Contractor of all of the Subcontractor's right, title and interest in and to such security collateral and to evidence the substitution of Contractor in place of the Subcontractor as holder of the applicable security collateral. The Subcontractor hereby authorizes Contractor to file such UCC-1 financing statements as Contractor may deem necessary or desirable to perfect Contractor's security interest hereunder.

**IN WITNESS WHEREOF,** the parties have duly executed this Subcontract as of the date first above written.

| Subcontractor | | Dragados USA, Inc. | |
|---|---|---|---|
| **Subcontractor** | | | |
| By: | _(Signature)_ | By: | _(Signature)_ |
| Printed Name: | Christopher H. Myles | Printed Name: | Jose Ignacio Martin Alos |
| Title: | Chief Construction Officer | Title: | Senior Vice President |

Subcontractor Check ONE: ☐ Corporation/Limited Liability Company ☐ Partnership/Joint Venture ☐ Individual
If your company qualifies as one or more of the business enterprise types listed below, please check the appropriate box(s) and list certifying agency(s) below:

☐ DBE (Disadvantaged Business Enterprise)     ☐ SDVE (Small Disabled Veteran Enterprise)
☐ MBE (Minority Business Enterprise)     ☐ WBE (Women Business Enterprise)
☐ SBE (Small Business Enterprise)     ☐ N/A (Does not apply to your firm)

Certifying Agency(s): _____

_____

_____

If your company is a Minority Business Enterprise (MBE), please check the appropriate box:
☐ African American     ☐ Hispanic
☐ Aleutian Indian     ☐ Native American
☐ Asian

LICENSING: By executing this Subcontract, Subcontractor affirms that it holds the following contractor license(s) applicable to the Work as required by the state in which the Project is located.

State of _____N/A_____ License No(s). _____N/A_____ (If none required, enter "N/A")

License Classification(s): _____N/A_____

Expiration Date: _____N/A_____

Payments will not be processed without complete licensing information.

*Subcontractor's Federal Employer Identification No.: _____45-1564383_____

(If no E.I. Number, enter business owner's Social Security No.) *Per IRS 3402(s), 31% of each payment is required to be withheld and remitted to the IRS if E.I. Number or Social Security Number is not provided. This withholding amount will be in addition to Subcontract retainage.

For Dragados USA, Inc.'s Use:
☐ License Verified     ☐ Not Required     By: _____ Date: _____

Page 15

Initialed _____ DUSA / _____ Subc.

Case 1:25-cv-00870-JLR Document 1 Filed 01/29/25 Page 35 of 98

**SCHEDULE 1 — CONTRACT DOCUMENTS**

The Contract Documents referred to in Article 1 and elsewhere in this Subcontract consists of the Subcontract and the following:

The Contract Documents, sometimes referred to collectively as the "Subcontract," are listed below and shall constitute the Subcontract.

- This Subcontract with Schedules 1, 2, 3 and 4
- The Contract
- Accident Prevention Plan
- Environmental Management Plan
- Construction Quality Control Plan
- Exhibit A (Drawings/Specifications) consisting of <u>FTP</u> pages, and applicable revisions
- Exhibit B (General Scope of Subcontractor's Work) consisting of <u>1</u> pages, dated 11/17/16
- Exhibit C (Insurance Requirements) consisting of <u>3</u> pages
- Exhibit D (Unit Prices) consisting of <u>1</u> pages, dated 11/17/16

    (Note: The setting forth of unit prices shall not be construed to require Contractor to engage Subcontractor to perform the work for which unit prices are listed.)
- Exhibit E (Alternates) consisting of <u>N/A</u> pages, dated <u>N/A</u>
- Exhibit F (Bonding Requirements and Required Bond Forms) consisting of <u>5</u> pages
- Additional Exhibits:

    <u>Exhibit G Owner Required Contract Clauses</u>

The Subcontractor is bound by the terms of all Contract Documents.

Initialed _____ DUSA / _____ Subc.

Case 1:25-cv-00087-JLW Document 1-2 Filed 02/04/25 Page 36 of 98

## SCHEDULE 2 — PERFORMANCE SCHEDULE

Pursuant to Article 6 of this Subcontract and without limiting the provisions thereof, Subcontractor shall perform the Work and its several parts according to the following specific schedule and as the same may be revised from time to time by Contractor:

Subcontractor understands the need for timely delivery of related scope items throughout the duration of the Project. The Subcontractor will be bound by the same restrictions as the Contractor is bound to the Owner, which includes all Intermediate Completion Times listed in the Contract Documents. Subcontractor acknowledges that the schedule my vary and sequence of execution of the work may be changed to accommodate the general schedule of the Contractor.

Subcontractor understands that their work may be directly tied to the completion of the bridge work along NC147, and the opening of the Eastbound and Westbound lanes to traffic. Subcontractor also understands that this scope of work is directly related to the traffic phasing along NC147, and the weekend Intermediate Completion Times listed in the Contract Documents. Subcontractor shall have the appropriate resources available to complete the required work within the established ICT periods, where applicable. Subcontractor shall have the resources available to complete their work without delaying the Contractors operations, which could include work in multiple areas of the project simultaneously. The Subcontractor will be available upon request within 1 week notice to mobilize to the site to perform the scope of work.

## SCHEDULE 3 — TEMPORARY FACILITIES

All temporary Project site facilities and storage, sheds, shanties, material storage rooms, field offices, power, hoists, scaffolding, cold weather protection, etc. ("Temporary Facilities"), required in performing the Work shall be furnished by Subcontractor except as provided herein. Subcontractor agrees to furnish, at Subcontractor's expense, sufficient Temporary Facilities for the efficient performance of the Work. Subcontractor agrees to place its Temporary Facilities in locations designated by Contractor. When it becomes necessary, in the opinion of the Contractor, for Subcontractor to provide Temporary Facilities, Subcontractor will do so in an expeditious manner and at no additional cost. Temporary Facilities shall be equipped with fire extinguishers and shall be of fireproof material only, such as concrete, gypsum block, rated drywall, or sheet metal. The sole exceptions to Subcontractor's obligations to provide Temporary Facilities are:

The Temporary Facilities furnished by Contractor shall be without charge to Subcontractor except as otherwise indicated above.

In connection with their furnishing of the Temporary Facilities indicated above, Contractor shall not be liable for conditions beyond the reasonable control of Contractor which may interrupt, delay or otherwise interfere with the availability of such Temporary Facilities to Subcontractor. Unless otherwise expressly indicated, the Temporary Facilities furnished by Contractor shall not be for the exclusive use of Subcontractor, but shall be shared by others performing work on the Project. Contractor, therefore, reserves the exclusive right to schedule the use of any Temporary Facilities in accordance with its determinations as to the needs of the Project and shall incur no liability as a result thereof. If either party from time to time furnishes the other a crane, hoisting equipment, or other machinery or equipment, with or without an operator, for such party's exclusive use, then the using party shall at all times furnish adequate and competent supervision and direction therefor and shall be fully liable and responsible for safe and proper care, use and custody of such machinery or equipment.

Page 17

Initialed ___ DUSA / ___ Subc.

SCHEDULE 4 – EMPLOYMENT ELIGIBILITY VERIFICATION

In addition to Subcontracts compliance with this Schedule, the provisions of this Schedule must be incorporated into any subcontract Subcontractor enters into in connection with the performance of the Work.

1.	The Subcontractor shall obtain and pay for all necessary permits and licenses pertaining to the Work and shall comply with all federal, state, municipal and local laws, ordinances, codes, rules, regulations, standards, orders, notices and requirements, including but not limited to those relating to safety, discrimination in employment, fair employment practices, immigration laws or equal employment opportunity, and whether or not provided for by the other Contract Documents, without additional charge or expense to the Contractor and/or Owner and shall also be responsible for and correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of its Work. Each requisition for payment shall constitute a representation and warranty that Subcontractor is in compliance with applicable law.

2.	The Subcontractor shall at any time upon demand furnish such proof as Contractor may require showing such compli-ance and the correction of such violations. The Subcontractor agrees to save harmless and indemnify Contractor and Owner, as well as any other parties Contractor is required to defend, indemnify and hold harmless, and their respective agents, servants and employees, from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs and expenses, including reasonable legal fees and disbursements, caused or occasioned directly or indirectly by the failure of the Subcontractor or its subcontractor(s) of any tier to comply with any of said laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct such violations there-fore resulting from or in connection with the performance of Work.

3.	The Immigration and Nationality Act as amended by the Immigration Reform and Control Act of 1986 (IRCA) makes it illegal for employers to knowingly hire persons who are not authorized to work in the United States. For all employees, employers are re-quired to complete an Employment Eligibility Verification form I-9 which requires the prospective employee to produce documentation that establishes identity and employment eligibility. For more information visit www.uscis.gov, or speak to your attorney. Each subcontractor is solely responsible for properly completing Employment Eligibility Verifications for their own employees.

4.	Subcontractor acknowledges, represents and warrants that Subcontractor is aware of and understands IRCA (or any E-Verify requirement or other similar immigration law requirement where applicable), that Subcontractor is in compliance with IRCA (or E-Verify requirement or other similar immigration law requirement where applicable), and that Subcontractor is not knowingly employing workers who are not authorized to work in the United States. Subcontractor agrees that Subcontractor will not employ any worker under this Subcontract for whom Subcontractor has not completed and maintained verification. Subcontractor agrees that if Subcontractor acquires knowledge (constructive or otherwise), indicating that one of Subcontractor's workers on this Project may not be authorized to work in the United States, despite Subcontractor having conducted appropriate verification, that Subcontractor will exercise due diligence as required by law to confirm authorization status and take appropriate action which may include termination of employment. Subcontractor represents and warrants that they will not subcontract to or utilize labor sources that it knows or has reason to know violate IRCA (or E-Verify requirement or other similar immigration law requirement where applicable).

A.	Additional Employment Eligibility Verification (E-Verify) where E-Verify is required by Federal Acquisition Regulations (FAR).

As prescribed in FAR Section 22.1803, Subcontractor and its subcontractors of every tier shall comply with the following provisions to the fullest extent required by law:

Employment Eligibility Verification (Jan 2009)

(a)	*Definitions.* As used in this clause—

"Commercially available off-the-shelf (COTS) item"—

(1) Means any item of supply that is—

	(i)	A commercial item (as defined in paragraph (1) of the definition at FAR Section 2.101);

	(ii)	Sold in substantial quantities in the commercial marketplace; and

	(iii)	Offered to the Government, without modification, in the same form in which it is sold in the commercial market-place; and

(2) Does not include bulk cargo, as defined in section 3 of the Shipping Act of 1984 (46 U.S.C. App. 1702), such as agricultural products and petroleum products. Per 46 CFR 525.1 (c)(2), "bulk cargo" means cargo that is loaded and carried in bulk onboard ship without

Page 18                                                                                    Initialed _____ DUSA / _____ Subc.

mark or count, in a loose unpackaged form, having homogenous characteristics. Bulk cargo loaded into intermodal equipment, except LASH or Seabee barges, is subject to mark and count and, therefore, ceases to be bulk cargo.

"*Employee assigned to the contract*" means an employee who was hired *after* November 6, 1986, who is directly performing work, in the United States, under a contract that is required to include the clause prescribed at FAR Section 22.1803. An employee is not considered to be directly performing work under a contract if the employee—

    (1) Normally performs support work, such as indirect or overhead functions; and

    (2) Does not perform any substantial duties applicable to the contract.

"*Subcontract*" means any contract, as defined in FAR Section 2.101, entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract. It includes but is not limited to purchase orders, and changes and modifications to purchase orders.

"*Subcontractor*" means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime Contractor or another subcontractor.

"*United States*", as defined in 8 U.S.C. 1101(a)(38), means the 50 States, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

(b)    *Enrollment and verification requirements.*

    (1) If the Subcontractor is not enrolled as a Federal Contractor in E-Verify at time of contract award, the Subcontractor shall—

        (i)    *Enroll.* Enroll as a Federal Contractor in the E-Verify program within 30 calendar days of contract award;

        (ii)    *Verify all new employees.* Within 90 calendar days of enrollment in the E-Verify program, begin to use E-Verify to initiate verification of employment eligibility of all new hires of the Subcontractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); and

        (iii)    *Verify employees assigned to the contract.* For each employee assigned to the contract, initiate verification within 90 calendar days after date of enrollment or within 30 calendar days of the employee's assignment to the contract, whichever date is later (but see paragraph (b)(4) of this section).

    (2) If the Subcontractor is enrolled as a Federal Contractor in E-Verify at time of contract award, the Subcontractor shall use E-Verify to initiate verification of employment eligibility of—

        (i)    *All new employees.*

        (A)    *Enrolled 90 calendar days or more.* The Subcontractor shall initiate verification of all new hires of the Subcontractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); or

        (B)    *Enrolled less than 90 calendar days.* Within 90 calendar days after enrollment as a Federal Contractor in E-Verify, the Subcontractor shall initiate verification of all new hires of the Subcontractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); or

        (ii)    *Employees assigned to the contract.* For each employee assigned to the contract, the Subcontractor shall initiate verification within 90 calendar days after date of contract award or within 30 days after assignment to the contract, whichever date is later (but see paragraph (b)(4) of this section).

    (3) If the Subcontractor is an institution of higher education (as defined at 20 U.S.C. 1001(a)); a State or local government or the government of a Federally recognized Indian tribe; or a surety performing under a takeover agreement entered into with a Federal agency pursuant to a performance bond, the Subcontractor may choose to verify only employees assigned to the contract, whether existing employees or new hires. The Subcontractor shall follow the applicable verification requirements at (b)(1) or (b)(2) respectively, except that any requirement for verification of new employees applies only to new employees assigned to the contract.

Page 19

Initialed _____ DUSA / _____ Subc.

(4) *Option to verify employment eligibility of all employees.* The Subcontractor may elect to verify all existing employees hired after November 6, 1986, rather than just those employees assigned to the contract. The Subcontractor shall initiate verification for each existing employee working in the United States who was hired after November 6, 1986, within 180 calendar days of—

      (i)      Enrollment in the E-Verify program; or

      (ii)     Notification to E-Verify Operations of the Subcontractor's decision to exercise this option, using the contact information provided in the E-Verify program Memorandum of Understanding (MOU).

(5) The Subcontractor shall comply, for the period of performance of this contract, with the requirements of the E-Verify program MOU.

      (i)      The Department of Homeland Security (DHS) or the Social Security Administration (SSA) may terminate the Subcontractor's MOU and deny access to the E-Verify system in accordance with the terms of the MOU. In such case, the Subcontractor will be referred to a suspension or debarment official.

      (ii)     During the period between termination of the MOU and a decision by the suspension or debarment official whether to suspend or debar, the Subcontractor is excused from its obligations under paragraph (b) of this clause. If the suspension or debarment official determines not to suspend or debar the Subcontractor, then the Subcontractor must reenroll in E-Verify.

(c)     *Web site.*

Information on registration for and use of the E-Verify program can be obtained via the Internet at the Department of Homeland Security Web site:

*http://www.dhs.http://www.dhs.gov/E-Verifyhttp://www.dhs.gov/E-Verifygov/E-Verify.*

(d)     *Individuals previously verified.*

The Subcontractor is not required by this clause to perform additional employment verification using E-Verify for any employee—

     (1) Whose employment eligibility was previously verified by the Subcontractor through the E-Verify program;

     (2) Who has been granted and holds an active U.S. Government security clearance for access to confidential, secret, or top secret information in accordance with the National Industrial Security Program Operating Manual; or

     (3) Who has undergone a completed background investigation and been issued credentials pursuant to Homeland Security Presidential Directive (HSPD)-12, Policy for a Common Identification Standard for Federal Employees and Contractors.

(e)     *Subcontracts.*

The Subcontractor shall include the requirements of this clause, including this paragraph (e) (appropriately modified for identification of the parties), in each subcontract that—

     (1)  Is for—

      (i)      Commercial or noncommercial services (except for commercial services that are part of the purchase of a COTS item (or an item that would be a COTS item, but for minor modifications), performed by the COTS provider, and are normally provided for that COTS item); or

      (ii)     Construction;

     (2) Has a value of more than $3,000; and

     (3) Includes work performed in the United States.

Initialed ___ DUSA / ___ Subc.

Case 1:25-cv-00087-JLT Document 1-2 Filed 09/24/25 Page 40 of 98

This Exhibit B defines the General Scope to be performed by the Subcontractor.

The Scope of Work includes furnish and installation (and removal as applicable) of all items referenced in Exhibit D as modified based on over-runs/under-runs from NCDOT estimated quantities. Payment for services rendered is based on actual measured quantities and the unit prices referenced in Exhibit D, and all the subsequent addendums to the Special Provisions which the Subcontractor acknowledges they have read and agree with.

Scope and Price include as many mobilizations as required to complete all the work contained in this Agreement.

Subcontractor is responsible for providing all labor, materials, equipment, and other resources necessary to perform the scope of work. Material exclusions include Bearings and foam joint seals.

Subcontractor acknowledges that a certain amount of night and weekend work may be required at times throughout the Project duration, which is included in the unit prices listed in Exhibit D. If required, portable light plants are to be furnished by subcontractor.

Traffic Control will be the responsibility of the Contractor, when required. However, Subcontractor must request applicable lane/traffic closures a minimum of 7 days in advance, and approval of such must be provided in writing by Contractor and NCDOT. Lack of approval does not constitute a delay.

All required Quality Assurance and Quality Control testing is the responsibility of the Subcontractor.

All required submittals before, during and after the Work are the Subcontractors responsibility, and are included in the unit prices listed in Exhibit D. This includes but is not limited to Traffic Protection, Falsework and Formwork, Catalog cuts and certifications of material, and Railroad submittals.

All Bonds and Insurance specifically required by this Agreement are the Subcontractor's responsibility, and are included in the unit prices listed in Exhibit D.

The Scope of Work will be executed in compliance with all the Project environmental permits.

Material certifications are to be delivered to the Project Engineer or the Document Control Manager the same day that any materials are delivered onsite. Material can be delivered to the site only with the Superintendent or the Project Engineers approval. The Contractor is not responsible for the guard and custody of the materials and equipment delivered. All Material delivered to the site must be inspected and approved by the onsite NCDOT inspector. All material rejected by the onsite NCDOT inspector will be removed and replaced at no cost to the Contractor.

Except to the extent covered by Contractor's Builder's Risk insurance, any Work that is broken / damaged by accident/vandalism/weather events whatsoever during the project term will be covered by the Subcontractor and no cost to be charged to the Contractor. Upon written notification by the Contractor of damaged or missing material, Subcontractor will propose a plan for the prompt replacement of the required material to be delivered at no additional cost for the Contractor.

Subcontractor will follow and complete all required paperwork and measures required by the Contractor for documentation/safety purposes.

Subcontractor shall supply a four-week schedule to the Contractor at the beginning of each week showing their path of progression through the project.

The Subcontractor is bound to the same terms, conditions, deadlines and intermediate contract times, as the Contractor is bounded with the Owner, and no additional compensation associated with these items will be granted to the Subcontractor, unless Contractor receives additional compensation.

It is the Subcontractors responsibility to verify and check that its Work is installed as per the 2012 NCDOT Standard Specifications and the Project Special Provisions. If for any reason a modification must be made to these standards, the Subcontractor must receive written approval from the Contractor and submit a sketch detailing why the traffic signs could not be placed as indicated.

Initialed _____ DUSA / _____ Subc.

In this Exhibit C, the phrase "Contractor" refers to the Contractor named on page 1 of the Subcontract.

Subcontractor shall provide insurance as follows:

1.   Workers Compensation and Employers Liability

    a.   Statutory Workers Compensation (including occupational disease) in accordance with the laws of the state in which the work is performed, including the Other States Endorsement.

    b.   Employers Liability Insurance with $500,000 in limits for each of the following exposures: bodily injury by accident (each accident); bodily injury by disease (policy limit), bodily injury by disease (each employee).

    c.   Waiver of Subrogation in favor of all parties referenced in 2f below.

2.   Commercial General Liability ("CGL") with a combined single limit for Bodily Injury, Personal Injury and Property Damage of at least $5,000,000 per occurrence and aggregate. The general aggregate limit shall apply on a per project basis. The limit may be provided through a combination of primary and umbrella/excess liability policies.

    The terms and conditions of coverage shall be provided through the use of ISO Coverage Form CG-00-01-1001 or its equivalent, and shall encompass at least the following.

    a.   X, C and U hazards, where applicable;

    b.   Independent Contractors;

    c.   Blanket Written Contractual Liability covering all Indemnity Agreements, including Subcontract, Article 12 "Indemnity";

    d.   Products Liability and Completed Operations, with the provision that coverage shall extend for a period of at least twelve (12) months from Project completion or for any longer period if required elsewhere in the Contract Documents (such longer period shall take precedence);

    e.   CGL coverage written on an occurrence form;

    f.   Endorsement naming North Carolina Department of Transportation Dragados USA, Inc. ("DUSA"), and DUSA's parent and affiliates (to the extent applicable), and any other entity as required in the Owner/Contractor Agreement as Additional Insureds. ISO Form CG 2010 1185 or its equivalent shall be used to provide this coverage, unless the Project is located in the States of California, Colorado, Kansas, Montana, New Mexico or Oregon, then the ISO state-specific endorsement for the applicable state shall be used to provide this coverage in those states. The use of both ISO forms 2033 1001 and 2037 1001 together will be considered as an equivalent.

    g.   Waiver of Subrogation in favor of all Additional Insureds.

    h.   Policy to be primary as respects the coverage afforded the Additional Insureds.

3.   Commercial Automobile Liability (including all owned, leased, hired and non-owned automobiles) with a combined single limit for Bodily Injury and Property Damage of at least $1,000,000 per occurrence. The limit may be provided through a combination of primary and umbrella/excess liability policies. Parties referenced in 2f above shall be covered as Additional Insureds.

4.   Umbrella and/or excess liability policies may be used to comply with CGL, Auto Liability and Employers Liability limits shown above.

5.   To the extent the Subcontractor's Work requires the stamp or seal of a professional engineer (P.E.) or the submission of calculations or drawings of a design professional, Subcontractor shall procure and maintain at its own expense professional liability insurance by a nationally recognized insurance company authorized and qualified to do business in the State in which the Project is located and rated "A" or better by A. M. Best & Company, with minimum limits of $5,000,000 and with a maximum deductible or self insured retention of $100,000. The Professional Liability Insurance Policy shall provide that the insurance carrier will promptly notify Contractor and the Owner of any failure by Subcontractor to renew such policy on each anniversary date of the policy for a period of at least five (5) years from the completion of the Project. Subcontractor shall keep the policy in full force and effect for a period of five (5) years following completion of the Project. Subcontractor shall deliver to Contractor a certificate of insurance evidencing the aforesaid policy at least once each year following the date of this Subcontract and for a period of five (5) years after completion of the Project. During the course of the Subcontract, and for a period of five (5) years subsequent to the date of completion of the Project, Subcontractor shall promptly provide to Contractor written notice of any claim asserted, the entry of any settlement, or the rendering of any judgment which may be covered by the professional liability insurance policy mentioned above and which either individually or in the aggregate exceeds twenty

Page 22                                                                                    Initialed _____ DUSA / _____ Subc.

five percent (25%) of the available policy limits of any such insurance policy. The Contractor reserves the right to require higher limits if the value of Subcontractor's Work exceeds more than ten percent (10%) of the original Price.

6. If Subcontractor uses a crane, it will be required to supply Contractor with an updated crane certification and adhere to OSHA Standard # 1926.550. In addition, a crane liability insurance certificate (coverage $1,000,000 per occurrence) shall be provided to Contractor in writing prior to crane arriving on the job site. Subcontractor shall furnish certificates of insurance within five (5) days after the execution of the Subcontract to Contractor, which shall state applicable deductibles, if any, and a declaration stating if the policy excludes punitive damages, is on a claims made basis, or where limits are materially impaired by prior claims.

7. If Subcontractor utilizes testing companies or surveying companies, it shall obtain or require such testing companies or surveying companies to obtain Errors and Omissions liability coverage in the amounts stated above in Section 5. Certificates of Insurance are to be provided to Contractor prior to commencement of the Work.

8. If Subcontractor operates with the Railroad Right of Way, it shall obtain the required Railroad Insurance as specified in the Contract.

9. A Certificate of Insurance indicating coverages applicable to the Project and providing for thirty (30) days written notice prior to cancellation, non-renewal or material modification in any policy must be submitted, approved, and available to Dragados USA, Inc., prior to commencement of work. Submit certificate to:

**Dragados USA, Inc.**
4600 Marriott Drive, Suite 140
Raleigh, NC 27612


Attn:    Jose Martin Alos

A Certificate of Insurance, when submitted to the Contractor, constitutes a warranty by Subcontractor that:

a. The general aggregate limit applies on a per project basis.

b. Blanket Contractual Liability under the Commercial General Liability Policy has been endorsed to cover the Indemnitees specified in Article 12 of the Subcontract between the Contractor and the Subcontractor.

c. The Commercial General Liability Policy names as Additional Insureds North Carolina Department of Transportation Dragados USA, Inc. ("DUSA"), and DUSA's parent and affiliates (to the extent applicable) and any other entity as required in the Owner/Contractor Agreement. ISO Form CG 2010 1185 or its equivalent shall be used to provide this coverage, unless the Project is located in the States of California, Colorado, Kansas, Montana, New Mexico or Oregon, then the ISO state-specific endorsement for the applicable state shall be used to provide this coverage in those states. The use of both ISO forms 2033 1001 and 2037 1001 together will be considered as an equivalent.

d. With respect to the Excess Liability Insurance, the following policies are scheduled as primary:

- Commercial General Liability
- Automobile Liability
- Employers Liability

e. The insurance policies for all Subcontractor's insurance shall include a waiver of subrogation as follows:

"It is agreed that in no event shall these insurance companies have any right of recovery against North Carolina Department of Transportation, and Dragados USA, Inc., or any other additional insured as required in the Owner/Contractor Agreement."

f. The insurance policies shown are endorsed to be primary as respects any other insurance available to any Additional Insured.

**The reverse side of the certificate must list each of the above items "a" through "f", and the following statement must precede the listing: "This certificate warrants that:"**

10. All insurance carriers must: (i) be licensed in the State where the Project is located; and (ii) be rated at least A in Best's.

11. The Subcontractor shall secure, pay for, and maintain Property Insurance necessary for protection against loss of owned, borrowed, or rented capital equipment and tools, including any tools owned by employees, and any tools, equipment, staging, towers, and forms owned, borrowed or rented by the Subcontractor. The requirement to secure and maintain such insurance is solely for the benefit of the Subcontractor. Failure of the Subcontractor to secure such insurance or to maintain adequate levels of coverage shall not obligate North Carolina Department of Transportation, Dragados USA, Inc., or their agents and

Page 23                                                                                 Initialed _____ DUSA / _____ Subc.

employees or any other additional insured as required in Owner/Contractor Agreement for any losses, and North Carolina Department of Transportation, Dragados USA, Inc., and their agents and employees and any other additional insured as required in Owner/Contractor Agreement shall have no such liability. The property insurance shall include a Waiver of Subrogation in favor of all parties required to be named as additional insureds under the Contract Documents.

12. Should the Subcontractor engage a subcontractor, the same conditions applicable to the Subcontractor under these Insurance Requirements shall apply to each subcontractor.

Initialed _____ DUSA / _____ Subc.

Case 1:25-cv-00870-JLW Document 3 Filed 09/24/25 Page 44 of 98

East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) In Durham
**Exhibit D — Unit Prices**

| BID ITEM | UNIT | QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|
| | | | | *100,000* | *100,000* |
| 001 | LS | 1.00 | Mobilization | ~~$225,000.00~~ | ~~$225,000.00~~ |
| 636 | LS | 1.00 | Pollution Control | $135,000.00 | $135,000.00 |
| 647 | EA | 42.00 | Elastomeric Bearings [Installation] | $75.00 | $3,150.00 |
| 648 | CF | 435.50 | Concrete Repairs | $300.00 | $130,659.00 |
| 649 | CF | 190.53 | Shotcrete Repairs | $300.00 | $57,159.00 |
| 650 | LF | 409.00 | Epoxy Resin Injection | $60.00 | $24,540.00 |
| ~~651~~ | ~~LS~~ | ~~1.00~~ | ~~Foam Joint Seals [Installation]~~ | ~~$35,000.00~~ | ~~$35,000.00~~ |
| 657 | LS | 1.00 | Painting Existing Structure | $600,000.00 | $600,000.00 |
| 673 | LS | 1.00 | Under Structure Work Platform | $160,000.00 | $160,000.00 |
| 691 | LB | - | Structural Steel For Girder Repair (Qty < 5,001LB) | $28.00 | - |
| 691 | LB | - | Structural Steel For Girder Repair (5,000LB < Qty < 10,001LB) | $24.00 | - |
| 691 | LB | - | Structural Steel For Girder Repair (10,000LB < Qty < 20,001LB) | $20.00 | - |
| 691 | LB | - | Structural Steel For Girder Repair (20,000LB < Qty < 30,001LB) | $16.00 | - |
| 691 | LB | 42,000.00 | Structural Steel For Girder Repair (Qty > 30,000LB) | $13.00 | $546,000.00 |
| 694 | SF | 4,239.00 | Epoxy Protective Coating | $10.00 | $42,390.00 |
| 704 | EA | 26.00 | Girder Jacking | $5,000.00 | $130,000.00 |
| | HR | - | Welder per hour | $85.00 | - |
| | EA | - | Sole Plate (galvanized removed) | $100.00 | - |
| | EA | - | Sole Plate (galvanized not removed) | $125.00 | - |
| | HR | - | Welder helper per hour | $25.00 | - |
| | LS | - | Bond (2%) | $41,777.96 | $41,777.96 |
| | | | Total | | ~~$2,130,675.96~~ |

*Handwritten annotations: CHM. 1/12/17; CHM. to Remove (line) 1/12/17; CHM. 1,970,675.96 1/12/17*

The Subcontractor will be paid under the same circumstances as the Contractor is paid by the Owner and all the inclusions/exclusions within their unit price established in the Project Specifications and in the 2012 NCDOT Standard Specifications will apply.

Page 25

Initialed _____ DUSA / _____ Subc.

**All bonds are to be prepared in DUPLICATE.**

Subcontractor shall provide the following:
Performance Bond and a Labor and Material Payment Bond, written in the full contract amount, as set forth in this Exhibit F and in Article 10 of the Subcontract.

- All SIGNATURES and SEALS must be in place

Bonds must be accompanied by the following:

- Valid Power of Attorney with sufficient limits for the full Contract Amount

- Corporate and Surety Acknowledgment completed and notarized

- Current Financial Statement of the issuing Surety company

## —IMPORTANT—

Attached are the required Bond formats.

Surety Bonds will be obtained from Surety companies with a Best's rating of "A" (Excellent) or better. In addition, the Surety shall have a Best's Financial Size Category equivalent to at least Class VIII. If the Performance Bond is issued in an amount exceeding $1,000,000, then a higher Financial Size Category may be required.

If the Subcontractor fails to obtain the Surety Bonds in accordance with the above, the Contractor reserves the right to grant an exception to these requirements or to reject the Surety Bonds based on inadequate financial protection.

When completed, please forward all bonds to:

**Dragados USA, Inc.**
4600 Marriott Drive, Suite 140
Raleigh, NC 27612

Attn:    Jose Martin Alos

Page 26

Initialed ___ DUSA / ___ Subc.

Consistent with Article 1 of this Subcontract, Subcontractor acknowledges that it has received copies of, and has reviewed, the Contract Documents (including any amendments or modifications thereto) and agrees to be bound thereby insofar as they relate or apply to the Work and this Subcontract and obligations to be performed by Subcontractor thereunder. All of the obligations of Contractor to the Owner or other parties concerning the Work set forth in the Contract Documents shall become the obligations of the Subcontractor to the Contractor or the Owner or other parties, as applicable, under this Subcontract. Any rights Owner or other parties have against Contractor concerning the Work under the Contract Documents shall be a right of such parties and Contractor against Subcontractor under this Agreement.

Without limiting the foregoing in any manner, or the terms and conditions of this Subcontract, including, but not limited to Article 1 thereof, and in addition thereto, Contractor has identified below certain specific clauses and Exhibits in the Contract Documents that Subcontractor and its subcontractors and/or suppliers of every tier shall comply with (to the extent applicable and as appropriate) and/or be bound by. Such Owner-required contract clauses and Exhibits are attached hereto. Subcontractor shall include such terms and conditions in each agreement with its subcontractors and/or suppliers of any tier to ensure compliance by the subcontractors and/or suppliers with all applicable requirements of the Contract Documents.

The following is a non-exhaustive list of said contract clauses:

**North Carolina Department of Transportation Proposal (Contract ID C203394)**

**Project Special Provisions**
Contract time and liquidated damages 1 – 14
Minority and Women Business Enterprises 20 – 34
Contractor's License Requirements 34
Resource Conservation 35
Domestic Steel 35
Twelve Month Guarantee 39 – 40
Gifts from Vendors and Contractors 40 – 41
E-Verify Compliance 48

**Standard Special Provisions**
Plant and Pest Quarantines 7
Minimum Wages 8
On The Job Training 9 – 11

**Standard Specifications for Roads and Structures, January 2012**
Entire Specification including but not limited to:
Section 102-2 (B) and (C) (Bidding Requirements and Conditions)
Section 104-12 (Value Engineering Proposal)
Section 106-1 (General Requirements)
Section 107-1 (Laws to be Observed)
Section 107-13 (Protection of Public Lands)
Section 107-14 (Responsibility for Damage Claims)
Section 107-21 (Safety and Accident Protection)
Section 108-5 (Character of Workmen, Methods and Equipment)
Section 108-6 (Subletting of Contract)
Section 108-9 (B) (Default of Contract)
Section 109-3 (Force Account Work)
Section 109-4 (B) (Prompt Payments)

Exhibit G

Initialed _____ DUSA / _____ Subc.

This Attachment is dated of even date with, and is hereby incorporated into and made a part of the Subcontract Agreement between Dragados USA, Inc. and Subcontractor for the Project, dated November 17, 2016.

Subcontractor acknowledges the specific risks involved in the construction of the Project. Subcontractor represents that it is familiar with such risks and that it has had the opportunity to read, and has read and understood, the documents listed below. Subcontractor further represents and warrants that all its personnel/equipment or delivery companies contracted and related to this Project will read and agree to comply with all the requirements set forth in the following documents, as they may be amended from time to time:

Accident Prevention Plan

Environmental Management Plan

Construction Quality Control Plan

Project Specifications

NCDOT Standard Specifications

Subcontractor accepts responsibility for all liability that may arise in connection with a violated of the above documents.

On behalf of Subcontractor

 Christopher H. Myles, Chief Construction Officer

On behalf of Dragados USA,

Jose Martin Alos, Senior Vice President

Case 1:25-cv-00870-JLW   Document 1-2   Filed 09/29/25   Page 48 of 98



# CERTIFICATE OF LIABILITY INSURANCE

| | |
|---|---|
| **DATE (MM/DD/YYYY)** | 11/21/2016 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | | CONTACT NAME: Linda Sorrow | | | |
|---|---|---|---|---|---|---|
| Correll Insurance Group-Gaffney | | | PHONE (A/C, No, Ext): (864) 489-5788 | | FAX (A/C, No): (864) 489-7392 | |
| 103 N Johnson St | | | E-MAIL ADDRESS: lsorrow@correllinsurance.com | | | |
| PO Box 1387 | | | **INSURER(S) AFFORDING COVERAGE** | | | **NAIC #** |
| Gaffney SC 29342 | | | INSURER A: Navigators Insurance Company | | | 42307 |
| **INSURED** | | | INSURER B: Southern Cross Underwriters | | | |
| Extreme Concrete Cutting of Gaffney, LLC | | | INSURER C: Riverport Insurance Company | | | |
| 115 Madison Ave | | | INSURER D: | | | |
| | | | INSURER E: | | | |
| Gaffney SC 29340 | | | INSURER F: | | | |

## COVERAGES          CERTIFICATE NUMBER:CL164848708          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **X** COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE **X** OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | DN16CGL150888IC | 4/4/2016 | 4/4/2017 | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | **X** POLICY **X** PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | ☐ OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS **X** SCHEDULED AUTOS | | | 71APR332925 | 3/10/2016 | 3/10/2017 | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | Underinsured motorist | $ 300,000 |
| A | **X** UMBRELLA LIAB **X** OCCUR | | | | | | EACH OCCURRENCE | $ 3,000,000 |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 3,000,000 |
| | ☐ DED **X** RETENTION $ 10,000 | | | HO16EXC835080IC | 4/4/2016 | 4/4/2017 | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | | | | | **X** PER STATUTE ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | WC398401795000 | 5/1/2016 | 5/1/2017 | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Project Location: NC 98 to NC 147, Durham County, NC

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Dragados USA, Inc.<br>4600 Marriott Dr, Suite 140<br>Raleigh, NC 27612 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>**AUTHORIZED REPRESENTATIVE**<br>Linda Sorrow/LINDAS     *Linda Sorrow* |

**ACORD 25 (2014/01)**
INS025 (201401)

© 1988-2014 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF INSURANCE

This certificate is issued for informational purposes only. It certifies that the policies listed in this document have been issued to the Named Insured. It does not grant any rights to any party nor can it be used, in any way, to modify coverage provided by such policies. Alteration of this certificate does not change the terms, exclusions or conditions of such policies. Coverage is subject to the provisions of the policies, including any exclusions or conditions, regardless of the provisions of any other contract, such as between the certificate holder and the Named Insured. The limits shown below are the limits provided at the policy inception. Subsequent paid claims may reduce these limits.

| Certificate Holder: | Named Insured: |
|---|---|
| DRAGADOS USA, INC.<br>4600 MARRIOTT DR STE 140<br>RALEIGH, NC 27612-3303 | EXTREME CONCRETE CUTTING OF GAFFNEY LLC<br>115 MADISON AVE<br>GAFFNEY SC 29340-4710 |

| Automobile Liability | | | | |
|---|---|---|---|---|
| Insurer Name: Allstate Insurance Company | | | | |
| Policy Number: 648267660 | | | | |
| 1 – Any Auto | | 2 – Owned Autos Only | | 3 – Owned Priv. Pass. Autos Only |
| 4 – Owned Autos Other Than Priv. Pass. Autos Only | | 5 – Owned Autos Subject to No Fault | X | 6 – Owned Autos Subject to a Compulsory UM Law |
| X 7 – Specifically Described Autos | X | 8 – Hired Autos Only | X | 9 – Non-owned Autos Only |
| Policy Effective Date: 02-13-2016 | | Policy Expiration Date: 02-13-2017 | | |
| Limits Of Insurance: | $ 1,000,000 | Combined Single Limit (each accident) | | |
| | BI Per Person | | BI Per Accident | PD Per Accident |
| Description of Operations/Locations/Vehicles/Endorsements/Special Provisions | | | | |
| PROJECT LOCATION: NC 98 TO NC 147, DURHAM COUNTY, NC | | | | |

Interested Party Type: CERTIFICATE HOLDER

THIS CERTIFICATE DOES NOT GRANT ANY COVERAGE OR RIGHTS TO THE CERTIFICATE HOLDER.

IF THIS CERTIFICATE INDICATES THAT THE CERTIFICATE HOLDER IS AN ADDITIONAL INSURED, THE POLICY(IES) MUST EITHER BE ENDORSED OR CONTAIN SPECIFIC LANGUAGE PROVIDING THE CERTIFICATE HOLDER WITH ADDITIONAL INSURED STATUS. THE CERTIFICATE HOLDER IS AN ADDITIONAL INSURED ONLY TO THE EXTENT INDICATED IN SUCH POLICY LANGUAGE OR ENDORSEMENT.

| Producer: | |
|---|---|
| BRINTLEY INSURANCE AGENCY | |
| Authorized Representative: | |
| | Date: 11-22-16 |

Includes copyrighted material of Insurance Services Office, Inc., with its permission

Certificate Copy

**Exhibit**

**3**

## Performance Bond

Bond No. ___602-107065-9_____     Premium Amount $ _____

KNOW ALL MEN BY THESE PRESENTS,

That we,   Extreme Concrete Cutting of Gaffney, LLC,
_____
(Full Name and Address of Subcontractor)

115 Madison Avenue, Gaffney, South Carolina 29340
_____

(hereinafter called the Principal), as Principal, and   United States Fire Insurance Company,
_____
(Full Name and Address of Surety)

305 Madison Avenue, Morristown, New Jersey 07962
_____

a corporation duly organized under the laws of the state of   Delaware
(hereinafter called the Surety), as Surety, are held and firmly bound unto:

　　　　　Dragados USA, Inc.

　　　　　4600 Marriot Drive, Suite 140

　　　　　Raleigh, NC 27612

(hereinafter called the Obligee)

in the sum of   Two Million, One Hundred Thirty Thousand, Six Hundred Seventy-Five and 96/100***_____   U.S. Dollars
($ 2,130,675.96*** _____ ), for the payment of which we, the said Principal and the said Surety, bind
ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal entered into a certain Contract dated   November 17_____ , 2016_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(Month, Day)　　　　　　(Year)

with Dragados USA, Inc., for:

East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) In Durham
Durham, North Carolina

which is hereby referred to and made a part hereof as if fully set forth herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly and faithfully perform said Contract, within the time provided therein and any extension thereof that may be granted by the Obligee, and during the life of any guaranty required under said Contract, and shall also promptly and faithfully perform any and all authorized modifications of said Contract that may hereafter be made, then this obligation shall be null and void; otherwise, it shall remain in full force and effect.

The Surety agrees that no change, extension of time, alteration, addition, omission or other modification of the Contract Documents, as specified in the Contract, shall in any way affect its obligations under this Bond, and the Surety hereby waives notice of any such changes, extensions of time, alterations, additions, omissions or other modifications.

Whenever Principal shall be, and declared by Obligee, to be in default, in breach, and/or to have failed to perform in any manner under the Contract, the Obligee having performed its obligations thereunder, the Surety shall promptly remedy the default by one of the following:

1. Complete the Contract in accordance with its terms and conditions.

2. Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Obligee, and make available as Work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the Contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, and pursuant to the Contract, the amount set forth in the first paragraph hereof. The term "balance of the Contract price," as used in this paragraph, shall mean the total amount payable by Obligee to the Principal under the Contract and any amendments thereto, less the amount properly paid by Obligee to the Principal.

3. Pay to Obligee the full amount of the penal sum above stated.

For projects located in the State of Connecticut, Surety is liable for and is obliged to pay any interest, costs, penalties or attorneys' fees imposed upon the Principal under any provisions of Connecticut Public Act 99-153, entitled "An Act Concerning Fairness in Financing in the Construction Industry."

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators, successors or assigns of the Obligee.

Performance Bond — Page 1　　　　　　　　　　　　　　　　　　　　Initialed ____ DUSA / ____ Subc.

Principal and Surety shall not be liable to the Obligee unless the Obligee has performed its obligations to the Principal in accordance with the terms of said Contract.

Sealed with our seals and dated this ___22nd___ day of ___November___, ___2016___
                                        *(Day)*                    *(Month)*          *(Year)*

                                                    Extreme Concrete Cutting of Gaffney, LLC
                                                    _____
                                                                    *(Principal)*

_____          By:       _Project Manager_
*(Attested by)*                                                  *(Title)*

                                                              SEAL

_____                    United States Fire Insurance Company
*(Attested by)*   Kathryn McCartha-Powers                          *(Surety)*
                                                    _____ *
                                                            *(Attorney-in-Fact)*  C. Wayne McCartha

                                                              SEAL

                                                    *Attach Power-Of-Attorney

Performance Bond - Page 2                           Initialed ____DUSA / ____ Subc.

## Labor and Material Payment Bond

Bond No. 602-107065-9                                 Premium Amount $ _____

**KNOW ALL MEN BY THESE PRESENTS,**

That we, Extreme Concrete Cutting of Gaffney, LLC.
_____
*(Full Name and Address of Subcontractor)*

115 Madison Avenue, Gaffney, South Carolina 29340

(hereinafter called the Principal), as Principal, and    United States Fire Insurance Company,
_____
*(Full Name and Address of Surety)*

305 Madison Avenue, Morristown, New Jersey 07962

a corporation duly organized under the laws of the state of    Delaware
(hereinafter called the Surety), as Surety, are held and firmly bound unto:

Dragados USA, Inc.

4600 Marriot Drive, Suite 140

Raleigh, NC 27612

(hereinafter called the Obligee)

in the sum of    Two Million, One Hundred Thirty Thousand, Six Hundred Seventy-Five and 96/100***    U.S. Dollars
($ 2,130,675.96*** ), for the payment of which we, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal entered into a certain Contract dated    November 17    , 2016
                                                                *(Month, Day)*        *(Year)*
with Dragados USA, Inc., for:

East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) In Durham
Durham, North Carolina

which is hereby referred to and made a part hereof as if fully set forth herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all claimants as hereafter defined, for all (1) labor and material used or reasonably required for use in the performance of the Contract, (2) pension, welfare, vacation and any other supplemental employee benefit contributions payable under collective bargaining agreements with respect to persons employed upon said work, and (3) federal, sate and local taxes and contributions required to be withheld or paid with respect to the employment of persons upon said work that may hereafter be made, then this obligation shall be void; otherwise, it shall remain in full force and effect, subject, however, to the following conditions:

1.  A claimant is defined as one having a direct contract with the Principal or a subcontractor of the Principal, for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2.  The above-named Principal and Surety hereby jointly and severally agree with the Obligee that every claimant as herein defined, who has not been paid in full, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Obligee shall not be liable for the payment of any cost or expenses of any suit.

3.  No suit or action shall be commenced hereunder by any claimant:

    a.  After the expiration of the minimum period of limitation permitted by any law controlling the construction hereof.

    b.  Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, and not elsewhere.

The Surety agrees that no change, extension of time, alteration, addition, omission or other modification of the Contract Documents, as specified in the Contract, shall in any way affect its obligations under this Bond, and the Surety hereby waives notice of any such changes, extensions of time, alterations, additions, omissions or other modifications.

For projects located in the State of Connecticut, Surety is liable for and is obliged to pay any interest, costs, penalties or attorneys' fees imposed upon the Principal under any provisions of Connecticut Public Act 99-153, entitled "An Act Concerning Fairness in Financing in the Construction Industry."

Labor and Materials Payment Bond - Page 1                    Initialed _____ DUSA / _____ Subc.

Principal and Surety shall not be liable to the Obligee unless the Obligee has performed its obligations to the Principal in accordance with the terms of said Contract.

Sealed with our seals and dated this      22nd      day of      November  ,  2016
                                        _(Day)_                      _(Month)_     _(Year)_

Extreme Concrete Cutting of Gaffney, LLC
_(Principal)_

_____      By:      Project Manager
_(Attested by)_                                             _(Title)_

SEAL

United States Fire Insurance Company
_(Surety)_

_____                 *
_(Attested by)_   Kathryn McCartha-Powers         _(Attorney-In-Fact)_   C. Wayne McCartha

SEAL

**\*Attach Power-Of-Attorney**

Initialed _____DUSA / _____ Subc.

**POWER OF ATTORNEY**
**UNITED STATES FIRE INSURANCE COMPANY**
**PRINCIPAL OFFICE - MORRISTOWN, NEW JERSEY**

**14821**

**KNOW ALL MEN BY THESE PRESENTS**: That United States Fire Insurance Company, a corporation duly organized and existing under the laws of the state of Delaware, has made, constituted and appointed, and does hereby make, constitute and appoint:

*C. Wayne McCartha, Kathryn McCartha-Powers, Raymond E. Cobb, Jr.*

each, its true and lawful Attorney(s)-In-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver: Any and all bonds and undertakings of surety and other documents that the ordinary course of surety business may require, and to bind United States Fire Insurance Company thereby as fully and to the same extent as if such bonds or undertakings had been duly executed and acknowledged by the regularly elected officers of United States Fire Insurance Company at its principal office, in amounts or penalties not exceeding: **Seven Million, Five Hundred Thousand Dollars ($7,500,000).**

This Power of Attorney limits the act of those named therein to the bonds and undertakings specifically named therein, and they have no authority to bind United States Fire Insurance Company except in the manner and to the extent therein stated.

This Power of Attorney revokes all previous Powers of Attorney issued on behalf of the Attorneys-In-Fact named above and expires on January 1, 2017.

This Power of Attorney is granted pursuant to Article IV of the By-Laws of United States Fire Insurance Company as now in full force and effect, and consistent with Article III thereof, which Articles provide, in pertinent part:

Article IV, Execution of Instruments - Except as the Board of Directors may authorize by resolution, the Chairman of the Board, President, any Vice-President, any Assistant Vice President, the Secretary, or any Assistant Secretary shall have power on behalf of the Corporation:

(a) to execute, affix the corporate seal manually or by facsimile to, acknowledge, verify and deliver any contracts, obligations, instruments and documents whatsoever in connection with its business including, without limiting the foregoing, any bonds, guarantees, undertakings, recognizances, powers of attorney or revocations of any powers of attorney, stipulations, policies of insurance, deeds, leases, mortgages, releases, satisfactions and agency agreements;

(b) to appoint, in writing, one or more persons for any or all of the purposes mentioned in the preceding paragraph (a), including affixing the seal of the Corporation.

Article III, Officers, Section 3.11, Facsimile Signatures. The signature of any officer authorized by the Corporation to sign any bonds, guarantees, undertakings, recognizances, stipulations, powers of attorney or revocations of any powers of attorney and policies of insurance issued by the Corporation may be printed, facsimile, lithographed or otherwise produced. In addition, if and as authorized by the Board of Directors, dividend warrants or checks, or other numerous instruments similar to one another in form, may be signed by the facsimile signature or signatures, lithographed or otherwise produced, of such officer or officers of the Corporation as from time to time may be authorized to sign such instruments on behalf of the Corporation. The Corporation may continue to use for the purposes herein stated the facsimile signature of any person or persons who shall have been such officer or officers of the Corporation, notwithstanding the fact that he may have ceased to be such at the time when such instruments shall be issued.

**IN WITNESS WHEREOF,** United States Fire Insurance Company has caused these presents to be signed and attested by its appropriate officer and its corporate seal hereunto affixed this 5th day of August, 2015.



**UNITED STATES FIRE INSURANCE COMPANY**

Anthony R. Slimowicz, Senior Vice President

State of New Jersey }
County of Morris }

On this 5th day of August, 2015 before me, a Notary public of the State of New Jersey, came the above named officer of United States Fire Insurance Company, to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seal of United States Fire Insurance Company thereto by the authority of his office.

**SONIA SCALA**
**NOTARY PUBLIC OF NEW JERSEY**
**MY COMMISSION EXPIRES 3/25/2019**

Sonia Scala                                    (Notary Public)

I, the undersigned officer of United States Fire Insurance Company, a Delaware corporation, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy is still in force and effect and has not been revoked.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed the corporate seal of United States Fire Insurance Company on the 22 day of Nov. 2016

**UNITED STATES FIRE INSURANCE COMPANY**

Al Wright, Senior Vice President

**Exhibit**

**4**

## COMPLETION AGREEMENT

**East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC**
**Prime Contract No. C203394, WBS 34745.3.S**
**Subcontract 037a- Structure Rehabilitation**

This Completion Agreement (the "Agreement") is made and entered into this _14_ day of _February_, 20_20_, by and between United States Fire Insurance Company ("Surety") and Dragados USA, Inc. ("Dragados").

## RECITALS

**WHEREAS,** Dragados entered into a contract (the "Contract"), with Extreme Concrete Cutting of Gaffney, LLC ("Extreme" or "Principal"), concerning Dragados' Prime Contract No.: C203394, WBS 34745.3.S2 East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC with North Carolina Department of Transportation ("Project"); and,

**WHEREAS,** Surety on behalf of Extreme, as Principal, issued a Performance Bond ("Performance Bond") and Payment Bond ("Payment Bond"), both designated with bond No. 602-107065-9 in the amount of $2,130,675.96 for the benefit of Dragados, as obligee, in connection with the Contract (collectively referred to as the "Bonds"); and,

**WHEREAS,** on or about September 25, 2018 and June 5, 2019, Dragados notified Extreme it was in default of Article 26 of the Contract; and,

**WHEREAS,** Extreme failed to timely cure its default; and,

**WHEREAS,** Dragados made the default final and issued a Notice of Termination to Extreme by letter dated June 20, 2019; and,

**WHEREAS,** Dragados made demand under the Performance Bond for completion of work remaining under the Contract; and,

**WHEREAS,** payment will be made to Surety for completion of the Project as provided in the Contract; and,

**WHEREAS,** the Surety shall complete the Contract in accordance with the terms of the Performance Bond and in accordance with this Agreement.

**NOW, THEREFORE,** in consideration of the agreements and undertakings hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Dragados and the Surety agree as follows:

## AGREEMENTS

1.    The Surety hereby undertakes to cause the performance of the Contract, which together with all Contract Documents comprising same is incorporated herein by reference, including all

Case 1:25-cv-00870-JLW   Document 1-3   Filed 09/24/25   Page 56 of 98

modifications thereto, in accordance with terms, covenants and conditions thereof. Dragados acknowledges that the Surety, by its execution of this Agreement, is acting in its capacity as the Surety for Extreme in making arrangements for the performance and completion of the Contract, and not as a completing contractor, and that the Surety is not assuming any obligations or liabilities beyond those set forth in the Bonds. As to the completion of the Contract, except as otherwise provided in this Agreement, the Surety is entitled to all rights, title, and interest of Extreme in and to the Contract in all respects as if the Surety were the original party to the Contract.

2.      Surety will contract the performance of the work under the Contract, including modifications requested and authorized by Dragados,[1] to one or more contractors (the "Completion Contractor(s)"). The Surety shall satisfy the required insurance obligations under the Contract by providing evidence of the required insurance coverage carried by Completion Contractor(s).

3.      Dragados and the Surety agree that as of the date of this Agreement:

(a)      Dragados' payment records for the project details the following:

| | |
|---|---|
| Original Contract Amount without Supplemental Agreements | $ 1,970,675.96 |
| Changes Issued To Date | $      30,233.06 |
| Revised Contract Amount | $ 2,000,909.02 |
| Funds Earned To Date | $    978,340.02 |
| Funds Paid To Date | $    970,077.52 |
| Funds Earned to Date, but unpaid | $      8,262.50 |
| Remaining Contract Balance, including unpaid | $ 1,022,569.00 |

(b)      This is only an estimate of these amounts. The final contract balance will be based upon the terms of the Contract and unit prices for the remaining work.

(c)      Within 30 days of execution of this Agreement, Dragados will make payment for any funds earned to date, but not paid to Extreme prior to the parties' entry into this Agreement, pursuant to the direction of the Surety.

4.      Dragados agrees that the Contract Balance, including earned but unpaid funds, is dedicated to and will be applied to the completion of the Contract pursuant to this Agreement. Dragados shall pay directly to the Surety, or as directed by the Surety, the Contract Balance, plus or minus any additional amounts of money on account of any modifications requested and authorized by Dragados, in accordance with the Contract's original schedule of values unless modified by agreement of the parties. Surety reserves any right it may have to object to any future modifications if it could have the effect of increasing Surety's exposure on its Performance Bond (either by increasing the amount of the contract price or the

---

[1] Surety reserves any right it may have to object to a modification(s) if it could have the effect of increasing Surety's exposure on its Performance Bond (either by increasing the amount of the contract price or the contract time).

contract time. Payment of the Contract Balance to the Surety or the person directed by the Surety to receive such payments shall be made in accordance with the terms of the Contract. The Surety agrees to spend its own funds as may be necessary to pay for the performance of all of Extreme's obligations under the Contract in the event that the Contract Balance is insufficient, with any such payments being credited against the penal sum of the Performance Bond.

5.    Insofar as Dragados has any right, title, or interest therein, Dragados agrees that the Surety and (Completion Contractor) shall have the right to use, without charge, any of the equipment, materials and appurtenances furnished or supplied by Extreme which may be stored on or about the premises of the Project site or materials which may have been fabricated for use in connection with the Contract, whether or not presently upon the Project site.

6.    All payments properly made by the Surety for the performance of the Contract, less all payments made by Dragados to the surety pursuant to this Agreement, shall be credited against the penal sum of the Performance Bond. Nothing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety under the Performance Bond.

There shall be no reduction of the penal amount for the expenses incurred by the Surety for legal fees, consulting fees, or similar expenses related to the termination of Extreme's contract.

7.    In no event shall Dragados withhold any of the Contract Balance from the Surety because of or on account of any claims, suits, or demands by any persons or entities furnishing or alleging to have furnished labor and/or materials to the Project that occurred prior to the Agreement. The Payment Bond shall remain in full force and effect in accordance with its terms and provisions.

8.    The Surety and Dragados agree that by the execution of this Agreement and its performance thereunder, the Surety reserves and does not waive any rights, remedies, or defenses of the Surety or Extreme with respect to any claims or defenses, including with regard to delays and proposed assessment of liquidated damages by Dragados or NCDOT, that the Surety or Extreme may or might have against Dragados or NCDOT under the contract. The Surety and Dragados agree that Dragados reserves and does not waive any rights, remedies, or defenses that it may or might have against the Surety or Extreme.

9.    Nothing contained in this Agreement constitutes a waiver by the Surety of any rights it has against Extreme or its Indemnitors which it may have to seek reimbursement or indemnity with respect to the payments which the Surety is making pursuant to this Agreement, with respect to any payments which the Surety makes under the Payment Bond issued, nor with respect to any fees and expenses incurred by the Surety as a result of having issued either the Performance Bond or the Payment Bond. It is expressly understood and agreed that the Surety is reserving all rights, claims, and causes of action it has against Extreme and its Indemnitors, which it now has or which may arise in the future to seek reimbursement or indemnity with respect to any payments of any kind made by the Surety involving or arising out of the Project or the Performance Bond or Payment Bond and with respect to any and all expenses incurred by the Surety as a result of having issued the Payment Bond or the Performance Bond.

10.    This Agreement is solely for the benefit of Dragados and the Surety. Dragados and the Surety do not intend by any provision of this Agreement to create any rights in or increase the rights of any third-parties, nor to confer any benefit upon or enforceable rights under this Agreement or otherwise upon anyone other than Dragados and the Surety. Specifically, Dragados and the Surety acknowledge

Case 1:25-cv-00870-JLW   Document 3   Filed 09/24/25   Page 58 of 98

that nothing in this Agreement shall extend or increase the rights of any third-party claimants or the liabilities or obligations of the Surety under the Bonds.

11. Surety consents, and Dragados agrees, to Completion Contractor and Dragados dealing directly with each other in the normal, day-to-day administration of the Contract without the necessity of Surety's involvement. Surety shall not be required to maintain full-time presence on site or participation in the normal, day-to-day administration of the Contract. However, it is agreed that Surety will be provided copies of formal communications about the Contract and the Work and notice of any matters arising under the Contract for which the Contractor or Completion Contractor would be provided notice. Furthermore, no action or decision affecting the Surety's potential liability or exposure under its Performance Bond shall be taken without Surety's knowledge or approval/consent.

12. This Agreement constitutes the whole of the understanding, discussions, and agreements by and between Dragados and the Surety. The terms and provisions of this Agreement are contractual and not mere recitals. Dragados and the Surety acknowledge that there have been no oral, written or other agreements of any kind as a condition precedent to or to induce the execution and delivery of this Agreement. Any written or oral discussions conducted prior to the effective date of this Agreement shall not in any way vary or alter the terms of this Agreement.

13. This Agreement shall not be changed, amended or altered in any way except in writing and executed by both Dragados and Surety.

14. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

15. Any notices to cure, any notice under any termination or default provision of the Contract, or any other notices which are required to be given by the terms of the Contract, this Agreement or the Bonds shall be made as follows:

**As to Dragados:**

Jose Ignacio Martin Alos
Dragados USA, Inc.
7920 ACC Blvd., Suite 210
Raleigh, North Carolina 27617
Email: jmartinalosb@Dragados-USA.com
Phone: (404) 702-1030

**With a copy to:**

Matt Levey
Dragados USA, Inc.
303 US70 Service Road
Durham, NC 27703
Email: mlevey@Dragados-USA.com
Phone: 919-564-5857

Case 1:25-cv-00870-JLW   Document 1   Filed 09/24/25   Page 59 of 98

| | |
|---|---|
| **As to Surety:** | Eric Johansen |
| | Crum & Forster |
| | 305 Madison Avenue |
| | Morristown, NJ 07960 |
| | Email: Eric.Johansen@cfins.com |
| | Phone: 973-753-3301 |
| | |
| **With a copy to:** | Melissa Rice |
| | Crum & Forster |
| | 305 Madison Avenue |
| | Morristown, NJ 07960 |
| | Email: melissa.rice@cfins.com |
| | Phone: 215-982-3534 |

16. This Agreement shall become effective upon execution by the Surety and Dragados.

17. This Agreement shall be binding upon the parties and their respective successors and assigns.

18. In the event that one or more provisions of this Agreement shall be declared to be invalid, illegal or unenforceable in any respect, unless such invalidity, illegality or unenforceability in any respect, shall be tantamount to a failure of consideration, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date indicated above, and each of the undersigned personally represent and warrant that they have the full right, power and authority to execute this Agreement on behalf of the respective parties.

**DRAGADOS USA, INC.**

By: _____
Signature

JOSE I. MARTIN Alg
Printed Name

SVP NC, SC & VA
Title

**U.S. FIRE INSURANCE COMPANY**

By: _____
Signature

Michelle Stegmann
Printed Name

Sr. VP, Claims Surety
Title

## AGREEMENT BETWEEN SURETY AND COMPLETION CONTRACTOR

**East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC**
**Prime Contract No. C203394, WBS 34745.3.S**
**Subcontract 037a- Structure Rehabilitation**

This Agreement made this 31 day of January, 2020, by and between United States Fire

Insurance Company (hereinafter referred to as "Surety") and Lee Construction Company of the

Carolinas, Inc. (hereinafter referred to as the "Completion Contractor") upon the following

terms:

WHEREAS, Dragados USA, Inc. (hereinafter referred to as "Obligee") entered into a

contract (as amended, the "Original Contract") with Extreme Concrete Cutting of Gaffney, LLC

("Original Contractor") for Bridge Repairs on Dragados' Prime Contract No.: C203394, WBS

34745.3.S2 East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway)

Durham, NC with North Carolina Department of Transportation (the "Project"); and,

WHEREAS, Surety, issued a Performance Bond and a Payment Bond, each bearing

bond Number 602-107065-9, to the Obligee, covering the Original Contract between the Obligee

and Original Contractor; and,

WHEREAS, on or about September 25, 2018 and June 5, 2019, the Obligee declared

Original Contractor in material breach of the contract; and,

WHEREAS, the Obligee made the default final and issued a Notice of Termination

by letter dated June 20, 2019; and,

WHEREAS, the Obligee made demand under the Performance Bond; and,

Exhibit

5



WHEREAS, contemporaneous with the execution of this Agreement, Surety is executing a Completion Agreement with the Obligee pertaining to the completion of the Original Contract (which Completion Agreement is attached hereto as **Exhibit A** and incorporated herein by reference); and,

WHEREAS, Completion Contractor has submitted a proposal to Surety to perform and complete the work under the Original Contract remaining to be performed and completed following termination of the Original Contractor, as specified in the attached **Exhibit B** (the "Remaining Work"), in accordance with the Contract Documents and in a manner consistent with the Completion Agreement between Obligee and Surety for the consideration stated below; and,

WHEREAS, the parties acknowledge that Completion Contractor will not be responsible or liable to the Obligee or Surety for delays in the work under the Original Contract or for delays in the Remaining Work that are incurred, experienced, or result from actions, omissions or events occurring prior to Completion Contractor receiving a Notice to Proceed hereunder, or which result from the need to address any latent defects in the work of the Original Contractor or from the need to satisfy any warranty obligation in connection with work performed by the Original Contractor; and,

NOW, THEREFORE, in consideration of the mutual promises, undertakings, agreements and covenants herein contained, the validity and sufficiency of which, and the consideration therefor, being expressly acknowledged by each of the parties, Surety and Completion Contractor agree as follows:

## I. WHEREAS CLAUSES AND THE WORK

**1.1**    The precatory and "Whereas" clauses recited above are incorporated herein and made part hereof.

**1.2**    Completion Contractor hereby assumes responsibility to Surety and the Obligee for performance of the Remaining Work set forth in **Exhibit B**. Completion Contractor agrees to undertake and complete all Remaining Work pursuant to any applicable plans and specifications therefor and in a manner consistent with the Completion Agreement between Surety and the Obligee. The effectiveness of this Agreement is contingent and conditioned upon the execution of the Completion Agreement between Surety and the Obligee; however, effective upon the execution of the Completion Agreement between Surety and the Obligee, the Completion Agreement between the Surety and Obligee is incorporated herein by reference to the extent not inconsistent with the terms and provisions herein, and to the extent of any inconsistency, the terms of this Agreement shall control in all respects. By way of amplification, but without any limitation, in assuming said obligations and duties Completion Contractor agrees:

    **1.2.1**    To perform all Remaining Work and supply and pay for all labor, materials, and equipment necessary for the completion of the Remaining Work, and to facilitate final acceptance of the Project described in the Original Contract.

    **1.2.2**    Except to the extent expressly modified herein, to perform the Remaining Work in accordance with applicable provisions of the Original Contract, the specifications, drawings, conditions, general provisions, notices, supplements and amendments, modifications, change orders, and all clarifications and supplemental instructions issued



through the date of this Agreement, all of which such Contract Documents are made a part hereof.

## II. CONTRACT DOCUMENTS

**2.1** Completion Contractor acknowledges that it has all required Contract Documents necessary for completion and acceptance of the Remaining Work required herein and has inspected the construction site and the work in place. Completion Contractor expressly states and acknowledges that it has not relied upon any representation of the Surety regarding work conditions or access to the Remaining Work, and has visually inspected the Project site and access conditions. Completion Contractor further acknowledges that it shall not be excused from performance of the Remaining Work hereunder because of poor or difficult access. The Contract Documents hereunder, which are made part hereof by reference as to the Remaining Work, consist of the following:

**2.1.1** This Completion Agreement, including pages 1 through 14 inclusive;

**2.1.2** The Original Contract Documents as they relate to the Remaining Work, including, without limitation, all general provisions, supplemental general provisions, conditions, specifications, drawings, Modifications, Change Orders, and all clarifications and supplemental instructions issued through the date of this Agreement and provided to Completion Contractor; and

**2.1.3** Surety's Invitation to Bid, and

**2.1.4** Completion Contractor's Proposal, attached as **Exhibit B.**



**2.2**   These Contract Documents constitute the entire agreement between Surety and the Completion Contractor and may be altered or amended only by duly-executed written instruments. Completion Contractor represents and warrants that it is familiar with all such Contract Documents and accepts same.

### III. CONTRACT TIME

**3.1**   Time is of the essence. Completion Contractor and Surety shall, at the Surety's discretion, meet within seven (7) calendar days of the date of this agreement at the Project site to hold a pre-construction meeting regarding the Remaining Work. The work shall commence within seven (7) calendar days of receipt of a Notice to Proceed from Surety, and from the date Completion Contractor commences the Remaining Work shall achieve substantial completion within 120 calendar days and final completion within an additional 30 calendar days.

**3.2**   Completion Contractor shall be liable to Surety for all actual damages incurred by Surety by reason of delay caused by Completion Contractor in completion of the Remaining Work after the time period set forth in paragraph 3.1, including all liquidated damages assessed against the Surety by Obligee under the Contract Documents by reason of delay caused by Completion Contractor in completion of Remaining Work after the time period set forth in Paragraph 3.1. In no event shall Completion Contractor be responsible or liable for any delays or other costs, damages, or expenses caused by the Original Contractor, or caused by events or the action or inaction of others (except Completion Contractor's own subcontractors).

### IV. COST OF THE WORK

**4.1**   Completion Contractor agrees to perform and complete the Remaining Work as defined in Article I, for the unit prices set forth in **Exhibit B** attached hereto.



Case 1:25-cv-00870-JLR   Document 1   Filed 09/24/25   Page 65 of 98

**4.2**   As to unit price items, Completion Contractor shall be paid for the Remaining Work based on verified quantities accepted and approved by Obligee. Completion Contractor and Surety expressly acknowledge that Completion Contractor shall not be liable for latent defects in the work performed by Original Contractor or its Subcontractors.   Surety shall compensate Completion Contractor for any corrective work authorized by Surety due to such latent defects, in accordance with the unit prices and fee schedule set forth in **Exhibit B**. Contractor shall not be required to perform any work on the Project in addition to the Remaining Work (whether directed by Obligee or Surety), without authorization and agreement as to payment for said work from Surety or Obligee.

**4.3**   Except as otherwise provided, Surety shall not be liable for extra or additional work, or increased costs of any kind, unless authorized by Surety in writing in advance or allowed, approved and paid for by Obligee, or approved in a properly executed modification or change order by Surety.

**4.4**   In no event will Surety be liable to Completion Contractor under this Agreement for amounts in excess of the penal sum in its Performance Bond No. 602-107065-9 (copy attached as **Exhibit C**).   Surety will provide advance notice to the Completion Contractor in the event it reasonably anticipates exceeding the penal sum of the Bond.   Nothing in this paragraph will be construed to limit Completion Contractor's rights and/or claims to seek payment due for the Remaining Work from Obligee, Original Contractor, or others in the event Surety expends the penal sum of the Bond.



Case 1:25-cv-00870-JLD   Document 1-2   Filed 09/24/25   Page 66 of 98

## V. PAYMENTS

**5.1**    The Completion Contractor shall be paid for the Remaining Work under this Agreement, as set forth above, by Surety based on approved quantities and payment from the Obligee as processed and paid in accordance with the terms and procedures of the Original Contract. Additionally, Surety will pay directly to Completion Contractor, in accordance with the preceding Section, those amounts due in accordance with the schedule as set forth herein. Progress payments shall be based upon the quantities completed by the Completion Contractor and approved by the Obligee. Completion Contractor and Surety shall undertake all efforts necessary to facilitate payment by Obligee under the Original Contract and shall execute any supplemental agreements necessary for this purpose.

**5.2**    Surety is in the process of ratifying the Subcontract for Painting (the scope of work that Completion Contractor did not include in its bid attached as Exhibit B). Completion Contractor will be required to coordinate and schedule its work with the Painting Subcontractor.

**5.3**    Except as otherwise provided as to Surety's payment obligations hereunder, Completion Contractor shall be responsible to provide all information needed to make application for payment required under the Contract Documents for submission to Obligee. Copies of all such applications for payment shall be submitted to Surety in such time that they may be properly and finally submitted to Obligee, and Completion Contractor shall also submit to Surety any required application for payment hereunder with respect to amounts to be paid directly by Surety. Unless otherwise provided, payments shall be made by Surety to Completion Contractor according to the times set forth in the Original Contract.



Case 1:25-cv-00870-JLR   Document 1   Filed 09/29/25   Page 67 of 98

**5.4**     Final payment shall be due to Completion Contractor from Surety according to the times and conditions set forth in the Original Contract, and any final payment from Surety shall be due within twenty (20) days of Surety receiving notice of final acceptance and final payment from the Obligee.

### VI. BONDS AND INSURANCE

**6.1**     Completion Contractor shall obtain, effect, maintain and pay for all insurance that may be required by the Original Contract Documents or by law with respect to the Remaining Work, including liability insurance protecting Surety and the Obligee against claims for bodily injury, death or damaged property and for such other risks as are specified in the Contract Documents relating to the Remaining Work and occurring upon, or in connection with the execution of the Remaining Work covered under this Agreement, with limits in the amount at least equal to the amount specified in the Original Contract. Said insurance will be in a form, and issued by a company or companies, satisfactory to the Obligee and Surety, which policies name the Obligee and Surety as additional insureds.     Completion Contractor's insurance will be primary. Completion Contractor will furnish Surety and Obligee with certification that the Completion Contractor has complied with these requirements, and if requested, will provide Surety with a certificate by the insurance company issuing each such policy that such policy will not be cancelled except after thirty (30) days notice to Surety and the Obligee of intentions so to do.

6.2     Completion Contractor shall procure and provide to Surety a Performance Bond and Payment Bond, each in the penal amount of $1,282,558.00.  Said bonds shall be provided to Surety within seven (7) calendar days of notice of award from the Surety, and shall name Surety



Case 1:21-cv-00870-JLL Document 1-2 Filed 09/29/25 Page 68 of 98

as obligee under the Bonds, and shall be in such form and by such company as is acceptable to Surety and Obligee.

## VII. CONTRACT ADMINISTRATION

**7.1**     Without limiting the generality of Completion Contractor's obligation under this Agreement to complete the Remaining Work in accordance with the applicable requirements of the Original Contract, Completion Contractor shall process and handle for its own account, and on behalf of Surety, all necessary paperwork, and all other matters required for the prosecution of the Remaining Work, and that may be required by Obligee to obtain progress payments, final acceptance of the Remaining Work and final payments.  Completion Contractor's obligations shall include maintaining sufficient books, records, accounts and reports for the Remaining Work (all of which shall be available to Surety for its examination upon reasonable notice to Completion Contractor during regular business hours), to enable Surety to be fully informed as to the progress of the Remaining Work.

**7.2**     Completion Contractor shall have the authority to deal directly with the Obligee on all matters regarding day-to-day administration and prosecution of the Remaining Work.  Surety may be required to execute modifications, change orders, extensions or reductions of time, under the Contract Documents, and shall be required to do so with respect to any modification or change order which would have the effect of increasing or extending Surety's risk under its Bonds or the Completion Agreement with the Obligee.  As to such that relate to the Remaining Work, Completion Contractor shall be bound by the determination of the Obligee, to the extent that Surety is bound thereby, regarding said change orders, extensions or reductions of time, and shall be entitled to only those extensions of time, change orders or increase or decrease in

Case 1:25-cv-00870-JLR   Document 3   Filed 09/29/25   Page 69 of 98

Contract quantities and price as are actually made or paid by Obligee to Surety and/or the Completion Contractor. Completion Contractor shall be consulted in advance of any agreement or execution of any such change order, extension or reduction of time by Surety. Completion Contractor reserves its rights to make a claim or otherwise seek reimbursement or payment from Obligee and/or Surety with respect to any change order or modification pertaining to the Remaining Work with respect to which Completion Contractor has not consented.

**7.3** Completion Contractor shall not, without the prior written consent of Surety, which will not be unreasonably withheld, assign or sublet in whole or in part, any interest under any of the Contract Documents, and specifically, shall not assign any money due or to become due hereunder without prior written consent of Surety, which will not be unreasonably withheld.

**7.4** Completion Contractor shall be responsible for scheduling and coordinating the work of all its employees and subcontractors on the Project.

**7.5** Completion Contractor will cooperate with the representatives of Obligee in conducting inspections to determine quantities of the Remaining Work and the date or dates of substantial completion and final completion.

**7.6** If the Completion Contractor fails to correct defective work performed by the Completion Contractor, or persistently fails in supplying materials or equipment for the Remaining Work in accordance with the applicable Contract Documents, then upon Completion Contractor's receipt of notice from Surety and seven (7) days opportunity to cure, Surety may order the Completion Contractor to stop the work, or any portion thereof, until the cause for such order has been eliminated.



**7.7** In the event of any termination of the Contract between Obligee and Surety, or if Obligee breaches its Contract with Surety, Surety may terminate this Agreement, and shall pay Completion Contractor such sums due and owing for Remaining Work performed as of the date of termination, and for the cost of materials and equipment previously purchased, leased and/or ordered to perform the Remaining Work as of the time of receipt of notice of termination.

**7.8** Completion Contractor shall supervise and perform the Remaining Work in a good and workmanlike manner, and shall be solely responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Remaining Work under this Agreement.

**7.9** Unless otherwise specifically noted, Completion Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for the proper execution and completion of the Remaining Work. However, Completion Contractor shall not be liable for amounts claimed due but not paid by the Original Contractor, Surety, Obligee or other entity, for any work performed under the Original Contract, including without limitation, labor, material and/or equipment supplied by or through the Original Contractor, regardless of the time such claim is asserted. Surety will be responsible for such claims under its Payment Bond, subject to the terms of and/or defenses under such Payment Bond.

**7.10** Surety shall provide to Completion Contractor materials which Surety has acquired for use on the Project and which are stored at the Project site, as detailed on the attached **Exhibit E.** Completion Contractor will utilize said materials as needed for the Remaining Work and will not include costs associated with such materials in its bid or Completion Price. Upon Substantial



Completion of the Remaining Work or the Project, and receipt of notice of such from Completion Contractor, Surety may at its option and within five (5) calendar days of said notice, take possession and control, and remove from the Project site at its cost all remaining materials that have not been used in connection with the Remaining Work or incorporated into the Project. In the event Surety does not elect to exercise this option, and said materials are not removed from the project site within five (5) calendar days of the referenced notice, Completion Contractor shall assume title and control of said unused materials and discard or otherwise remove them from the site and dispose of them so that the site is clean and acceptable to the Obligee.

## VIII. INDEMNITY AND WARRANTY

**8.1**    Completion Contractor agrees to indemnify and hold harmless the Obligee and Surety against any and all losses, liabilities, costs, and expenses on account of any injury or claimed injury to persons or property damage incurred in respect to or arising out of the Completion Contractor's failure to perform the Remaining Work in accordance with the terms of this Agreement.

**8.2**    Completion Contractor agrees to indemnify and save harmless Surety from any claim arising out of or in connection with delays in the Remaining Work caused by Completion Contractor resulting in the failure of Completion Contractor to complete performance of the Remaining Work within the time agreed to herein.

**8.3**    Completion Contractor agrees to provide and honor the warranties required by the Original Contract and the Contract Documents with respect to the Remaining Work. Completion



Case 1:25-cv-00870-JLT Document 1-2 Filed 09/24/25 Page 72 of 98

Contractor does not make any warranty with respect to work performed by Original Contractor or its subcontractors.

**8.4**    Completion Contractor agrees to perform warranty work, as may be necessary, to satisfy the warranty obligations of Original Contractor if requested to do so by Surety.  Any such work shall be paid by Surety pursuant to the schedule of prices set forth on **Exhibit B** attached hereto, or as otherwise agreed to in advance of said work.

**IX. MISCELLANEOUS**

**9.1**    All correspondence, notices and documents required or permitted to be given hereunder shall be in writing and delivered to the parties at the following addresses:

|  |  |
|---|---|
| (a) To **Completion Contractor at:** | Ron Shaw<br>Lee Construction of the Carolinas, Inc.<br>633 Eagleton Downs Drive<br>Pineville, NC 28134<br>Email: rpshaw@leecarolinas.com<br>Phone:  704-588-5272 |
| (b) To the **Obligee at:** | Jose Ignacio Martin Alos<br>Dragados USA, Inc.<br>4600 Marriott Drive, Suite 140<br>Raleigh, North Carolina 27612<br>Email: jmartinalosb@Dragados-USA.com<br>Phone: (404) 702-1030 |
| With a copy to: | Matt Levey<br>Dragados USA, Inc.<br>303 US70 Service Road<br>Durham, NC 27703<br>Email: mlevey@Dragados-USA.com<br>Phone: 919-564-5857 |



Case 1:25-cv-00870-JLW   Document 1-2   Filed 09/24/25   Page 73 of 98

      (c) To **Surety** care of:            Eric Johansen
                                             Crum & Forster
                                             305 Madison Avenue
                                             Morristown, NJ 07960
                                             Email: Eric.Johansen@cfins.com
                                             Phone: 973-753-3301

         With a copy to:             Melissa Rice
                                               Crum & Forster
                                             305 Madison Avenue
                                             Morristown, NJ 07960
                                             Email: melissa.rice@cfins.com
                                             Phone: 215-982-3534

**9.2**    This Agreement contains the entire understanding of the parties and shall be governed by the laws of the State of North Carolina.

## X. EXECUTION

**10.1**    This Completion Agreement may be executed in two or more counterparts, each of which shall be deemed as the original but all of which shall constitute one and the same agreement.

      IN WITNESS HEREOF, the parties hereto have caused this agreement to be executed as of the day and year first above written.

**COMPLETION CONTRACTOR**            **U.S. FIRE INSURANCE COMPANY**

By: _____      By: _____
     Signature                                     Signature

   _RONALD P. SHAW_                 _____
    Printed Name                                Printed Name

   _01·31·2020_                    _____
    Title                                          Title

    (c) To **Surety** care of:               Eric Johansen
                                         Crum & Forster
                                         305 Madison Avenue
                                         Morristown, NJ 07960
                                         Email: Eric.Johansen@cfins.com
                                         Phone: 973-753-3301

        With a copy to:                 Melissa Rice
                                           Crum & Forster
                                         305 Madison Avenue
                                         Morristown, NJ 07960
                                         Email: melissa.rice@cfins.com
                                         Phone: 215-982-3534

**9.2**    This Agreement contains the entire understanding of the parties and shall be governed by the laws of the State of North Carolina.

## X.  EXECUTION

**10.1**    This Completion Agreement may be executed in two or more counterparts, each of which shall be deemed as the original but all of which shall constitute one and the same agreement.

        IN WITNESS HEREOF, the parties hereto have caused this agreement to be executed as of the day and year first above written.

**COMPLETION CONTRACTOR**       **U.S. FIRE INSURANCE COMPANY**

By: _____      By: _____
     Signature                               Signature

    _____          _Michelle Stegman_
     Printed Name                         Printed Name

    _____          _Sr. Vice President, Claims_
     Title                                       Title

**EXHIBIT A**

**East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC**
**Prime Contract No. C203394, WBS 34745.3.S**
**Subcontract 037a- Structure Rehabilitation**

This Completion Agreement (the "Agreement") is made and entered into this _M_ day of _February_ , 20 2⁰ , by and between United States Fire Insurance Company ("Surety") and Dragados USA, Inc. ("Dragados").

## RECITALS

**WHEREAS,** Dragados entered into a contract (the "Contract"), with Extreme Concrete Cutting of Gaffney, LLC ("Extreme" or "Principal"), concerning Dragados' Prime Contract No.: C203394, WBS 34745.3.S2 East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC with North Carolina Department of Transportation ("Project"); and,

**WHEREAS,** Surety on behalf of Extreme, as Principal, issued a Performance Bond ("Performance Bond") and Payment Bond ("Payment Bond"), both designated with bond No. 602-107065-9 in the amount of $2,130,675.96 for the benefit of Dragados, as obligee, in connection with the Contract (collectively referred to as the "Bonds"); and,

**WHEREAS,** on or about September 25, 2018 and June 5, 2019, Dragados notified Extreme it was in default of Article 26 of the Contract; and,

**WHEREAS,** Extreme failed to timely cure its default; and,

**WHEREAS,** Dragados made the default final and issued a Notice of Termination to Extreme by letter dated June 20, 2019; and,

**WHEREAS,** Dragados made demand under the Performance Bond for completion of work remaining under the Contract; and,

**WHEREAS,** payment will be made to Surety for completion of the Project as provided in the Contract; and,

**WHEREAS,** the Surety shall complete the Contract in accordance with the terms of the Performance Bond and in accordance with this Agreement.

**NOW, THEREFORE,** in consideration of the agreements and undertakings hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Dragados and the Surety agree as follows:

## AGREEMENTS

1.     The Surety hereby undertakes to cause the performance of the Contract, which together with all Contract Documents comprising same is incorporated herein by reference, including all

modifications thereto, in accordance with terms, covenants and conditions thereof. Dragados acknowledges that the Surety, by its execution of this Agreement, is acting in its capacity as the Surety for Extreme in making arrangements for the performance and completion of the Contract, and not as a completing contractor, and that the Surety is not assuming any obligations or liabilities beyond those set forth in the Bonds. As to the completion of the Contract, except as otherwise provided in this Agreement, the Surety is entitled to all rights, title, and interest of Extreme in and to the Contract in all respects as if the Surety were the original party to the Contract.

2. Surety will contract the performance of the work under the Contract, including modifications requested and authorized by Dragados,[1] to one or more contractors (the "Completion Contractor(s)"). The Surety shall satisfy the required insurance obligations under the Contract by providing evidence of the required insurance coverage carried by Completion Contractor(s).

3. Dragados and the Surety agree that as of the date of this Agreement:

    (a)    Dragados' payment records for the project details the following:

| | |
|---|---|
| Original Contract Amount without Supplemental Agreements | $ 1,970,675.96 |
| Changes Issued To Date | $      30,233.06 |
| Revised Contract Amount | $ 2,000,909.02 |
| Funds Earned To Date | $      978,340.02 |
| Funds Paid To Date | $      970,077.52 |
| Funds Earned to Date, but unpaid | $        8,262.50 |
| Remaining Contract Balance, including unpaid | $ 1,022,569.00 |

    (b)    This is only an estimate of these amounts. The final contract balance will be based upon the terms of the Contract and unit prices for the remaining work.

    (c)    Within 30 days of execution of this Agreement, Dragados will make payment for any funds earned to date, but not paid to Extreme prior to the parties' entry into this Agreement, pursuant to the direction of the Surety.

4. Dragados agrees that the Contract Balance, including earned but unpaid funds, is dedicated to and will be applied to the completion of the Contract pursuant to this Agreement. Dragados shall pay directly to the Surety, or as directed by the Surety, the Contract Balance, plus or minus any additional amounts of money on account of any modifications requested and authorized by Dragados, in accordance with the Contract's original schedule of values unless modified by agreement of the parties. Surety reserves any right it may have to object to any future modifications if it could have the effect of increasing Surety's exposure on its Performance Bond (either by increasing the amount of the contract price or the

---

[1] Surety reserves any right it may have to object to a modification(s) if it could have the effect of increasing Surety's exposure on its Performance Bond (either by increasing the amount of the contract price or the contract time).

contract time. Payment of the Contract Balance to the Surety or the person directed by the Surety to receive such payments shall be made in accordance with the terms of the Contract. The Surety agrees to spend its own funds as may be necessary to pay for the performance of all of Extreme's obligations under the Contract in the event that the Contract Balance is insufficient, with any such payments being credited against the penal sum of the Performance Bond.

5.    Insofar as Dragados has any right, title, or interest therein, Dragados agrees that the Surety and (Completion Contractor) shall have the right to use, without charge, any of the equipment, materials and appurtenances furnished or supplied by Extreme which may be stored on or about the premises of the Project site or materials which may have been fabricated for use in connection with the Contract, whether or not presently upon the Project site.

6.    All payments properly made by the Surety for the performance of the Contract, less all payments made by Dragados to the surety pursuant to this Agreement, shall be credited against the penal sum of the Performance Bond. Nothing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety under the Performance Bond.

There shall be no reduction of the penal amount for the expenses incurred by the Surety for legal fees, consulting fees, or similar expenses related to the termination of Extreme's contract.

7.    In no event shall Dragados withhold any of the Contract Balance from the Surety because of or on account of any claims, suits, or demands by any persons or entities furnishing or alleging to have furnished labor and/or materials to the Project that occurred prior to the Agreement. The Payment Bond shall remain in full force and effect in accordance with its terms and provisions.

8.    The Surety and Dragados agree that by the execution of this Agreement and its performance thereunder, the Surety reserves and does not waive any rights, remedies, or defenses of the Surety or Extreme with respect to any claims or defenses, including with regard to delays and proposed assessment of liquidated damages by Dragados or NCDOT, that the Surety or Extreme may or might have against Dragados or NCDOT under the contract. The Surety and Dragados agree that Dragados reserves and does not waive any rights, remedies, or defenses that it may or might have against the Surety or Extreme.

9.    Nothing contained in this Agreement constitutes a waiver by the Surety of any rights it has against Extreme or its Indemnitors which it may have to seek reimbursement or indemnity with respect to the payments which the Surety is making pursuant to this Agreement, with respect to any payments which the Surety makes under the Payment Bond issued, nor with respect to any fees and expenses incurred by the Surety as a result of having issued either the Performance Bond or the Payment Bond. It is expressly understood and agreed that the Surety is reserving all rights, claims, and causes of action it has against Extreme and its Indemnitors, which it now has or which may arise in the future to seek reimbursement or indemnity with respect to any payments of any kind made by the Surety involving or arising out of the Project or the Performance Bond or Payment Bond and with respect to any and all expenses incurred by the Surety as a result of having issued the Payment Bond or the Performance Bond.

10.    This Agreement is solely for the benefit of Dragados and the Surety. Dragados and the Surety do not intend by any provision of this Agreement to create any rights in or increase the rights of any third-parties, nor to confer any benefit upon or enforceable rights under this Agreement or otherwise upon anyone other than Dragados and the Surety. Specifically, Dragados and the Surety acknowledge

that nothing in this Agreement shall extend or increase the rights of any third-party claimants or the liabilities or obligations of the Surety under the Bonds.

       11.     Surety consents, and Dragados agrees, to Completion Contractor and Dragados dealing directly with each other in the normal, day-to-day administration of the Contract without the necessity of Surety's involvement. Surety shall not be required to maintain full-time presence on site or participation in the normal, day-to-day administration of the Contract. However, it is agreed that Surety will be provided copies of formal communications about the Contract and the Work and notice of any matters arising under the Contract for which the Contractor or Completion Contractor would be provided notice. Furthermore, no action or decision affecting the Surety's potential liability or exposure under its Performance Bond shall be taken without Surety's knowledge or approval/consent.

       12.     This Agreement constitutes the whole of the understanding, discussions, and agreements by and between Dragados and the Surety. The terms and provisions of this Agreement are contractual and not mere recitals. Dragados and the Surety acknowledge that there have been no oral, written or other agreements of any kind as a condition precedent to or to induce the execution and delivery of this Agreement. Any written or oral discussions conducted prior to the effective date of this Agreement shall not in any way vary or alter the terms of this Agreement.

       13.     This Agreement shall not be changed, amended or altered in any way except in writing and executed by both Dragados and Surety.

       14.     This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

       15.     Any notices to cure, any notice under any termination or default provision of the Contract, or any other notices which are required to be given by the terms of the Contract, this Agreement or the Bonds shall be made as follows:

<u>As to Dragados:</u>

          Jose Ignacio Martin Alos

          Dragados USA, Inc.

          7920 ACC Blvd., Suite 210

          Raleigh, North Carolina 27617

          Email: jmartinalosb@Dragados-USA.com

          Phone: (404) 702-1030

<u>With a copy to:</u>

          Matt Levey

          Dragados USA, Inc.

          303 US70 Service Road

          Durham, NC 27703

          Email: mlevey@Dragados-USA.com

          Phone: 919-564-5857

Case 1:25-cv-00870-JL Document 1-2 Filed 09/24/25 Page 80 of 98

**As to Surety:**

Eric Johansen
Crum & Forster
305 Madison Avenue
Morristown, NJ 07960
Email: Eric.Johansen@cfins.com
Phone: 973-753-3301

**With a copy to:**

Melissa Rice
Crum & Forster
305 Madison Avenue
Morristown, NJ 07960
Email: melissa.rice@cfins.com
Phone: 215-982-3534

16.     This Agreement shall become effective upon execution by the Surety and Dragados.

17.     This Agreement shall be binding upon the parties and their respective successors and assigns.

18.     In the event that one or more provisions of this Agreement shall be declared to be invalid, illegal or unenforceable in any respect, unless such invalidity, illegality or unenforceability in any respect, shall be tantamount to a failure of consideration, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date indicated above, and each of the undersigned personally represent and warrant that they have the full right, power and authority to execute this Agreement on behalf of the respective parties.

**DRAGADOS USA, INC.**

By: _____
Signature

JOSE I. MARTIN Alq
Printed Name

SVP NC, SC & VA
Title

**U.S. FIRE INSURANCE COMPANY**

By: _____
Signature

Michelle Stegman
Printed Name

Sr. VP, Claims Surety
Title

## EXHIBIT B

FULL NAME OF BIDDER: <u>Lee Construction Company of the Carolinas, Inc.</u>

633 Eagleton Downs Drive, Pineville, NC 28134

<u>1. PRICE</u>

Provide all labor, equipment, and materials and furnish and perform all work in accordance with specifications, schedules and drawings forming parts thereof, subject to the terms and conditions of the contract and this invitation to Bid to complete the Rehabilitation and Repair of Bridges 12, 13 14 and 15: Extreme Concrete Cutting of Gaffney, LLC Subcontract with Dragados USA, Inc. for Dragados' Prime Contract No. C203394, WBS 34745.3.52 East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC with North Carolina Department of Transportation. Payments will be made based on actual approved quantities by Dragados.

| BID ITEM | QUANTITY | U.M. | CONCEPT | QUANTITY TO DATE | QUANTITY REMAINING | BID UNIT PRICE | BID TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | 1.00 | LS | MOBILIZATION | 1.00 | 1.00 | $ 100,000.00 | $ 100,000.00 |
| 636 | 1.00 | LS | POLLUTION CONTROL | 0.95 | 0.05 | $ - | $ - |
| 647 | 42.00 | EA | ELASTOMERIC BEARINGS | | 42.00 | $ 2,500.00 | $ 105,000.00 |
| 648 | 435.53 | CF | CONCRETE REPAIRS | 291.67 | 143.86 | $ 300.00 | $ 43,158.00 |
| 649 | 190.53 | CF | SHOTCRETE REPAIRS | 178.66 | 11.87 | $ 1,000.00 | $ 11,870.00 |
| 650 | 409.00 | LF | EPOXY RESIN INJECTION | 616.50 | 1.00 | $ 250.00 | $ 250.00 |
| 657 | 1.00 | LS | PAINTING EXISTING STRUCTURE | 0.70 | 0.30 | $ - | $ - |
| 673 | 1.00 | LS | UNDER STRUCTURE WORK PLATFORM | 0.50 | 0.50 | $ - | $ - |
| 691 | 0 | LB | STRUCTURAL STEEL FOR GIRDER REPAIR (< 5,000 LBS) | 0.00 | 1.00 | $ 35.00 | $ 35.00 |
| 691 | 0 | LB | STRUCTURAL STEEL FOR GIRDER REPAIR (5,001 - 10,000 LBS) | 0.00 | 1.00 | $ 30.00 | $ 30.00 |
| 691 | 0 | LB | STRUCTURAL STEEL FOR GIRDER REPAIR (10,001 - 20,000 LBS) | 0.00 | 1.00 | $ 25.00 | $ 25.00 |
| 691 | 0 | LB | STRUCTURAL STEEL FOR GIRDER REPAIR (20,001 - 30,000 LBS) | 0.00 | 1.00 | $ 20.00 | $ 20.00 |
| 691 | 42,000.00 | LB | STRUCTURAL STEEL FOR GIRDER REPAIR (30,001-42,000LB) | 0.00 | 42,000.00 | $ 15.00 | $ 630,000.00 |
| 694 | 4,239.00 | SF | EPOXY PROTECTIVE COATING | | 4,239.00 | $ 30.00 | $ 127,170.00 |
| 704 | 26.00 | EA | GIRDER JACKING | | 26.00 | $ 10,000.00 | $ 260,000.00 |
| | 1.00 | LS | BOND | 1.00 | 1 | $ 5,000.00 | $ 5,000.00 |

| | BID TOTAL: | $ 1,282,558.00 |
|---|---|---|

<u>2. CONTRACT TIME</u>

Calendar days to achieve Substantial Completion: ___120___ *

Calendar days to achieve Final Completion: ___+ 30 on the 120___ *

*NOTE: Does not include latent conditions, if any, or Contract Time extensions authorized by Dragados.

In accordance with procedures outlined in Section 4 of the Invitation to Bid, submit this Bid Form (Exhibit 1) and the following documents to the Surety (Eric Johansen, Director of Surety Engineering Services, U.S. Fire Insurance Company, eric.johansen@cfins.com) **not later than 5:00 P.M. on October 25, 2019;**

- an executed Non-Collusion Affidavit (Exhibit 2),

- an executed Indemnification and Contribution Agreement (Exhibit 3),

- a Bid Bond in the amount of of five (5%) percent of the total amount contained in the bidder's Bid Proposal.



# SUBCONTRACT
# PERFORMANCE
# BOND

**Bond No.: 107211126**

KNOW ALL BY THESE PRESENTS: That Lee Construction Company of the Carolinas, Inc., a North Carolina corporation, as Principal, hereinafter called Principal, and Travelers Casualty and Surety Company of America, a Connecticut corporation, as Surety, hereinafter called Surety, are held and firmly bound unto United States Fire Insurance Company, as Obligee, hereinafter called Obligee, in the amount of One Million Two Hundred Eighty-two Thousand Five Hundred Fifty-eight and 00/100 U.S. Dollars ($1,282,558.00) (the "Penal Sum"), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated January 31, 2020 entered into a subcontract number 037a Structure Rehabilitation with Obligee for the performance of subcontract work bridge rehab work, including warranty obligations, in accordance with drawings and specifications for the construction of the East End Connector from North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC, NCDOT C203394 project (hereinafter "the Project"), which subcontract is by reference made a part hereof, and is hereinafter referred to as the "Subcontract".

A. NOW, THEREFORE, THE CONDITIONS OF THIS OBLIGATION are such that, if Principal shall promptly and faithfully perform said Subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect, subject to the following conditions: (i) Principal is in default under the Subcontract; and (ii) Principal has been declared by Obligee to be in default under the Subcontract; and (iii) the Obligee has performed its obligations under the Subcontract. Upon the occurrence of each of the above conditions, Surety shall have 30 days ("Investigatory Period") from the last event to occur of the following: (a) receipt of the written notice of default; (b) the date access to the Project site is provided to Surety; or (c) the date the information and documentation in Obligee's or its agent's possession and requested by Surety is received by the Surety, which information and documentation must be requested by Surety within 10 days of its receipt of Obligee's written notice of default, to:

(1) Notify Obligee that it has elected to complete the Subcontract through independent contractor(s) retained by Surety and thereafter commence such performance with reasonable promptness. In such event, that portion of the Balance of the Subcontract Price as may be required to complete the Subcontract or remedy the default and to reimburse the Surety for its expenditures shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the Subcontract; or

(2) Notify the Obligee that it has elected to arrange for a subcontract between Obligee and a replacement subcontractor reasonably acceptable to Obligee guaranteed by subcontract performance and payment bonds provided by the replacement subcontractor in the amount of the replacement subcontract. In such event, Surety shall pay Obligee the difference between the cost of the replacement subcontractor and the amount that would have been payable to the Principal had there been no default under the Subcontract. Such payments may be in a lump sum (in the case of a lump sum subcontract) or periodically as incurred by Obligee; or

(3) Request that Obligee complete the Subcontract. In such event, Surety shall pay Obligee the difference between the reasonable cost of a replacement subcontractor and the amount that would have been payable to the Principal had there been no default under the Subcontract; or

(4) Arrange to provide financial and/or other assistance to the Principal ("Financing") to assist the Principal with completion of the Subcontract. In the event Obligee has formally terminated Principal's right to proceed under the Subcontract, this option shall be subject to Obligee's concurrence, which shall not be unreasonably withheld. The Obligee shall pay the Balance of the Subcontract Price as directed by the Surety. In the event Surety provides Financing, Surety, in its sole discretion, may upon written notice to Obligee cease providing such Financing at any time, in which event Surety shall immediately make a further election without a further Investigatory Period under this paragraph A; or

(5) Deny liability and notify the Obligee, citing the reasons therefor; or

(6) After investigation, determine the amount for which it may be liable to the Obligee and, as soon as practicable after the amount is determined, make payment to the Obligee.

B. After Obligee has provided Surety with written notice of the Principal's default, and during the Investigatory Period and any subsequent period before the commencement of work under paragraph A, subparagraphs 1 or 2, Obligee may take action pursuant to its Subcontract rights to mitigate the damages caused by the Principal's default. To the extent that Obligee performs obligations under the Subcontract during this period (the "Mitigation Work") Obligee shall be entitled to deduct the Cost of the Mitigation Work from the Balance of the Subcontract Price. To the extent the Balance of the Subcontract Price is exhausted, and Surety elects to proceed under paragraph A, subparagraphs 1, 2, 3 or 4, Surety shall reimburse Obligee for the difference between the Balance of the Subcontract Price and the Cost of the Mitigation Work incurred and paid by Obligee.

C. If Surety proceeds under paragraph A, subparagraphs 1, 2, 3, 4 or 6, Surety may additionally advise in its notice of its election to Obligee that the Obligee's claim is disputed as to liability and/or amount and Surety is proceeding under a reservation of all rights and defenses. In that event, Surety shall make all payments otherwise called for under this Bond. However, in the event it is determined that Surety is not liable, in whole or in part, under this Bond and Surety expended monies in excess of the funds paid by Obligee to Surety, then Surety shall be entitled to recover the excess from Obligee.

D. The Surety's aggregate liability is limited to the Penal Sum of this Bond, regardless of whether the liability arises from the actions or failure to act of Principal or Surety. All amounts expended by the Surety under paragraphs A and/or B and/or C of this Bond, in excess of funds paid by Obligee to Surety, shall be credited against the Penal Sum. However, in the event it is determined that Surety expended monies in excess of the Penal Sum of this Bond, then Surety shall be entitled to recover the excess from Obligee. The Penal Sum of this Bond shall automatically be increased or decreased by the amount of any change order, provided the change order(s) do not, either singly or in the aggregate, exceed 10% of the original Subcontract amount. Should any change order singly or in the aggregate exceed 10% of the original Subcontract amount, Surety's written consent must be obtained by Obligee in order to increase the penal sum.

E. Definitions:

    (1) The term "Balance of the Subcontract Price," as used in this Bond, shall mean the total amount payable by Obligee to Principal under the Subcontract and any amendments thereto, less the amounts heretofore properly paid by Obligee under the Subcontract.

    (2) The term "Cost of the Mitigation Work" means the cost actually incurred by Obligee in proper performance of work under the Subcontract, including remedying defects in the work of the Principal. Such costs shall be at rates and hours not higher than the standard customarily incurred at the place of the Project except with the prior written consent of the Surety. Obligee's overhead (both field and home office) as well as profit shall be included in the Cost of the Mitigation Work at a markup of 15% to the actual labor, material, equipment, and subcontractor costs incurred and paid for by Obligee. Obligee shall not apply markup to the cost of any subcontractor that is affiliated with Obligee.

F. Notwithstanding any provision in this Bond and any document incorporated herein to the contrary, any proceeding, legal or equitable, under this Bond must be instituted in a court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of default or within two years after the Principal ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

G. No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of the Obligee.

H. Any notice given or any demand made under this Bond shall be given in writing and may be provided to the following email address cebennet@travelers.com or given by any method of delivery that provides evidence or confirmation of receipt, including personal delivery, express courier (such as Federal Express), and prepaid

certified or registered mail with return receipt requested. The Surety's address for notice is One Tower Square, Hartford, CT 06183.

I. The Surety shall not be liable to the Obligee or others for obligations of the Principal that are unrelated to the Subcontract work, and the Balance of the Subcontract Price shall not be reduced or set off on account of any such unrelated obligations.

J. The Surety hereby waives notice of change, including changes of time, to the Subcontract, purchase orders or other obligations.

Signed this 5th day of February, 2020.

**Lee Construction Company of the Carolinas, Inc.**
(Principal)

By: _____
Ronald P. Shaw, President

**Travelers Casualty and Surety Company of America**
(Surety)

By: _____
Whitney D. Melton, Attorney-in-Fact
P.O. Box 73, Lynchburg, VA 24505-0073



**Travelers Casualty and Surety Company of America**
**Travelers Casualty and Surety Company**
**St. Paul Fire and Marine Insurance Company**

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**: That Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company are corporations duly organized under the laws of the State of Connecticut (herein collectively called the "Companies"), and that the Companies do hereby make, constitute and appoint **WHITNEY D MELTON** of **Altavista**, **Virginia**, their true and lawful Attorney-in-Fact to sign, execute, seal and acknowledge any and all bonds, recognizances, conditional undertakings and other writings obligatory in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**IN WITNESS WHEREOF**, the Companies have caused this instrument to be signed, and their corporate seals to be hereto affixed, this **3rd** day of **February, 2017.**

  

State of Connecticut

City of Hartford ss.

By: _____
Robert L. Raney, Senior Vice President

On this the **3rd** day of **February, 2017,** before me personally appeared **Robert L. Raney,** who acknowledged himself to be the Senior Vice President of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, and that he, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

**In Witness Whereof,** I hereunto set my hand and official seal.

My Commission expires the **30th** day of **June, 2021**



_____
Marie C. Tetreault, Notary Public

This Power of Attorney is granted under and by the authority of the following resolutions adopted by the Boards of Directors of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, which resolutions are now in full force and effect, reading as follows:

**RESOLVED,** that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the Company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her; and it is

**FURTHER RESOLVED,** that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary; and it is

**FURTHER RESOLVED,** that any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary; or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority; and it is

**FURTHER RESOLVED,** that the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any Power of Attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding on the Company in the future with respect to any bond or understanding to which it is attached.

I, **Kevin E. Hughes,** the undersigned, Assistant Secretary of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, do hereby certify that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which remains in full force and effect.

Dated this **5th** day of **February, 2020**

  

_____
Kevin E. Hughes, Assistant Secretary

*To verify the authenticity of this Power of Attorney, please call us at 1-800-421-3880.*
*Please refer to the above-named Attorney-in-Fact and the details of the bond to which the power is attached.*

## SUBCONTRACTOR
## PAYMENT BOND

**Bond No.: 107211126**

KNOW ALL BY THESE PRESENTS, That we, Lee Construction Company of the Carolinas, Inc., called the Principal, and Travelers Casualty and Surety Company of America, a Connecticut corporation, called the Surety, are held and firmly bound unto United States Fire Insurance Company, 305 Madison Avenue, Morristown, New Jersey 07962, hereinafter called the Obligee, in the sum of One Million TTwo Hundred Eighty-two Thousand Five Hundred Fifty-eight and 00/100 U.S. Dollars ($1,282,558.00) (the "Penal Sum"), for the payment whereof said Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, as provided herein.

WHEREAS, the Principal has entered into a subcontract numbered 037a Structure Rehabilitation with the Obligee, dated January 31, 2020, for East End Connector from North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC, NCDOT C203394 project ("Subcontract").

NOW, THEREFORE, the conditions of this obligation are such that if the Principal shall promptly make payment to all Claimants as hereinafter defined for all labor and material used, consumed or incorporated in the performance of the construction work to be performed under the Subcontract, then this obligation shall be void; otherwise to remain in full force and effect, subject, however, to the following conditions:

     1.    A Claimant is defined as one other than the Obligee having a contract with the Principal or with a direct subcontractor of the Principal to supply labor and/or materials and such labor and/or materials are actually used, consumed or incorporated in the performance of the construction work under the Subcontract.

     2.    The above-named Principal and Surety hereby jointly and severally agree with the Obligee that every Claimant as herein defined who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed or materials were furnished by such Claimant, may bring suit on this bond, prosecute the suit to final judgment for the amount due under Claimant's contract for the labor and/or materials supplied by the Claimant which were used, consumed or incorporated in the performance of the work, and have execution thereon; provided, however, that a Claimant having a direct contractual relationship with a direct subcontractor of the Principal shall have a right of action on this bond only if said Claimant notifies the Principal and Surety in writing of its claim within ninety (90) days from the date on which said Claimant did or performed the last labor and/or materials for which the claim is made. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in and envelope addressed to the Principal and Surety, at any place where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the project is located, save that such service need not be made by a public officer.

     3.    No suit or action or arbitration shall be commenced hereunder by any Claimant:

     a.    After the expiration of the earlier of: (1) one year after the day on which the Claimant last supplied the labor and/or materials for which the claim is made; or (2) the limitation period set forth in the public works bond statutes, if any, in the location where the construction work is being performed. Any limitation contained in this bond which is prohibited by any law controlling in the state where the suit is filed shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by the law of that state, and said period of

Case 1:25-cv-00800-JLW   Document 3   Filed 09/29/25   Page 88 of 98

limitation shall be deemed to have accrued and shall commence to run on the day the Claimant last supplied the labor and/or materials for which the claim is made; and

b.    Other than in a state court of competent jurisdiction in the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere.

The Obligee shall not be liable for the payment of any costs or expenses of any such suit action or arbitration.

4.    The Penal Sum of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder.  The Surety's liability hereunder is limited, singly, or in the aggregate, to the Penal Sum of the bond set forth herein.

Signed this 5th day of February, 2020.

**Lee Construction Company of the Carolinas, Inc.**
(Principal)

By: _____

Ronald P. Shaw, President

**Travelers Casualty and Surety Company of America**
(Surety)

By: _____

Whitney D. Melton, Attorney-in-Fact
P.O. Box 73, Lynchburg, VA 24505-0073

| | Travelers Casualty and Surety Company of America<br>Travelers Casualty and Surety Company<br>St. Paul Fire and Marine Insurance Company |
|---|---|

### POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**: That Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company are corporations duly organized under the laws of the State of Connecticut (herein collectively called the "Companies"), and that the Companies do hereby make, constitute and appoint **WHITNEY D MELTON** of **Altavista** , **Virginia** , their true and lawful Attorney-in-Fact to sign, execute, seal and acknowledge any and all bonds, recognizances, conditional undertakings and other writings obligatory in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**IN WITNESS WHEREOF**, the Companies have caused this instrument to be signed, and their corporate seals to be hereto affixed, this **3rd** day of **February, 2017**.

  

State of Connecticut

City of Hartford ss.

By: _____
Robert L. Raney, Senior Vice President

On this the **3rd** day of **February, 2017**, before me personally appeared **Robert L. Raney**, who acknowledged himself to be the Senior Vice President of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, and that he, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

**In Witness Whereof**, I hereunto set my hand and official seal.

My Commission expires the **30th** day of **June, 2021**



_____
Marie C. Tetreault, Notary Public

This Power of Attorney is granted under and by the authority of the following resolutions adopted by the Boards of Directors of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, which resolutions are now in full force and effect, reading as follows:

**RESOLVED**, that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the Company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her; and it is

**FURTHER RESOLVED**, that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary; and it is

**FURTHER RESOLVED**, that any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary; or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority; and it is

**FURTHER RESOLVED**, that the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any Power of Attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding on the Company in the future with respect to any bond or understanding to which it is attached.

I, **Kevin E. Hughes**, the undersigned, Assistant Secretary of Travelers Casualty and Surety Company of America, Travelers Casualty and Surety Company, and St. Paul Fire and Marine Insurance Company, do hereby certify that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which remains in full force and effect.

Dated this **5th** day of **February** , **2020**

  

_____
Kevin E. Hughes, Assistant Secretary

*To verify the authenticity of this Power of Attorney, please call us at 1-800-421-3880.*
*Please refer to the above-named Attorney-in-Fact and the details of the bond to which the power is attached.*



# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
02/04/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Sandra Oldham | | |
|---|---|---|---|
| Mid-Atlantic Insurance Services, LLC | PHONE (A/C, No, Ext): (919) 775-3124 | | FAX (A/C, No): (919) 775-1052 |
| P.O. Box 339 | E-MAIL ADDRESS: soldham@windstream.net | | |
| 2903 Jefferson Davis Hwy | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| Sanford                    NC  27331 | INSURER A : Travelers Indemnity Company | | |
| INSURED | INSURER B : Travelers Indemnity Co of America | | |
| Lee Construction of the Carolinas, Inc | INSURER C : Travelers Property Casualty Company of America | | |
| 633 Eagleton Downs Drive | INSURER D : | | |
| | INSURER E : | | |
| Pineville                  NC  24505 | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: Lee Construction 19-20          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY ☐ CLAIMS-MADE X OCCUR X Blanket AI per contract X Blanket Waiver per contract GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY X PRO-JECT ☐ LOC OTHER: | | Y | VTC2K-CO-0F456756-IND-19 | 11/01/2019 | 11/01/2020 | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 4,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 4,000,000 |
| | | | | | | | Employee Benefits | $ 1,000,000 |
| B | AUTOMOBILE LIABILITY X ANY AUTO ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY X Blnk AI/cont X Blnk Wai/cont | | | VTH-CAP-5876N399-TIA-19 | 11/01/2019 | 11/01/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| C | X UMBRELLA LIAB X OCCUR X EXCESS LIAB ☐ CLAIMS-MADE ☐ DED X RETENTION $ 0 | | | CUP-3P039192-19-25 | 11/01/2019 | 11/01/2020 | EACH OCCURRENCE | $ 25,000,000 |
| | | | | | | | AGGREGATE | $ 25,000,000 |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | UB-0L108173-19-25-D | 11/01/2019 | 11/01/2020 | X PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C | Leased/Rented Equipment | | | QT-630-3C60874A-TIL-19 | 11/01/2019 | 11/01/2020 | Any One Item | 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

RE: East End Connector from North of NC-98 to NC-147 (Buck Dean Freeway) Durham, NC; Prime Contract No. C203394, WBS 34745.3.S, Subcontract 037a-Structure Rehabilitation ---Please see attached Comments/Remarks page---

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| US Fire Insurance Company 305 Madison Avenue Morristown                NJ  07960 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE William Kern |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
## Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Lee Construction Company of the Carolinas, Inc.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

- [ ] Individual/sole proprietor or single-member LLC
- [✓] C Corporation
- [ ] S Corporation
- [ ] Partnership
- [ ] Trust/estate

- [ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

- [ ] Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

633 Eagleton Downs Drive

**6** City, state, and ZIP code

Pineville, NC 28134

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type. See Specific Instructions on page 2.*

---

**Part I**    **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

| Social security number |
| --- |
| ☐☐☐ – ☐☐ – ☐☐☐☐ |

or

| Employer identification number |
| --- |

---

**Part II**    **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**

Signature of U.S. person ▶ *[signature]*

Date ▶ 2-17-2020

---

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)

- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued), and

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X      Form **W-9** (Rev. 12-2014)

**EXHIBIT C**

## Performance Bond

Bond No. <u>602-107065-9</u>          Premium Amount $ _____

KNOW ALL MEN BY THESE PRESENTS,

That we, <u>Extreme Concrete Cutting of Gaffney, LLC,</u>
          *(Full Name and Address of Subcontractor)*
<u>115 Madison Avenue, Gaffney, South Carolina 29340</u>

(hereinafter called the Principal), as Principal, and <u>United States Fire Insurance Company,</u>
                                        *(Full Name and Address of Surety)*
<u>305 Madison Avenue, Morristown, New Jersey 07962</u>

a corporation duly organized under the laws of the state of <u>Delaware</u>
(hereinafter called the Surety), as Surety, are held and firmly bound unto:

      Dragados USA, Inc.

      4600 Marriot Drive, Suite 140

      Raleigh, NC 27612

(hereinafter called the Obligee)

In the sum of <u>Two Million, One Hundred Thirty Thousand, Six Hundred Seventy-Five and 96/100***</u>          U.S. Dollars
($ 2,130,675.96*** _____ ), for the payment of which we, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal entered into a certain Contract dated <u>November 17</u> , <u>2016</u>
                                                            *(Month, Day)*      *(Year)*
with Dragados USA, Inc., for:

East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) In Durham
Durham, North Carolina

which is hereby referred to and made a part hereof as if fully set forth herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly and faithfully perform said Contract, within the time provided therein and any extension thereof that may be granted by the Obligee, and during the life of any guaranty required under said Contract, and shall also promptly and faithfully perform any and all authorized modifications of said Contract that may hereafter be made, then this obligation shall be null and void; otherwise, it shall remain in full force and effect.

The Surety agrees that no change, extension of time, alteration, addition, omission or other modification of the Contract Documents, as specified in the Contract, shall in any way affect its obligations under this Bond, and the Surety hereby waives notice of any such changes, extensions of time, alterations, additions, omissions or other modifications.

Whenever Principal shall be, and declared by Obligee, to be in default, in breach, and/or to have failed to perform in any manner under the Contract, the Obligee having performed its obligations thereunder, the Surety shall promptly remedy the default by one of the following:

1. Complete the Contract in accordance with its terms and conditions.

2. Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Obligee, and make available as Work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the Contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, and pursuant to the Contract, the amount set forth in the first paragraph hereof. The term "balance of the Contract price," as used in this paragraph, shall mean the total amount payable by Obligee to the Principal under the Contract and any amendments thereto, less the amount properly paid by Obligee to the Principal.

3. Pay to Obligee the full amount of the penal sum above stated.

For projects located in the State of Connecticut, Surety is liable for and is obliged to pay any interest, costs, penalties or attorneys' fees imposed upon the Principal under any provisions of Connecticut Public Act 99-153, entitled "An Act Concerning Fairness in Financing in the Construction Industry."

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators, successors or assigns of the Obligee.

Performance Bond — Page 1          Initialed _____ DUSA / _____ Subc.

Principal and Surety shall not be liable to the Obligee unless the Obligee has performed its obligations to the Principal in accordance with the terms of said Contract.

Sealed with our seals and dated this _____22nd_____ day of _____November_____, _____2016_____
                                              (Day)                              (Month)              (Year)

_____                    Extreme Concrete Cutting of Gaffney, LLC
          (Attested by)                                                          (Principal)

                                                   By:     _____Project Manager_____
                                                                              (Title)

                                                                    SEAL

_____                    United States Fire Insurance Company
          (Attested by)    Kathryn McCartha-Powers                         (Surety)

                                                           _____
                                                              (Attorney-In-Fact)  C. Wayne McCartha

                                                                    SEAL

                                              *Attach Power-Of-Attorney

Performance Bond - Page 2                                  Initialed _____DUSA / _____ Subc.

## Labor and Material Payment Bond

Bond No. <u>602-107065-9</u>        Premium Amount $ _____

KNOW ALL MEN BY THESE PRESENTS,

That we,   <u>Extreme Concrete Cutting of Gaffney, LLC,</u>
*(Full Name and Address of Subcontractor)*

<u>115 Madison Avenue, Gaffney, South Carolina 29340</u>

(hereinafter called the Principal), as Principal, and   <u>United States Fire Insurance Company,</u>
*(Full Name and Address of Surety)*

<u>305 Madison Avenue, Morristown, New Jersey 07962</u>

a corporation duly organized under the laws of the state of   <u>Delaware</u>
(hereinafter called the Surety), are held and firmly bound unto:

     Dragados USA, Inc.

     4600 Marriot Drive, Suite 140

     Raleigh, NC 27612

(hereinafter called the Obligee)

in the sum of   <u>Two Million, One Hundred Thirty Thousand, Six Hundred Seventy-Five and 96/100***</u>   U.S. Dollars
($ 2,130,675.96*** ), for the payment of which we, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal entered into a certain Contract dated   <u>November 17</u> , <u>2016</u>
                                                         *(Month, Day)*      *(Year)*

with Dragados USA, Inc., for:

East End Connector From North of NC-98 to NC-147 (Buck Dean Freeway) In Durham
Durham, North Carolina

which is hereby referred to and made a part hereof as if fully set forth herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all claimants as hereafter defined, for all (1) labor and material used or reasonably required for use in the performance of the Contract, (2) pension, welfare, vacation and any other supplemental employee benefit contributions payable under collective bargaining agreements with respect to persons employed upon said work, and (3) federal, sate and local taxes and contributions required to be withheld or paid with respect to the employment of persons upon said work that may hereafter be made, then this obligation shall be void; otherwise, it shall remain in full force and effect, subject, however, to the following conditions:

1. A claimant is defined as one having a direct contract with the Principal or a subcontractor of the Principal, for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2. The above-named Principal and Surety hereby jointly and severally agree with the Obligee that every claimant as herein defined, who has not been paid in full, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Obligee shall not be liable for the payment of any cost or expenses of any suit.

3. No suit or action shall be commenced hereunder by any claimant:

   a. After the expiration of the minimum period of limitation permitted by any law controlling the construction hereof.

   b. Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, and not elsewhere.

The Surety agrees that no change, extension of time, alteration, addition, omission or other modification of the Contract Documents, as specified in the Contract, shall in any way affect its obligations under this Bond, and the Surety hereby waives notice of any such changes, extensions of time, alterations, additions, omissions or other modifications.

For projects located in the State of Connecticut, Surety is liable for and is obliged to pay any interest, costs, penalties or attorneys' fees imposed upon the Principal under any provisions of Connecticut Public Act 99-153, entitled "An Act Concerning Fairness in Financing in the Construction Industry."

Labor and Materials Payment Bond - Page 1                            Initialed _____ DUSA / ____ Subc.

Principal and Surety shall not be liable to the Obligee unless the Obligee has performed its obligations to the Principal in accordance with the terms of said Contract.

Sealed with our seals and dated this _____22nd_____ day of _____November_____ _____2016_____
                                          (Day)                        (Month)          (Year)

_Samantha_                                      Extreme Concrete Cutting of Gaffney, LLC
     (Attested by)                                          (Principal)

                                          By: _Project Manager_
                                                     (Title)

                                                     SEAL

_Dm M_                                          United States Fire Insurance Company
     (Attested by)   Kathryn McCartha-Powers                 (Surety)

                                          _____
                                          (Attorney-in-Fact)   C. Wayne McCartha

                                                     SEAL

                                          *Attach Power-Of-Attorney

Labor and Materials Payment Bond - Page 2

Initialed _____ DUSA / _____ Subc.

# POWER OF ATTORNEY
## UNITED STATES FIRE INSURANCE COMPANY
### PRINCIPAL OFFICE - MORRISTOWN, NEW JERSEY

14821

KNOW ALL MEN BY THESE PRESENTS: That United States Fire Insurance Company, a corporation duly organized and existing under the laws of the state of Delaware, has made, constituted and appointed, and does hereby make, constitute and appoint:

### C. Wayne McCartha, Kathryn McCartha-Powers, Raymond E. Cobb, Jr.

each, its true and lawful Attorney(s)-In-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver: Any and all bonds and undertakings of surety and other documents that the ordinary course of surety business may require, and to bind United States Fire Insurance Company thereby as fully and to the same extent as if such bonds or undertakings had been duly executed and acknowledged by the regularly elected officers of United States Fire Insurance Company at its principal office, in amounts or penalties not exceeding: Seven Million, Five Hundred Thousand Dollars ($7,500,000).

This Power of Attorney limits the act of those named therein to the bonds and undertakings specifically named therein, and they have no authority to bind United States Fire Insurance Company except in the manner and to the extent therein stated.

This Power of Attorney revokes all previous Powers of Attorney issued on behalf of the Attorneys-In-Fact named above and expires on January 1, 2017.

This Power of Attorney is granted pursuant to Article IV of the By-Laws of United States Fire Insurance Company as now in full force and effect, and consistent with Article III thereof, which Articles provide, in pertinent part:

Article IV, Execution of Instruments - Except as the Board of Directors may authorize by resolution, the Chairman of the Board, President, any Vice-President, any Assistant Vice President, the Secretary, or any Assistant Secretary shall have power on behalf of the Corporation:

(a) to execute, affix the corporate seal manually or by facsimile to, acknowledge, verify and deliver any contracts, obligations, instruments and documents whatsoever in connection with its business including, without limiting the foregoing, any bonds, guarantees, undertakings, recognizances, powers of attorney or revocations of any powers of attorney, stipulations, policies of insurance, deeds, leases, mortgages, releases, satisfactions and agency agreements;

(b) to appoint, in writing, one or more persons for any or all of the purposes mentioned in the preceding paragraph (a), including affixing the seal of the Corporation.

Article III, Officers, Section 3.11, Facsimile Signatures. The signature of any officer authorized by the Corporation to sign any bonds, guarantees, undertakings, recognizances, stipulations, powers of attorney or revocations of any powers of attorney and policies of insurance issued by the Corporation may be printed, facsimile, lithographed or otherwise produced. In addition, if and as authorized by the Board of Directors, dividend warrants or checks, or other numerous instruments similar to one another in form, may be signed by the facsimile signature or signatures, lithographed or otherwise produced, of such officer or officers of the Corporation as from time to time may be authorized to sign such instruments on behalf of the Corporation. The Corporation may continue to use for the purposes herein stated the facsimile signature of any person or persons who shall have been such officer or officers of the Corporation, notwithstanding the fact that he may have ceased to be such at the time when such instruments shall be issued.

IN WITNESS WHEREOF, United States Fire Insurance Company has caused these presents to be signed and attested by its appropriate officer and its corporate seal hereunto affixed this 5th day of August, 2015.

UNITED STATES FIRE INSURANCE COMPANY

Anthony R. Slimowicz, Senior Vice President

State of New Jersey}
County of Morris }

On this 5th day of August, 2015 before me, a Notary public of the State of New Jersey, came the above named officer of United States Fire Insurance Company, to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seal of United States Fire Insurance Company thereto by the authority of his office.

SONIA SCALA
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES 3/25/2019

Sonia Scala          (Notary Public)

I, the undersigned officer of United States Fire Insurance Company, a Delaware corporation, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy is still in force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of United States Fire Insurance Company on the 22 day of Nov, 2016

UNITED STATES FIRE INSURANCE COMPANY

Al Wright, Senior Vice President